```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
    * * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. 21-CR-125
vs.                                )
                                   )
BRIAN McCREARY,                    )  April 1, 2022
                                   )  9:40 a.m.
              Defendant.           )  Washington, D.C.
    * * * * * * * * * * * * * * * *
```

**TRANSCRIPT OF SENTENCING HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

**APPEARANCES:**

FOR THE UNITED STATES:
                    BRANDON K. REGAN
                    DOJ-USAO
                    Federal Major Crimes
                    555 4th St NW
                    Washington, DC 20530
                    (202) 252-7759
                    Email: brandon.regan@usdoj.gov

FOR THE DEFENDANT:  JEFFREY DENNER, Pro Hac Vice
                    607 North Avenue
                    Suite 18, 2nd Floor
                    Wakefield, MA 01880
                    (617) 227-2800
                    Email: jad@dennerlaw.com

                    RICHARD D. HEIDEMAN
                    JOSEPH H. TIPOGRAPH
                    5335 Wisconsin Avenue, NW
                    Washington, DC 20015
                    (202) 463-1818
                    Email: rdheideman@hnklaw.com

ALSO PRESENT:       CARMEN NEWTON, Probation Officer,
                    via videoconference

Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1                    **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Matter before the Court,

3     Criminal Case No. 21-125, United States of America versus

4     Brian McCreary.

5              Counsel, please come forward and state your names

6     for the record.

7              Before that, Your Honor, probation officer

8     Ms. Newton is available via video.

9              THE COURT:  Via?

10             THE COURTROOM DEPUTY:  She is present via

11    videoconference.

12             THE COURT:  Videoconference, okay.

13             MR. REGAN:  Good morning, Your Honor.

14    Brandon Regan on behalf of the United States.

15             THE COURT:  Yes.  Good morning, Mr. Regan.

16             MR. DENNER:  Good morning, Your Honor.

17    Jeffrey Denner on behalf of the defendant.

18             THE COURT:  Okay.  I can't understand you.

19             Are you fully vaccinated and boosted?

20             MR. DENNER:  No.

21             THE COURT:  Okay.  Keep your mask on, then,

22    please.

23             MR. DENNER:  What I am is -- I am medically

24    compromised, so I can't; but I do test myself every day.

25             THE COURT:  Have you tested?  And you are

1    negative?

2              MR. DENNER:  I am.  I am.  I test myself every day

3    with a test that -- so if I may take it off.

4              THE COURT:  All right.  You may remove your mask,

5    then.

6              MR. DENNER:  Thank you, Your Honor.

7              Jeffrey Denner for the defendant, Brian McCreary.

8              THE COURT:  Okay.  Before you take your mask off,

9    are you fully vaccinated and boosted?

10             MR. HEIDEMAN:  Yes, ma'am.

11             THE COURT:  All right.  You may take your mask

12   off.

13             MR. HEIDEMAN:  Richard Heideman is my name; I am

14   here in Washington, D.C.  I am cocounsel with Mr. Denner.

15             And I am joined in the courtroom by Joseph H.

16   Tipograph of our firm who is in the courtroom, although he

17   will not be speaking today.

18             THE COURT:  All right.  Thank you.

19             MR. HEIDEMAN:  Thank you, Your Honor.

20             THE COURT:  All right.  And good morning,

21   Mr. McCreary.

22             THE DEFENDANT:  Good morning.

23             THE COURT:  All right.  So we're here this morning

24   for the sentencing of Brian McCreary, who pleaded guilty to

25   Count 2 of the indictment against him for entering or

1    remaining in a restricted building or grounds in violation

2    of 18 U.S.C. Section 1752(a)(1), which is a Class A

3    misdemeanor.

4           The sentencing hearing is being held in person,

5    but the public access line is being made available for

6    persons to listen to these proceedings remotely.

7           Anyone listening to this sentencing hearing over

8    the public teleconference line is reminded that, under my

9    Standing Order 20-20, recording and rebroadcasting of court

10   proceedings, including those held by videoconference, is

11   strictly prohibited.  Violation of these prohibitions may

12   result in sanctions including removal of court-issued media

13   credentials, restricted or denial of entry to future

14   hearings, or any other sanctions deemed necessary by the

15   presiding judge.

16          All right.  I start all my sentencing hearings by

17   reviewing all of the materials that I have reviewed in

18   connection with sentencing to make sure that all of the

19   parties are working from the same set of documents.

20          I have reviewed the probation office's presentence

21   investigation report docketed at ECF 37, and the probation

22   office's sentencing recommendation docketed at ECF 38.

23          I have also reviewed the sentencing memorandum

24   submitted by the government docketed at ECF 39; the

25   supplemental notice docketed at ECF 42 regarding an

1    additional piece of CCTV footage that was submitted to the

2    Court in aid of sentencing and in response to the Court's

3    minute order of March 28th, 2022.

4         I have also reviewed the eight videos listed in

5    the government's reports itemizing the video evidence

6    relevant to the statement of the offense associated with

7    Mr. McCreary's plea in this case; and as supplemented for

8    sentencing, docketed -- and those notices are docketed at

9    ECF Nos. 30 and 41.

10        I have also received the sentencing memoranda

11   submitted on behalf of the defendant docketed at ECF 40.

12        Does the government have all of those documents?

13        MR. REGAN:  I do, Your Honor.

14        THE COURT:  Am I missing anything?

15        MR. REGAN:  Not that I saw, Your Honor.

16        THE COURT:  All right.

17        Mr. Denner?

18        MR. DENNER:  Yes, Your Honor.  We have them all as

19   well.

20        THE COURT:  All right.  So, Mr. McCreary, stand

21   when I am addressing you, please.

22        You can just stay right where you are.

23        I do like to tell defendants who are standing

24   before me for sentencing how my sentencing hearing will

25   proceed.  Different judges do sentencings different ways.

1    They all comply with the rules, but within the applicable

2    criminal rule there are different ways to do things.  So I

3    like to tell defendants how I conduct my sentencing hearings

4    so you know what is going to be happening next during the

5    course of the hearing.

6              My sentencing hearing has four steps.

7              At the first step I am going to determine whether

8    the government or you and your counsel have any objections

9    to any of the factual or other portions of the presentence

10   investigation report; and if there are any objections, I

11   will resolve those.

12             The second step is to determine how the advisory

13   guidelines apply in your case.  Your offense of conviction

14   is a Class A misdemeanor so the federal guidelines do apply

15   in your case.  And I will review how the guidelines apply

16   and what the recommended sentencing range is under the

17   guidelines.

18             The third step is to hear from the government

19   first, then I will hear from your counsel.  And, lastly, I

20   will give you an opportunity to speak to me directly if you

21   wish.  I haven't heard directly from you in this case, so

22   this is your opportunity to talk to me directly about what

23   an appropriate sentence is in your case.

24             The last step requires the Court to explain the

25   sentence I am about to impose, and impose sentence.

```
1                    Do you understand what is going to be happening in

2       the next hour or so?

3                    THE DEFENDANT:  Yes, Your Honor.

4                    THE COURT:  All right.  You may be seated.

5                    So looking at the presentence investigation report

6       that was filed December 22, 2021, I understand, Mr. Regan,

7       that the government has no objections to any of the factual

8       or other determinations set out in the PSR; is that correct?

9                    MR. REGAN:  That's correct, Your Honor.

10                   The government originally lodged an objection

11      which I think was a typo; but that has since been corrected

12      in the finalized sentence report.

13                   THE COURT:  All right.  Mr. Denner -- you don't

14      have to come up -- but I also understand that the defense

15      has no objection to any of the factual statements in the

16      presentence investigation report; is that correct?

17                   MR. DENNER:  That is correct, Your Honor.

18                   THE COURT:  All right.

19                   Mr. McCreary, please stand right where you are.

20                   Are you fully satisfied with your attorneys in

21      this case?

22                   THE DEFENDANT:  I am, Your Honor.

23                   THE COURT:  Do you feel that you have had enough

24      time to talk to your attorneys about the probation office's

25      presentence investigation report, the sentencing
```

1     recommendation, the papers filed by the Government in

2     connection with your sentencing?

3                    THE DEFENDANT:  I have, Your Honor.

4                    THE COURT:  All right.  You may be seated.

5              All right.  Hearing no objection from either side,

6     the factual portions of the presentence investigation report

7     will be accepted as undisputed and as my findings of fact at

8     sentencing as supplemented by review of the video evidence

9     exhibits in this case.

10             All right.  So no objection has been raised to the

11    presentence investigation report's description of how the

12    federal sentencing guidelines apply in this case.  The

13    parties seem to agree to the guideline calculation.  And

14    this is such an important part of the sentencing, I am

15    required to review precisely how I determine the guidelines

16    apply, which I will do now.

17             We're at step two of the hearing, Mr. McCreary,

18    for your information.

19             Starting with the criminal history category that

20    Mr. McCreary falls in, the presentence investigation has

21    found that Mr. McCreary has no prior criminal convictions

22    and, thus, his criminal history score is zero; and his

23    criminal history category is 1.

24             The offense of conviction at 18 U.S.C. Section

25    1752(a)(1) of entering and remaining in a restricted

building or grounds is subject to the guideline at Section

2B2.3, which starts with a base offense level of 4 for a

trespass offense; and then two offense levels are added

because the trespass occurred at any restricted building or

grounds under the guideline at Section 2B2.3(b)(1)(A)(vii).

And two offense levels are subtracted for defendant's

acceptance of responsibility under the guideline at Section

3E1.1(a); resulting in a total offense level of 4 which, in

combination with his criminal history category of 1, results

in an advisory guideline sentencing range of zero to 6

months imprisonment or up to three years probation under the

guidelines.

Any period of imprisonment may be followed by up

to one year of supervised release, which is also the

statutory maximum; a fine range of $500 to $9500; and a

special assessment of $25 for the single count of

conviction.

Are there any objections to the record about this

guideline determination from the government, Mr. Regan?

MR. REGAN:  No, Your Honor.

THE COURT:  Mr. Denner?

MR. DENNER:  No, Your Honor.

THE COURT:  All right.  So I am now going to turn

to the parties -- we're at step three of the sentencing

hearing -- to discuss application of the factors under

1    18 U.S.C. Section 3553(a) on the divergent sentencing

2    recommendations that I have received in this case.

3           The government recommends three months home

4    detention, 36 months or 3 years of probation, 60 hours of

5    community service, and $500 of restitution.  That's compared

6    to the defense request for half that period of probation, or

7    18 months probation, and 150 hours of community service, and

8    $500 of restitution; and the probation office's

9    recommendation of just 18 months probation with no community

10   service.

11          So, in other words, the government recommends no

12   prison time here; and the defense and the probation office

13   recommend half the period of probation recommended by the

14   government.

15          So those are the recommendations I have received

16   from the parties and from the probation office.

17          So let me start, Mr. Regan, with the government.

18          MR. REGAN:  Thank you, Your Honor.

19          THE COURT:  I don't know what you want to begin by

20   talking about, but I want to begin by talking about the CCTV

21   footage.

22          MR. REGAN:  Yes, Your Honor.

23          THE COURT:  So that was in response to my order

24   asking for any additional video footage, in addition to that

25   provided for the plea.  The government supplied the CCTV

1    footage, which I looked at.

2            And I was fairly surprised by what I saw on the

3    CCTV footage, so I asked the government to -- it had not

4    been described in either parties' papers.  You have had the

5    discovery -- the defense has had the discovery for some

6    time; I am sure the government has had it for some time.

7            And the government then supplemented its

8    submissions in this case to describe what -- and confirmed

9    what I had seen in this CCTV footage.  And, specifically,

10   this was CCTV footage from inside the Capitol focused on the

11   Senate wing door, at a very critical time period, at about

12   2:13 p.m. on January 6th.

13           And as the government explains in its response to

14   my minute order, the submitted CCTV footage, in fact, shows

15   that Defendant used a pole-like object to assist other

16   rioters who were attempting actively to shatter a window at

17   the Senate wing entrance, an effort that ultimately was

18   successful; and people can be seen jumping through that

19   window -- that broken window -- to get in.

20           The conduct that appears in that CCTV footage

21   appears to contradict the government's representations in

22   its sentencing memo that -- and I quote:  Defendant did not

23   engage in violence or property destruction during the riot.

24   That was at the government's memo docketed at ECF 39, at

25   page 2.

1           And I appreciate, in the government's recent

2      supplement, where it acknowledged the omission, apologized;

3      and I totally understand that there are terabytes of

4      information that the government has collected in connection

5      with January 6th.  And this was a few seconds on this video.

6      It is not a surprise that the government might sometimes

7      miss a few seconds in a video of a defendant's conduct.

8           So thank you for your apology, Mr. Regan, not

9      entirely necessary.  In the context, it's totally

10     understandable how certain things will be missed.

11          Then when the mind is focused at the time of

12     sentencing when I, as the sentencing judge, want to make

13     sure I understand all of the facts -- all of the aggravating

14     and all of the mitigating factors that should go into

15     fashioning an appropriate sentence in this case -- I

16     understand that's a focused set of -- focused attention on

17     one area in the evidence submitted that is different from

18     having to deal with the terabytes of information the

19     government has had to deal with.

20          But I want to make sure that I understand that,

21     now having focused on that CCTV footage, is the government

22     standing by its sentencing recommendation in this case?

23          MR. REGAN:  It is, Your Honor, for a couple of

24     reasons.

25          The omission in the original sentencing memo is

1   not an omission that we didn't know that fact existed.  When

2   we drafted -- when I drafted the sentencing memo, I think

3   that that fact falls squarely into, sort of, the description

4   of the defendant's actions that day as a whole.

5        Now, while he -- the government stands by -- it

6   doesn't appear that he destroyed any property or assaulted

7   anybody.  Really, the gravamen of the defendant's offenses

8   that day is he is surrounded by people who are doing just

9   that, which is perhaps the most aggravating circumstance for

10  the defendant in this case.  That is just another example

11  of -- when he walks through the door that is very clearly,

12  while he's standing there, kicked open from the inside by

13  two people who are hanging from the doorway trying to kick

14  it open.

15       This is just another example of -- the defendant

16  very clearly knows what is happening around him.  He sees

17  the window smashed in.  Even if he doesn't walk up to that

18  window, you can see him through the window as people are

19  punching the glass.  So the government thinks that that is

20  captured in, sort of, the defendant's understanding of what

21  is happening that day even if he is not the one actually

22  breaking windows or chasing officers or yelling obscenities.

23  The government, sort of, captures that in what he sees

24  happening that he cannot deny.

25       THE COURT:  All right.  So what I saw on the CCTV

1    footage was clearly other rioters punching, shattering the

2    window, starting with, you know, one rioter hitting the

3    window, and it begins to shatter; it hasn't completely

4    fallen out.  And they keep -- other rioters keep hitting it.

5    Then a guy with a boot comes -- hangs on a lintel and, you

6    know, kicks in one other side of the window.

7            I see this defendant with a pole because he has a

8    flag stuck in his backpack when he goes into the Capitol

9    Building.  He uses that flagpole that he's also jabbing at

10   the window.  So you don't view that as an active

11   participation in the breaking of the window?  Because that's

12   what it looked like to me.

13           But the government doesn't see that?

14           MR. REGAN:  Your Honor, I wouldn't -- it depends

15   on, I guess, how we characterize "active participation."

16           I don't think it's something would lead the

17   government to charge him with destruction of property like

18   we have charged other defendants.  But, again, I think it is

19   certainly germane to the discussion of what it is the

20   defendant is doing and what is happening around him.

21           My understanding is that that flag is one of the

22   small then-president Trump flags that was being handed out

23   at some of the rallies.  It certainly doesn't excuse the

24   fact that the defendant is, sort of, prodding around.  It's

25   difficult to tell in the video whether or not he actually

1    makes contact with the window.  I think it's clear he

2    doesn't actually break the window, but everybody --

3              THE COURT:  Well, there are other people --

4              MR. REGAN:  Right.

5              THE COURT:  -- the other people around him are

6    clearly being aggressive in breaking the window.

7              MR. REGAN:  That's correct, Your Honor.

8              But I do think it is absolutely a circumstance to

9    be considered, much like every other circumstance that we

10   have seen on the defendant's own videos where he sees very

11   clearly what is happening around him and does nothing to

12   stop it or remove himself from the situation.

13             THE COURT:  All right.  And so the government's

14   view is that -- as it represents in its memo, that the

15   defendant did not cause any damage to the U.S. Capitol

16   property himself?

17             MR. REGAN:  That's correct, Your Honor.

18             THE COURT:  All right.  Well, let me tell you --

19   well, let me ask also.  During this time period -- the time

20   stamp on the video is about 2:13.  And it starts on the CCTV

21   footage with a very calm, you know, empty corridor, very

22   quiet; you know, one staffer with a badge walks down the

23   corridor.  And then, all of a sudden, the rioters reach that

24   doorway and the footage lasts for another -- almost,

25   approximately, three minutes.  So it's from 2:13 until about

1    2:16 -- maybe into 2:17, but probably 2:16.

2              So based on all of the things I have read, the

3    Senate Chamber and the Vice President weren't evacuated

4    until about 2:20.  So they were -- this footage of people

5    breaking into that Senate wing door -- breaking the windows

6    and coming into the door were actually before there was any

7    evacuation in process; is that right?

8              MR. REGAN:  That is my understanding as well, Your

9    Honor.

10             And as I am sure the Court is well aware, the

11   government at this point in the investigation has concluded

12   that that 2:13 p.m. breach is actually the first actual

13   breach of the building.  So at that point there wasn't any

14   real need to evacuate because, while there was chaos

15   happening outside, it had not yet gotten to the point where

16   people were actually inside the building.

17             And when you watch the CCTV footage, you can

18   actually sort of -- as you look through the Senate wing

19   door, you can see people streaming up the steps; and some of

20   that you can also see, in Mr. McCreary's videos, where the

21   police are now overrun at, sort of, that exact moment in

22   time; and that's when they start descending upon the steps.

23   And it's only a minute or so later that the glass is

24   shattered and then broken, and then that individual wearing

25   all of the paramilitary gear starts to kick the door open

1    from the inside.  But that is correct, Your Honor.

2              THE COURT:  Right.  And so if you follow the

3    sequence of the videos in this case, you have Mr. McCreary

4    being among the first people to breach the Capitol on

5    January 6th, right?

6              MR. REGAN:  Yes, Your Honor.  Based on my count,

7    one of the first 30 or so.

8              THE COURT:  First 30.  Right.

9              He was actively trying to use his flagpole to help

10   break that window, even though the government says he didn't

11   destroy any part of the building at the Capitol; is that

12   right?

13             MR. REGAN:  I would encourage at a minimum, yes,

14   Your Honor.

15             THE COURT:  And then we have more video footage

16   where this crew -- the first people to breach the Capitol on

17   January 6th by breaking in the door and the window in the

18   Senate wing -- was a crowd that then confronted Officer

19   Goodman, right?

20             MR. REGAN:  That's correct, Your Honor.

21             THE COURT:  And you hear all sorts of people

22   making -- refusing to disperse, to put it bluntly, when

23   Officer Goodman told them to disperse.

24             MR. REGAN:  Yes, Your Honor.

25             THE COURT:  And then you see the video footage of

```
1    this defendant following this crowd chasing Officer Goodman

2    as he's leading them away from the Senate Chamber because

3    members of Congress had not been evacuated yet, leading them

4    away, up the stairs where there was a line of police

5    officers, right?

6              MR. REGAN:  That's correct, Your Honor.

7              THE COURT:  And this is a defendant who then went

8    up those stairs, following Officer Goodman, chasing him; and

9    then another line of police officers, up the stairs, tells

10   them all to disperse.  And this defendant is in that crowd

11   being told to disperse again and leave the building, right?

12             MR. REGAN:  That's correct, Your Honor.

13             THE COURT:  And so this defendant at some point

14   does leave the Capitol Building, right?

15             MR. REGAN:  He does, Your Honor.

16             THE COURT:  But he comes back in complete defiance

17   of those police orders to leave, right?

18             MR. REGAN:  That's correct, Your Honor.

19             THE COURT:  So this is a defendant I have in front

20   of me who also entered the building twice, right?

21             MR. REGAN:  That's correct, Your Honor.

22             THE COURT:  And the government's recommendation is

23   probation?

24             MR. REGAN:  90 days of home detention, excuse me,

25   yes, with probation.
```

1              THE COURT:  But as a special condition of

2     probation?

3              MR. REGAN:  Correct, Your Honor.

4              THE COURT:  All right.  And I need some help

5     understanding why the government is only requesting a

6     probationary sentence here with some home detention.  And

7     it's -- actually, I think you're only recommending 2 months

8     of home detention, not 90 days.  Why?

9              Because I have cases in front of me with other

10    defendants who pleaded guilty to a lower Class B petty

11    offense -- not a Class A misdemeanor like this defendant --

12    Class B petty offense misdemeanor of parading, picketing,

13    and demonstrating, who entered the Capitol only once -- and

14    spent less than ten minutes inside the building, didn't

15    contribute at all in any fashion to any property damage in

16    the Capitol, didn't even try to -- and the government has

17    recommended incarceration in those cases.  I have to tell

18    you, Mr. Regan, I am really puzzled about this.

19             For example, I had a case 21-CR-456 involving

20    Brian Stenz.  He was inside the Capitol for eight minutes,

21    pleaded guilty to the petty offense of parading,

22    demonstrating, and picketing; and the government requested a

23    split sentence of 14 days incarceration and 36 months

24    probation.

25             Another case, Samuel Fox -- I am not sentencing

1    him until next week -- 21-CR-435, he pleaded guilty also to

2    a Class B misdemeanor, not a Class A misdemeanor like this

3    defendant; and the government requested 30 days

4    incarceration for Mr. Fox, followed by 36 months probation.

5    And that -- Mr. Fox was inside the Capitol for two minutes,

6    one time, two minutes; 30 days for two minutes.

7         Could you explain to me what it is about this

8    defendant, Mr. McCreary -- given his offense conduct as I

9    see it -- that with his plea of guilty to a Class A

10   misdemeanor, why does his conduct warrant a probationary

11   sentence with some home detention, a less severe penalty

12   than Mr. Stenz and Mr. Fox?

13        MR. REGAN:  Yes, Your Honor.  So I am going to

14   skip over the --

15        THE COURT:  And, I mean, I have to tell you, I

16   understand that there are a lot of cases and, you know, I

17   understand that the government has to, you know, make

18   decisions, and the decisions that the government makes

19   evolve over time.  I mean, all of the sentencing memos say,

20   oh, at the very beginning of this we were offering straight

21   probation sentences; you know, our thinking has evolved.

22        I understand evolution of sentencing.  But we sit

23   here today, more than a year after the events on January 6,

24   2021, and I have got sentencings that are basically

25   concurrent; so it's hard to -- I am puzzled.

1           MR. REGAN:  Yes, Your Honor.

2           So one of the things that the Court noted, I

3    think, that is definitely part of the government's calculus,

4    I will stay to start, there was -- this was a close call for

5    the government, absolutely.  And we certainly went back and

6    forth on what an appropriate sentence recommendation would

7    be in this case.

8           In addition to all of the aggravating factors,

9    which the Court has laid out probably more eloquently than I

10   could, the government determined that some of the mitigating

11   factors in this case were fairly strong.  As an overall

12   investigation, with the Court having been familiar with --

13   starting on January 6 -- the monumental efforts taken by law

14   enforcement and the government and the courts, to be quite

15   honest, to try and get this investigation off the ground,

16   the government views cooperation with law enforcement early

17   on as something that should be rewarded in terms of a

18   mitigating --

19          THE COURT:  But what is weird is there is no

20   cooperation provision in the plea agreement for this

21   defendant, not even -- there is cooperation -- the standard

22   cooperation that you usually see in guns and drugs cases,

23   which is wholesome, fulsome cooperation, down to testifying

24   in front of a grand jury, testifying in court; you have got

25   to spill everything you know, you have got to open up your

1      life -- that's the normal cooperation provision.

2              In these cases, in a lot of the plea agreements,

3      the cooperation has been, basically, you will sit down with

4      one interview with law enforcement; maybe you will -- maybe

5      you will let the government look at your phone or social

6      media.  I mean, it is such a -- it's hard to call it a

7      "cooperation provision," but that's what the title is that

8      the government has been giving it in the plea agreements.

9      This defendant doesn't even have that cooperation provision

10     in his plea agreement.

11             MR. REGAN:  Yes, Your Honor.  And perhaps

12     "cooperation" is not the right word, or at least in the

13     legal sense of the word.

14             What I am referencing is -- so on January 6th, the

15     defendant does what the Court just described; he then drives

16     back to Massachusetts.  That very night it takes him roughly

17     seven hours to get home.  He himself posts to the FBI tip

18     line; now, concededly in a somewhat self-serving fashion.

19     But what he does do is he provides his name, exactly where

20     he was, where he lives; and then he provides the videos that

21     have been provided to the Court.  At --

22             THE COURT:  Okay.  So let's look at that.

23             And I am curious about the motivation because I --

24     I mean, this defendant -- and based on the papers I have

25     read -- really thought that he was going to be combating

1    Antifa, or something, on January 6th.  And I am a little

2    curious about whether he thought he was submitting

3    recordings that were going to help the FBI investigate

4    Antifa, not himself, or any of the fellow rioters who were

5    promoting, as he was, some stopping of the peaceful

6    transition of power with the Electoral College vote count

7    and certification.  So, yes, he turned over a bunch of

8    recordings.  But is the government confident that it has all

9    of the recordings that he made that day?

10            MR. REGAN:  To the extent possible, yes, Your

11   Honor.  So when --

12            THE COURT:  Because -- did you obtain a copy --

13   did you obtain his phone?

14            MR. REGAN:  We did, Your Honor.  And we obtained

15   his digital devices from his home which he provided consent

16   to -- we had a warrant for anyway.  But he did provide

17   voluntary consent for those which is, sort of, when you look

18   at this on the spectrum or the timeline of this case -- and

19   I completely agree with the Court, there is a self-serving

20   nature to the original disclosure to the FBI; and I think

21   that is somewhat colored by the Antifa rhetoric which, I

22   think, the defendant makes very clear he thought played a

23   role -- at least back then played a role in that.  And there

24   is also --

25            THE COURT:  So is it the government's view that --

1   you say it was self-serving.  But he produced all of those

2   tapes because he was help- -- trying to help the FBI

3   investigate Antifa?

4           MR. REGAN:  Not entirely, Your Honor.

5           Again, this is somewhat speculative based on

6   what -- piecing together portions of the videos and some of

7   the things he tells law enforcement.  When he submits those

8   videos originally, if you look at the evidence as a whole, I

9   think it's a fair conclusion that he does think that Antifa,

10  at that moment in time at least, had something to do with

11  triggering the violence and the chaos that day.

12          He also -- with the FBI tip line, I don't know if

13  the Court has seen what the tips look like; but you are

14  limited to a certain number of videos and a certain number

15  of words per tip, sort of like Twitter.  But the way he --

16          THE COURT:  I wasn't aware of that.

17          MR. REGAN:  So he actually posted multiple times

18  on the tip line because he couldn't fit all of his videos in

19  the first one.  There is a little bit of, sort of,

20  Robin Hood-esque language in there that:  There were people

21  doing things that I didn't think they should be doing,

22  whether they were Antifa or not.  I want to help the FBI, so

23  here are some of those videos.

24          Concededly, the defendant isn't doing the same

25  things as everybody around him; but there is somewhat of a

1    self-serving flavor to the way he is describing it, as

2    though he is -- at that time, it is the government's

3    understanding that he thought he was a citizen journalist.

4    And when he was reporting to the FBI, he was reporting in a

5    quasi-investigative journalist capacity as reporting what he

6    saw; and what his motivations were for entering the building

7    at that time were to record what was happening around him.

8            When you look at all of the videos in context and

9    what we know now about the defendant, that is obviously not

10   entirely true because we know his motivations were also

11   guided by the misperceptions of the 2020 presidential

12   election.  But when the government looks at those --

13           THE COURT:  And by the CCTV footage showing him

14   using a flagpole to help break a window in the Capitol.

15           MR. REGAN:  Correct, Your Honor.  That's why I

16   color that as "self-serving" with respect to identifying

17   himself to the FBI.

18           But I think what is worth acknowledging -- and

19   perhaps the defendant didn't realize he was doing this at

20   the time -- he does identify himself -- he is one of the

21   very first rioters to self-identify as being present.  And

22   he has perhaps the misfortune -- there is no evidence to

23   suggest he knows these other people -- of being near, at the

24   time, what was the most identifiable person in the Capitol

25   riots investigation, Jacob Chansley.  In fact, Mr. --

1          THE COURT:  Is this the guy with the horns?

2          MR. REGAN:  The QAnon Shaman, yes, Your Honor.

3     In, sort of, the photo that was pushed very wide by USA

4     Today, he's standing off to the side of Mr. Chansley.

5          But the government still does put some stock in

6     the fact that he does self-identify to the FBI regardless of

7     his motivations.  He is obviously then a known quantity to

8     the FBI, and he submits to a voluntary interview.  He also

9     provides all of the digital devices in his home to include

10    some that actually belong to his daughter; and the FBI did

11    look through those.  And I think those steps very early on

12    in the investigation -- in an investigation that was in its

13    infancy, and perhaps at the time we didn't even realize how

14    sprawling it truly would be -- did aid law enforcement;

15    specifically aided law enforcement in addressing and

16    identifying -- or at least seeing video of others who were,

17    sort of, higher up on the pecking order in terms of what

18    happened that day, the Chansleys of the world, the other

19    individuals that were chasing Officer Goodman, the other

20    officers [sic] that were actually engaged with law

21    enforcement outside the Senate chambers at roughly 2:17 p.m.

22         THE COURT:  And when you say that other people

23    were chasing Officer Goodman, why don't you include this

24    defendant?  Because it looked like a crowd chasing Officer

25    Goodman, and he was helping to facilitate the threat that

1   crowd posed to Officer Goodman, putting aside everybody else

2   who had not been evacuated yet from the Senate Chamber.

3          So why is it that you think that he wasn't chasing

4   Officer Goodman and it was only other people in the crowd

5   who were doing that?

6          MR. REGAN:  Your Honor, I agree with the Court's

7   characterization.  I think when I look at that crowd, and we

8   watched not only the videos that the defendant has provided

9   but the CCTV footage from inside of the building, he is

10  certainly part of the crowd.  And I think the defendant --

11  other than entering the building and his motivations for

12  being there, one of the most aggravating factors is that the

13  people he is surrounded with are doing perhaps some of the

14  most egregious things on January 6; and he is at least, by

15  his mere presence, associating himself with that.  He is

16  certainly part of the crowd that is chasing Officer Goodman

17  in the sense that he is one of many.

18         And the government's position throughout this

19  entire investigation is that it would be very difficult for

20  January 6 to occur if it were one person or twenty people or

21  fifty people.  But the group mentality and the mob mentality

22  are what made this possible, and Mr. McCreary is certainly

23  part of that.

24         Now -- but when you look at his conduct inside the

25  building compared to those surrounding him, that's where the

1    government made distinctions because, although he is part of

2    the group, he is not part of the group that's screaming at

3    law enforcement or threatening them; he is not carrying a

4    weapon; he is not -- I mean, I don't want to compare him to

5    the QAnon Shaman because he's probably at the top of that

6    pecking order; he doesn't have any leadership role.

7         This also goes into when the government looked at

8    some of the digital evidence and the interviews with the

9    defendant, he is sort of a lone wolf.  He is not affiliated

10   with anybody there.  We were unable to find any affiliations

11   to any paramilitary, right-wing, or alt-right groups; there

12   was some mention of QAnon --

13        THE COURT:  Mr. Regan, all of those factors that

14   you have just said, you know, no leadership role, lone wolf,

15   you know, not part of a larger conspiracy, didn't take a

16   leadership role even on the day of January 6th, even though

17   he -- Mr. McCreary was really among the first 30 people to

18   breach the Capitol, and that applies to so many of the other

19   defendants who -- because of those factors -- were

20   allowed -- were extended plea offers by the government to

21   Class B petty offenses, and the government still asked for

22   jail time for them.

23        So do I take it, from what you are saying, is that

24   this defendant is being given a break by the government

25   because of his activity, self-serving as it may have been --

1    misguided because he actually thought that he was providing

2    information to investigate Antifa, as opposed to himself and

3    the fellow rioters -- because he provided videotapes the

4    night of January 7, 2021?

5            MR. REGAN:  That is one of what the government

6    considers one of the most compelling mitigating

7    circumstances in this case; that's correct, Your Honor.

8            THE COURT:  And, I mean, I do -- I am fully

9    appreciative of the fact that cooperation with the

10   government has to be acknowledged.

11           And I think that the government has also -- is

12   also right when it says that -- in one of its briefing

13   memos, at page 2, that the defendant entered into a plea

14   agreement at the earliest possible time because I think that

15   early acceptance of pleas is an acknowledgment and should be

16   acknowledged at sentencing, for acceptance of

17   responsibility, an appreciation by the defendant of the

18   severity and seriousness of the offense conduct; and that is

19   acknowledged by sentencing judges because it also is a part

20   of the calculation as to the risk a particular defendant

21   poses for recidivism, engaging in future offense conduct, if

22   they're acknowledging with a prompt plea and acceptance of

23   responsibility of what they did.

24           So I look at the facts in this case to evaluate --

25   as in every case, I look at how long did it take from arrest

1    to plea; how long did that take?  In this case, it took six

2    months.

3            I mean, I have seen in cases like -- one case in

4    front of me, Leonard Gruppo, 21-CR-391, where the turnaround

5    time from arrest to entry of plea was less than three

6    months, rather than the six months here.  And in

7    Mr. Gruppo's case -- to a petty offense, by the way, Class B

8    misdemeanor -- the government recommended 30 days'

9    incarceration.

10           So I do agree with the government, as a general

11   policy matter, that prompt acceptance of the plea, prompt

12   acceptance of responsibility, appreciating the seriousness

13   of the offense conduct, yes, that can be acknowledged at

14   sentencing as a clue, you know, one of the things we look

15   for in terms of remorse and risk of re-offending by engaging

16   in similar other criminal conduct.  And it's hard for me to

17   see that there was a prompt acceptance of responsibility

18   here.

19           MR. REGAN:  So, Your Honor, I think Mr. Denner

20   would probably tell you the same thing, but that was the

21   earliest that the government made a plea available to

22   Mr. McCreary.

23           I am not entirely familiar with Mr. Gruppo's case;

24   but I can tell based on the fact that he pled to parading,

25   demonstrating, or picketing, that he wasn't originally

1    charged with a felony where as Mr. McCreary was.  There were

2    also some inner machinations within the government in terms

3    of getting pleas out to certain classes of defendants based

4    on their charges in their original indictments.

5           But I will say that this is the first plea offer

6    that was offered to Mr. McCreary; and it was not offered as

7    early as some of the earlier defendants based on the facts

8    of this case and some of the surrounding circumstances that

9    he was involved in himself or the surrounding defendants.

10   But in terms of early acceptance of responsibility, the

11   government would characterize this as that.

12          THE COURT:  All right.  So let me explore with you

13   a little bit one of the peculiarities of the sentencing

14   scheme for Class A misdemeanors because it's statutorily --

15   for a Class A misdemeanor, statutorily the person would be

16   subject to up to five years probation -- guidelines, three

17   years -- which is what the government is asking for here;

18   three years probation, with some special conditions of home

19   detention.

20          And it is the case that I and I think some of my

21   colleagues, certainly, have been imposing lengthy periods of

22   probation, 36 months generally, to -- particularly for

23   defendants who have been demonstrably, by their conduct on

24   January 6th, susceptible to believing lies about a stolen

25   election and participating in mob action to stop the

1    peaceful transition of power, and so the 36 months of

2    supervision, by our amazing and good probation office, would

3    take them through the next midterm elections and

4    presidential election, and help ensure peaceful transitions

5    of power in the future -- at least in the near future.

6           And it is one of the -- as I said, the

7    peculiarities of Class A misdemeanors that, if a defendant

8    is sentenced to a term of imprisonment, they can only be

9    sentenced to one year of supervision after any period of

10   straight imprisonment; one year of supervision, not 36

11   months.

12          And the split sentence bar, which we have had some

13   debate about between the judges on the court and the

14   government -- I wouldn't say "debate" -- discussion about

15   whether the split sentence bar applies to petty offenses, it

16   plainly, indisputably applies to Class A misdemeanors and

17   felonies, right?

18          MR. REGAN:  Correct, Your Honor.

19          THE COURT:  So is it -- is part of the reason that

20   the government is seeking only a sentence of three years'

21   probation here is to maintain this defendant who was plainly

22   susceptible to believing what he was hearing and seeing

23   online to these conspiracy -- weird conspiracy theories and

24   lies?

25          Is that part of the reason that the government is

1    asking for three years of probation here because of the

2    split sentence bar, and the fact that if he were sentenced

3    to a term of imprisonment he statutorily -- statutorily he

4    could only be supervised for at most one year after?

5              MR. REGAN:  Yes, Your Honor.  It is absolutely

6    part of the calculus, and more so with respect to the term

7    of probation that is available.

8              I think the Court has aptly noted the length of

9    probation puts us through a period of what I would

10   anticipate is at least some transition in government, and

11   the overall fervor -- and I think this defendant is actually

12   a pretty good case study in the susceptibility of even just

13   average Americans for the transition of power.  And we are

14   now --

15             THE COURT:  I would not say that.  There were

16   thousands of people participating in the Capitol breach on

17   January 6th.  I would not call them "average Americans."

18   Most Americans were shocked and appalled by what they saw.

19             MR. REGAN:  Your Honor, I only say that to lead to

20   my next point, which is, 15 months later it is still

21   dominating the headlines on what is relevant political

22   discourse in this country; and it is perhaps even more

23   relevant lately than it was a month ago.  It died off a

24   little bit, after January 6th; and it is now dominating the

25   headlines again.  So it is certainly a factor, as the Court

1     noted, for both specific and general deterrence looking

2     forward towards pending events in U.S. government.

3                 THE COURT:  Okay.  Anything further, Mr. Regan?

4                 MR. REGAN:  If I could, Your Honor, just very

5     briefly.

6                 The Court has asked some pointed questions that I

7     think have put me on the opposite side of the table, so to

8     speak, in terms of --

9                 THE COURT:  We're having a discussion.  I count

10    this as part of our adversarial process.  I ask questions as

11    I am thinking through tough issues, difficult issues; and

12    sentencing, in these cases, does present some tough issues,

13    also in terms of compliance with a statutory directive under

14    18 U.S.C. Section 3553(a)(6) to avoid unwarranted sentence

15    disparities.

16                And I know that the government, when it makes its

17    sentencing recommendations, is also considering that just as

18    I am required to; and so getting the benefit of the

19    government's thinking on this is helpful as I'm evaluating

20    that factor.

21                MR. REGAN:  Yes, Your Honor.  And I certainly was

22    not meaning to impugn the questions.  I just wanted to make

23    clear on the record the government's position is that what

24    the defendant did on January 6th is reprehensible,

25    inexcusable, and is part of what the core problem was on

 1    January 6th.

 2                Now, when the government is discussing mitigating

 3    factors, I just want to make sure that that is clear.  We

 4    are in no way excusing Mr. McCreary's actions that day.  We

 5    are trying to place him on a spectrum in what has been an

 6    arduous process trying to create a sentencing regime where

 7    we avoid unwarranted sentencing disparities, and we sentence

 8    like defendants similarly.  But just to be plainly clear, in

 9    no form or fashion is what the defendant did on January 6th

10    excusable in any sense of the word.

11                That's all I have, Your Honor.

12                THE COURT:  Thank you, Mr. Regan.

13                MR. REGAN:  Thank you.

14                THE COURT:  Mr. Denner.

15                MR. DENNER:  Yes, Your Honor.  Thank you.

16                THE COURT:  I want to give you an opportunity to

17    comment on the CCTV footage also that was submitted on

18    March 24th in response to the Court's order.

19                MR. DENNER:  Yes, Your Honor.  I will.

20                And I appreciate -- initially, I would like to

21    tell you that I appreciate you permitting me to appear pro

22    hac vice in this case.

23                Your Honor --

24                THE COURT:  Well, let me just start with a

25    question.  Having seen the CCTV footage -- and I take it the

 1    parties had seen it long before it was submitted to the

 2    Court for my review.

 3              Do you still stand by your representation in your

 4    sentencing brief that defendant did not himself engage in

 5    any violent conduct on January 6th, and that his conduct

 6    arguably facilitated, if only indirectly, the assault on the

 7    Capitol?

 8              MR. DENNER:  Your Honor, that's a difficult

 9    question to answer.

10              Let me start by saying I am surprised to find

11    myself on the defense side of this case.  I am someone who

12    is so in love with America and the thought of democracy

13    given my background -- I don't normally get into that, but

14    being a former Marine, having my family come over from

15    Eastern Europe as a result of the Holocaust, and America

16    taking them in many, many years ago, I -- when I first heard

17    this, it was beyond enduring what I was hearing was an

18    assault on democracy, and I haven't changed that thought at

19    all.  I have not changed that thought at all, and I am

20    surprised to be here in front of you today.

21              With all respect -- and I mean that -- every

22    question you are asking are the questions I have asked

23    myself over time as well.  I think you have this defendant

24    very wrong.  I think I even had him wrong at first when I

25    first started talking about it and looking into the whole

 1    thing.

 2              I will tell you that what he did is inexcusable;

 3    and I think he realized that on January 6th what he did was

 4    inexcusable.  I think -- as he was driving back home on the

 5    night of January 6th going into January 7th, I think he

 6    realized that.  Nothing is black and white in this case;

 7    it's all grays.  And the notion it's a self-serving

 8    component to what he did is, on some level, true.

 9              I have had the opportunity, as an officer of the

10    court, to speak to him extensively.  I have had an

11    opportunity to look at all of this and to understand this

12    man, his background.  I have had multiple conversations with

13    Mr. Regan about it all --

14              THE COURT:  Can I just pause you for just a

15    second --

16              MR. DENNER:  Yes.

17              THE COURT:  -- because Mr. Regan said that

18    Mr. McCreary, by sending some of his recordings -- many

19    recordings to the FBI on the night of January 7th -- was

20    engaging in a self-serving act.  So was that self-serving in

21    order to inoculate himself from criminal liability to be the

22    good guy wearing the white hat to help the FBI, or was it

23    also self-serving to assist the FBI in pursuing what this

24    defendant perceived to be Antifa-generated violence?

25              MR. DENNER:  Your Honor, with all due respect, I

1     think you are simplifying a very complex situation.  I don't

2     think that's what Mr. Regan has said.  I have had the

3     advantage of speaking with him 25 times.

4              I think what he's telling you as a prosecutor is

5     that it's hard to get inside someone's head and their heart

6     and see what they're really thinking and doing.

7              There is an element of self-serving if you think

8     that that night, when he was driving back, that his acuity

9     was such that he realized:  I can be in trouble here; I was

10    in there.  This is wrong.  I better do something to fix

11    that; and he realized that all by the wee hours of the next

12    morning being exhausted driving home, and that's why he did

13    this.  Can I tell you with certainty that that wasn't part

14    of his motivation?  I cannot.

15             Can I tell you with better certainty that if it

16    was it was far lesser consideration for him than the shock

17    that he had of what had happened during that day and the

18    path he'd got caught up in?  And he recognized the fact that

19    when you have a riotous mob and that he was part of it, that

20    that was something that shouldn't have been done, and he was

21    shocked -- he was shocked at what happened there.  He was

22    shocked at the violence, at the savagery.  And if he ever

23    thought -- if he thought it was Antifa at first, it was only

24    at first; and he should be excused for that.

25             This is a man who is living in semirural western

1    Massachusetts, has absolutely no criminal record.  He is a

2    family man; he has got a five-year-old child -- all of the

3    things you have read -- a wife; he's gainfully employed his

4    whole life.  He has had no problem anywhere; he's not part

5    of any alt-right group, any alt-left group.

6          But what is he hearing after the election for

7    weeks and months?  What is he -- I mean, he has got an

8    associates' degree that he barely got.  He's not a

9    particularly educated guy, and he's not a particularly smart

10   guy; he simply isn't.

11         He is living in a part of Massachusetts that's a

12   fairly -- the rural nature of it makes it a bit more

13   conservative, but Massachusetts is a fairly liberal state;

14   so he's hearing information on both sides.  But the

15   President -- again, I don't mean to be disrespectful to

16   anyone, but the President of the United States is telling

17   everybody -- and people around him are telling everybody,

18   and the mixed message from the media is telling people --

19   that this election was stolen; it was a stolen election.

20         There is a significant percentage of the

21   population, for whatever the reason, is buying that which --

22   with all respect, I am not a political person -- but is

23   crazy.  And he --

24              THE COURT:  Well, does he still believe that?

25              MR. DENNER:  Not at all.  And he didn't believe it

1    at the time, he was confused at the time.

2         He was hearing all of this stuff about a stolen

3    election and voter fraud, and whatever; and the President of

4    the United States invites him and anyone else that wants to

5    come down to a rally where perhaps he can better understand

6    this.  Why does he go down there?  He goes down there

7    because he has aspirations.

8         He started a podcast.  He wants to have a podcast

9    with a lot of followers; and toward that end, he thinks he

10   is going to -- the first thing he told me when we spoke, he

11   is going to kick off his podcast with this because, at some

12   point, he would like to be in elected office on some level

13   in Massachusetts.  I am not just going to tell you that; he

14   is going to briefly, in his allocution, talk to you about

15   it.  You will make a determination whether you think he is

16   speaking from his heart and his mind and whether that's

17   accurate or not.  But it --

18        THE COURT:  Well, your papers did mention that he

19   was -- he fully expected to use his videos that he was

20   making on January 6th as part of a podcast he was putting

21   together which might be utilized to support a possible run

22   for municipal electoral office that he was considering.

23        I thought that was interesting because it appeared

24   that he was planning to use -- to use the videos he was

25   taking on January 6th to promote his bona fides in a

1    conservative area of semirural Massachusetts --

2              MR. DENNER:  Your Honor, that's not --

3              THE COURT:  -- that he was a participant and a

4    believer in a Stop-the-Steal, you know, conspiracy.

5              MR. DENNER:  Your Honor, with respect, you can

6    interpret everything I say in that way if you'd like, but

7    that's not how I mean it; that's not what I am saying.  I am

8    trying to give you an accurate perspective on what's going

9    on from our vantage point.

10             He was initially taking pictures of everything,

11   recording everything, and the government's -- it's in the

12   videos.  And in the government's sentencing memorandum you

13   will see that everywhere --

14             THE COURT:  Mr. Denner, this is a simple, direct

15   question.  Was he planning on taking videos to use in a

16   podcast to run for electoral office on January 6th in order

17   to show that he was a supporter of former President Trump --

18             MR. DENNER:  No.

19             THE COURT:  -- that he believed in these

20   conspiracy theories, and that he believed that this would

21   help him in an election in the area where he was living?

22             MR. DENNER:  Absolutely not.

23             Let me answer the compound parts of your question.

24             THE COURT:  Because it was in your briefing that

25   said he was putting together --

1          MR. DENNER:  Your Honor, if you are going to

2     ask --

3          THE COURT:  -- these recordings for a podcast to

4     run for office -- and do not interrupt me because your words

5     will be lost; the court reporter will take down what I

6     say --

7          MR. DENNER:  Of course, Your Honor.

8          THE COURT:  -- so that was your statement in your

9     briefing.  So it leads me to the inference that he was

10    preparing recordings on January 6th to help him in an

11    election in what you describe as conservative semirural part

12    of Massachusetts in order to be helpful to him in that

13    election.

14         MR. DENNER:  Your Honor.

15         THE COURT:  If not, what would be the purpose?

16         MR. DENNER:  Your Honor, with all respect -- and I

17    mean this -- if you are going to ask me a compound question

18    with six different parts to it, I can't give you one answer

19    to six parts.

20         Was he filming this because he wanted to go on the

21    record and use it -- and use it in what he was going to do

22    in his private life when he first got down there, yes.

23         When he drove home that night did his mind change?

24    Absolutely.  And he will tell you that himself.  On his way

25    home that night, the shock of what had happened that day

```
1    began to take root; and at that point he realized that he
2    had to use it, but he didn't have to use it for himself and
3    his own aspirations as realistic or unrealistic as they
4    would have been; but he had to use it and give it to the FBI
5    because something very bad had happened that day.
6           Getting back to your first question about the
7    CCTV -- and never, even if he had been using it for his
8    election, would it have been to appeal to a conservative
9    group in Massachusetts.
10          North Adams, in that area of Massachusetts, while
11   having some little pockets of conservatism is not a
12   conservative place.  There are colleges up there; there are
13   arts out there; it's a very artsy place.  It is simply not a
14   conservative place.  Massachusetts is not a
15   conservative state, it simply isn't.  With --
16          THE COURT:  Mr. Denner, I don't know anything
17   about the politics of Massachusetts.  I was actually -- it
18   was based on what you told me about him living in a
19   semirural area of Massachusetts that was conservative.
20          MR. DENNER:  No, it's balanced -- there is a
21   balance.  That's what he wanted to do.  He didn't want to --
22   his initial thought was that he would have a podcast that
23   might be getting to the bottom of what's going on because,
24   in Massachusetts, as I assume in most parts of the northeast
25   at least, you are hearing Fox News saying one thing; MSNBC
```

1    saying something else; CNN being in the middle; local news

2    being -- somehow taking pieces of all of it, and it's very

3    confusing.

4            When the President of the United States says:

5    They stole the election, this is Antifa taking over the

6    world; you wonder who is telling the truth.  He went down

7    there to try to understand what the truth was.

8            When he got down there, I can't tell you what

9    he -- a throwaway thing, I thought it was Antifa at first.

10   I can tell you, when he was driving home that night, within

11   hours he made the decision to take this to the FBI

12   voluntarily.

13           You talk about cooperation -- you talk about

14   cooperation as having to be part of a plea agreement that

15   somehow legitimizes it; I could respectfully not disagree

16   more with you.

17           I have been a lawyer for 49 years -- a criminal

18   defense lawyer for 49 years; and the cooperation that comes

19   of someone trying to simply help themselves after the fact,

20   after they knowingly committed a crime, and they get caught,

21   and they're charged and they're basically told:  The only

22   way you can help yourself out and get a better resolution is

23   to essentially inform on other individuals -- that is a form

24   of cooperation.

25           But I would respectfully suggest to you that his

1    cooperation which came not entirely voluntarily, as the

2    government points out; but certainly a large component of it

3    was:  Wow, I have got to do something about this.  What

4    happened today was absolutely unacceptable and shocking to

5    him -- and it was; and it still is.  And he was incredibly

6    shamed -- that's the word he used to me when we talked about

7    it -- shamed that he had somehow become a part of it,

8    realizing that the only way this could have happened was

9    with a lot of people there.

10        But a lot of people showed up who -- there were

11   people who knew exactly what was going on.  There were

12   people who conspired with other people who weren't there who

13   knew what was going on who called the shots.  He was not

14   privy to any of that stuff.  He went down there for a

15   completely different reason, because his president said come

16   down and basically learn what's going on.  He went down to

17   learn -- he went down because he wanted to basically use

18   that as part of how he was going forward in life; and he

19   came back giving up the thought of that's how he was going

20   to use it then.  It would be used for a way it had to be

21   used because what happened there was absolutely

22   unacceptable, and his role there was unacceptable.

23        As I have said in my sentencing memorandum, he

24   doesn't excuse himself at all.  I don't excuse him.

25   Everything he has done on January 6th is inexcusable.  What

1    he did after January 6th is the best way, in my mind, that

2    an individual who has done something wrong -- he has clearly

3    done something wrong, very wrong.  It really bothers me what

4    happened that day; it will continue to my dying day.  But he

5    did the best that he could to make himself right with God

6    and his government after that, and has continued to do so

7    since then.

8         With regard to the CCTV tape, I will tell you that

9    he found -- he bought -- as part of what he was doing, he

10   bought a Trump memento to bring it back to -- that would be

11   part of what -- the podcast he was doing.  It had a

12   circumference of this, a plastic stick attached to the flag,

13   the circumference of --

14        THE COURT:  The Trump memento was the flag?

15        MR. DENNER:  Yes.  It was the Trump flag.  He

16   bought a Trump flag -- not an American flag; they weren't

17   selling them.  They were selling Trump flags right there.

18   He bought one there, and he put it in his bag, whatever.

19        And while he was watching all of these people

20   hitting the glass, breaking the glass with crowbars, with

21   huge poles, with metal and whatever -- okay? -- as part of

22   what he was doing absolutely unacceptably bad judgment,

23   horrendous judgment, should have been nowhere near that at

24   that point.  But he had made the determination he was going

25   to record that and he was going to bear witness to that, and

1    whatever.

2              Initially it was self-serving for himself because

3    he was -- he never anticipated -- no one other than the

4    people who went in this preplanned anticipated the violence

5    and the craziness of what had happened.  Should he have

6    entered the building once?  Absolutely not.  Should he have

7    been on the Capitol grounds when there were fences up?

8    Absolutely not --

9              THE COURT:  Well, using the Trump memento

10   flagpole -- no matter how big or small -- to help break the

11   glass --

12             MR. DENNER:  He wasn't trying to break the glass;

13   he was tapping the glass, Your Honor.

14             THE COURT:  -- is different than bearing witness.

15             MR. DENNER:  He tapped the glass because he wanted

16   to say -- he saw people having great difficulty breaking it.

17   So when they moved away, he tapped it like two or three

18   times.  The stick would have broken if he had done anything

19   else even if he had the intent to break it, and he didn't.

20             THE COURT:  So, as you said, he saw people having

21   trouble breaking the glass --

22             MR. DENNER:  Right.

23             THE COURT:  -- so he went over to tap it a few

24   times?

25             MR. DENNER:  No, not to break the glass.

1          He wanted to be able to say that the glass was

2    really tough, and he tapped -- that was for his show.  Okay?

3    That was for the podcast he was going to put together.

4          Your Honor, you can frown and you can disagree

5    with me, and I wouldn't blame you.  But I am telling you,

6    you don't break a glass -- triple glass window that you

7    can't get with a crowbar with a tiny plastic thing; he just

8    tapped it a couple of times.

9          Was that a mistake?  Of course it was a mistake.

10          He wasn't looking ahead and saying someday this is

11    going to be in a video, and whatever.  It was part of his

12    curiosity, what he was doing there.  I think even at that

13    point he had not realized exactly how bad it was going to be

14    yet because the real violence was yet to occur.  And I don't

15    think -- he absolutely got swept up in that initially for

16    his own issues.  But he never, Your Honor, he never -- he

17    will allocute.  He never intended to hurt anyone, to hurt

18    any property, or whatever.

19          Does he -- should he have been there?  No.

20          Should he have somehow -- not "somehow" -- should

21    he have understood that the more people are there the worse

22    the problem?  Yes.  He should have understood that; that's

23    why he's pleading guilty to something.  That's why his life,

24    whether -- like it or not, has been damaged dramatically

25    too.  He has lost jobs; he's having difficulty getting new

1    jobs.  He has one now.  He got fired from pizza delivery.

2    His own business went under with a pending federal case.

3    And, Your Honor --

4              THE COURT:  Well, one of the things that you

5    suggest in your proposed sentencing recommendation is that

6    the Court sentence him to 150 hours of community service;

7    and you state:  Perhaps directed toward communicating via

8    media/social media what McCreary personally observed on

9    January 6th in Washington, D.C., to persons who were not

10   there.  This is a pretty unorthodox suggestion for community

11   service, essentially asking the Court to give its imprimatur

12   to having this defendant produce and promote content for

13   circulation to the public over social media.

14             And I want to explore that with you a little bit

15   because what is it that you think would be of such public

16   benefit or constitute a service to the community to put a

17   camera back in this defendant's hands to talk about what

18   happened on January 6?

19             MR. DENNER:  What I am talking about is things I

20   have done in other cases, and not necessarily perfectly

21   analogous situations; but writing stuff up, going to speak

22   to high school classes; going to speak to youth groups to

23   really make people understand that this really was an

24   assault on democracy, and it was people running amok.

25             Because, right now, what I am hearing -- not that

1    I matter in this case -- I am hearing the Republican

2    National Committee saying things like:  All these people

3    there were actually very good people, and it's amazing that

4    we could think otherwise.  I am hearing a world of

5    statistics that tell me that still a significant percentage

6    of this country feels that this was a peaceful rally down

7    there; and nobody did anything wrong and it's the left

8    overreaching.

9         I think it's a very important thing for someone to

10   get out there and say, no, that's not what happened here

11   because he knows that's not what happened there because he

12   was standing there filming it; he was standing there seeing

13   it.  He lived it; he messed up.  He made a huge mistake

14   here, and he's paying for it.

15        I think, Your Honor, with all respect, that it's

16   not just me that feels that way.  I obviously operate with a

17   bias, although respectfully less than you think.  The

18   government thinks that way; the probation department thinks

19   that way.  The sentencing guidelines as they're written

20   suggest that.  The 3553(a) considerations and the factors

21   largely come out the way I interpret the facts on his side.

22        THE COURT:  Yes, I know.

23        And the probation office did consider his

24   involvement in their sentencing recommendation.  I think

25   they considered their -- they stated that they consider his

1        conduct to be minimal in this case.

2                And I will be honest with you, when I look at the

3        offense conduct in the case of a person who was at the

4        vanguard -- the first 30 people to help break down doors

5        into the Capitol Building, the Senate wing -- to make the

6        first breach into the Capitol --

7                MR. DENNER:  Your Honor, I don't think --

8                THE COURT:  -- who used a flagpole to try and help

9        break into the Capitol --

10               MR. DENNER:  I don't think that at all --

11               THE COURT:  -- who followed Officer Goodman, who

12       was trying to drag them away from the Senate Chamber --

13               MR. DENNER:  No, I agree with you.

14               THE COURT:  Don't interrupt me.

15               MR. DENNER:  Okay.

16               THE COURT:  Again, Mr. Denner, bad habit on your

17       part.

18               MR. DENNER:  Okay.

19               THE COURT:  Just because I am a woman sitting up

20       here doesn't mean you can interrupt me.

21               -- who followed Officer Goodman up the stairs, was

22       told to leave, left and came back in direct violation of the

23       orders -- I'm sorry, not minimal conduct.

24               MR. DENNER:  I don't consider it minimal conduct

25       either.

1           THE COURT:  So if the government views it as

2     minimal conduct -- or mitigated conduct by the production of

3     video recordings on January 7th; the probation office, with

4     all due respect, they are great people, they view it as

5     minimal.  In my view, it is not minimal conduct.

6           MR. DENNER:  And that's the difference, Your

7     Honor, I believe, if I may.  They're recommending 18 months

8     probation.

9           I am recommending additional things other than

10    just the probation.  I am representing a good deal of

11    community service, and the other thing that I recommended

12    within.

13          I don't consider it minimal.  But, more

14    importantly, the defendant doesn't consider it minimal; he

15    doesn't at all.  He doesn't consider any participation in

16    this assault on democracy as minimal; he does not.

17          But there is a significant difference with what he

18    did -- both in what his intentions were and what he actually

19    did.  He should not have been in that group with Officer

20    Goodman.  Whether he was filming or not, he shouldn't have

21    been there; he understands that.  He understood that when he

22    was driving back that night as all of these things ran

23    through his head.  He realized this was a mob, but he didn't

24    understand that going in.  I mean, perhaps he should have,

25    but he didn't.

1          He went down there thinking that there was going

2     to be a rally, and a lot of these truths become more

3     self-evident -- to quote the Constitution or the Declaration

4     of Independence, or wherever that is.  It didn't become more

5     self-evident because it wasn't planned that way.  He wasn't

6     in on the planning; many people were.

7          Many people -- what happened, happened just the

8     way it was supposed to roll out; he didn't know that.  When

9     he went around with these people who did know that, he

10    didn't catch on to it at the time.  He just got swept up in

11    the moment, and that's not acceptable; but that's why he is

12    going to be -- have a criminal record one way or another for

13    the rest of his life.  It's unacceptable.

14         THE COURT:  Yes.  Let me ask you one other

15    question on a different topic which is -- this defendant did

16    not sign the requested release form for the probation office

17    to obtain his credit report, although the presentence

18    investigation report notes that he submitted a net worth

19    statement and monthly cash flow statement.

20         Is there a reason why he didn't fully reveal his

21    finances?

22         MR. DENNER:  No.  This is the first I have heard

23    of it, Your Honor.

24         THE COURT:  Well, it's not.  I mean, it's in the

25    presentence investigation report which you have had for some

 1    time.

 2             MR. DENNER:  Well, then for whatever the reason --

 3    there is no reason that he didn't.

 4             You're perfectly willing to do that, correct?

 5             THE DEFENDANT:  Yes.

 6             MR. DENNER:  If I missed that in there, then it's

 7    my bad; but there is absolutely no reason that he doesn't do

 8    that, and of course he will do that.  Of course he will do

 9    that.

10             Again, Your Honor, this is -- you are well within

11    your right, of course -- I don't have to tell you this -- to

12    view his behavior any way you feel the facts take you to

13    that.

14             I think that -- I think the way probation looks at

15    it you disagree with to some extent.  I don't consider it

16    minimal.  Perhaps "minimal" in the context of the really

17    egregious things that happened here.  But I would not use

18    anything "minimal" in connection to what happened here; I

19    wouldn't.  I would not.

20             When I made my recommendations there wasn't even

21    an issue about -- it's not a "pole."  It's a small little

22    plastic thing that -- if I hit this with it (gesturing), the

23    plastic thing would break.  He wasn't attempting to break

24    anything; that was not his intent at all.

25             He stupidly -- stupidly was trying to build the

1    best story he could for the people he was going to tell it

2    to.  It had nothing to do with committing property damage;

3    it had nothing to do with committing violence against other

4    individuals; that was not what he was there for.  That

5    unfortunately had the --

6              THE COURT:  And the story he was going to tell was

7    what?

8              MR. DENNER:  It wasn't about -- what happened

9    there.  When he initially went, he thought he would have a

10   podcast that would be very entertaining because he didn't

11   realize that the podcast he was planning -- the film he was

12   planning was going to turn into this.  He didn't realize

13   this.  You would have had to have either been psychic or

14   part of the planning group, which he was not.

15             He is somebody with no record, with no

16   affiliations with any of these groups, who is from Western

17   Massachusetts who believed the President, and came down to

18   listen to him.  He came down.  He was going to film it all,

19   and it was going to be a podcast, and it was going to launch

20   his career; and it was better than delivering pizzas and the

21   other stuff he was doing.

22             THE COURT:  Launch his career and get him elected

23   to political office?

24             MR. DENNER:  Not necessarily, but certainly launch

25   his career as -- not a "journalist" per se.  But a lot of

1      people have podcasts, make a living doing it, have a

2      following of 100,000 people, 50,000 people, a million

3      people -- and that's what he was interested in.  It's not

4      something I know a lot about; but I do know that people are

5      doing that.  That's what he was looking to do; that's why he

6      went down there.

7              He never anticipated that this was going to turn

8      into an insurrection, an uprising against the United States

9      of America; and that's what happened.  It's outrageous.

10     It's still outrageous.  But it's not only -- it's not only

11     me saying that there is a huge portion of the population --

12     not in this room, happily, and not where I am -- who

13     actually believe this.  And to the extent that he can make

14     the smallest dent in it, in a small circle, that's what he

15     would like to do now; it's simply the way it is.

16             He is not somebody who is part of an alt right

17     conspiracy against the United States.  He is not somebody

18     who feels that the election was stolen; he doesn't feel that

19     way at all.  He was confused in the beginning because the

20     president and the head republican -- whatever -- were saying

21     that.  It was just hard for him to accept that they would

22     simply be lying to everyone because that's not his universe;

23     that's not his world.  It's still hard for a lot -- not him

24     at this point, but it's hard for a lot of other people to

25     accept it.

1          Everybody expected President Trump to march with

2     them to the park there and give a speech about the proof --

3     because he kept saying he was going to give the proof of

4     that, and give the proof of it.  And that was going to be

5     the great subject matter of his podcast, to have it

6     personally on his thing; and he would replay it on the

7     internet, as many people are doing.

8          It wasn't to forward some conservative group or

9     some conservative grouping, he is not that sophisticated at

10    all; and that's not his feelings.  He is in the middle.  He

11    is in the middle trying to understand who is telling the

12    truth.  Was this a good election?  Was this a bad election?

13    I would like to hear both sides.  And he went down there to

14    hear it; that's what he did.

15          Did he make mistakes?  Gigantic mistakes.

16    Gigantic mistakes.

17          I think my sentencing memorandum for the first,

18    really, two pages -- which I am sure you have read, and I am

19    not going to repeat it -- sets out how I feel none of this

20    is excusable.  It is not excusable, it isn't.  But at least

21    it places him in context; the offender and the offense

22    conduct in context.

23          Mr. Regan is not looking to do me a favor or

24    Mr. McCreary a favor.  He looked at the case, and he made a

25    determination.  Not that it was minimal behavior.  I don't

1    think he thinks it's minimal at all.  What he thinks is it's

2    really serious and really egregious; but, when he realized

3    what he had done wrong, what he did was incredibly helpful.

4              THE COURT:  All right.  Mr. Denner, is there

5    anything else that you want to add to your argument?

6              MR. DENNER:  No, Your Honor.

7              What I simply would like to do is -- if this is

8    the time, to give him his right of allocution.

9              THE COURT:  I'm sorry.  Could you say that again?

10             MR. DENNER:  I am done, Your Honor.

11             Respectfully, I think the defendant is ready to

12   allocute if that is --

13             THE COURT:  All right.  Mr. McCreary, please step

14   forward.

15             Are you fully vaccinated?

16             THE DEFENDANT:  I am not, Your Honor.

17             THE COURT:  All right.  Then keep your mask on.

18             THE DEFENDANT:  Yes.  So, as stated, my initial

19   intention to even being there was to springboard a podcast.

20             I knew a lot of people were going to be attending.

21   And I just wanted to take advantage of the fact that because

22   there is going to be a large attendance, a lot of people

23   would be looking for information online for it.

24             I drove down the night before; I slept in my car.

25   I got up and tried to record.  And I was in a horrible

1     position trapped between two speakers so that I couldn't

2     actually hear or understand anything being said at the

3     rally.  I felt that I ended up failing the entire purpose

4     initially.  And I had no idea that we were even marching

5     down the street -- like anything was going to be happening

6     post.  That came to my attention, and I followed the crowd.

7          I circumvented the crowd because I was in a

8     horrible position; I wasn't sure what was happening.  I had

9     hoped to be able to catch footage that was relevant to

10    perhaps -- I thought somebody might be speaking or

11    something; I had no idea what was going to happen.

12         I circumvented the crowd and found myself where

13    people were attacking the building; and I started recording

14    them.

15         When the --

16         THE COURT:  How precisely did you get up to that

17    terrace?

18         THE DEFENDANT:  So I noticed a barricade that was

19    leaning against a wall.  I -- again, I couldn't get anywhere

20    near where was the crowd was.  I was stuck on the outskirts.

21    And I noticed this barricade and I thought I could climb up

22    there and record, from above, people to have a better

23    understanding of what was happening; so I went up there.

24         THE COURT:  So you turned the barricade over and

25    used it as a ladder?

1           THE DEFENDANT:  No, ma'am.  It was already there.

2      It was --

3           THE COURT:  It was already being used as a ladder?

4           THE DEFENDANT:  I did not see anybody else use it

5      as a ladder.  I just simply noticed that it was leaning

6      against the wall, and I chose to climb up so I could have a

7      better view.  It was there that I noticed people attacking

8      the windows and doors.  That was the first of any violence

9      that I saw.  I didn't see any fences coming into the space

10     or -- I certainly didn't see anybody attacking police

11     officers.

12          My mind at that moment was simply to continue to

13     record because I thought that was the most relevant thing

14     for me to talk about.  It was something happening right in

15     front of me, and I did.

16          I followed the crowd, and continued to record

17     segments leading up to the police officers upstairs.  And

18     once I left -- the reason I re-entered the building was

19     because another door was kicked out, by coincidence, right

20     next to me.  And I was following the same logic -- not

21     excusable logic, but the same logic that I wanted to record

22     as much as I could; and I followed the second group in and

23     continued to record them.

24          I left that day with one understanding.  And

25     before I got home my perception had been changed quite a

1    bit.  It's not -- I wasn't sitting in solitude thinking to

2    myself in my car, it was more of -- I was listening --

3    turned on the news and I was listening, getting perspective

4    from outside sources.  I had no idea anybody attacked police

5    officers.

6         I -- so, yeah.  On my drive home, as I am

7    listening to this, I realized that it was much more horrid

8    than what I had comprehended, and I immediately thought it

9    would be gross to use the footage that I recorded to try to

10   launch a podcast.  I turned it over -- I got home around

11   1:30, and I immediately reached out to the FBI and turned it

12   over to them.  And I -- as stated, I gave up on the idea of

13   launching podcasts.  And the podcast was never intended to

14   be used to run for Congress.  I had actually done that the

15   year prior -- attempted to -- when COVID started.

16        After the event, you know, I had -- there is

17   nothing to brag about; I don't understand how anybody could;

18   and I feel shame every day, Your Honor.  You know, it's

19   sometimes hard to look at people, to even speak to them.

20        You know, I know what I did was not right in the

21   least; and I will do whatever you think is appropriate to

22   repay the government in any way that I can.  So I apologize

23   profusely.  Thank you.

24        THE COURT:  All right.  You can stay right where

25   you are, Mr. McCreary.

1                    Mr. Denner, do you want to stand with your client?

2            MR. DENNER:  Yes, Your Honor.

3            THE COURT:  We're now at the last step of the

4       sentencing hearing, Mr. McCreary, where I have to explain

5       the sentence I am about to impose, and impose sentence on

6       you.

7            So after considering the sentencing memoranda that

8       have been submitted, the presentence investigation report,

9       and the probation office's recommendation, hearing argument,

10      reviewing all of the sentencing memos and the videotapes

11      that have been submitted in connection with your sentencing

12      about your conduct on January 6th, 2021, I must consider the

13      relevant factors that are set out by Congress in 18 U.S.C.

14      Section 3553(a), and ensure that I impose a sentence

15      sufficient but not greater than necessary to comply with the

16      purposes of sentencing.  And it's good to remind all of us

17      about what those purposes of sentencing are here.

18           The purposes include:  The need for the sentence

19      imposed to reflect the seriousness of the offense; promote

20      respect for the law; provide just punishment for the

21      offense; deter criminal conduct; protect the public from

22      future crimes by you, Mr. McCreary; promote rehabilitation.

23           So, in considering these purposes, having already

24      considered how the sentencing guidelines and policy

25      statements apply here, I must also consider the nature and

1    circumstances of the offense; your history and

2    characteristics; the types of sentences available; the need

3    to avoid unwarranted sentence disparities among defendants

4    with similar records found guilty of similar conduct, and

5    the need to provide restitution to any victims of the

6    offense.  And I am going to begin with the restitution

7    amount at the outset.

8            As the plea agreement provides for a restitution

9    payment of $500, which this Court finds is the best

10   available estimate of damage done to identifiable victims;

11   here, the Architect of the Capitol, on the limited record

12   presented in this case, and so orders this amount pursuant

13   to 18 U.S.C. Section 3663(a)(1)(A).

14           The Court finds that determining complex issues of

15   fact related to the cause or amount of the victim's loss

16   would complicate or prolong the sentencing process to a

17   degree that the need to provide restitution to any victim is

18   outweighed by the burden on the sentencing process, as

19   provided in 18 U.S.C. Section 3663A(c)(3)(B).  So the

20   mandatory restitution provisions of Section 3663A do not

21   apply, and the Court need not endeavor to fix the

22   restitution amount more precisely than the $500 amount

23   agreed by the parties.  Since the government has estimated

24   for -- over a year-old estimate of the damage to the Capitol

25   and hasn't updated that estimate in connection with

1      sentencing, that's all I have to rely on.

2              Regarding the nature and circumstances of the

3      offense, this defendant has been convicted of entering and

4      remaining in a restricted building or grounds in violation

5      of 18 U.S.C. Section 1752(a)(1), which is a Class A

6      misdemeanor.

7              And though, on its face, this is a trespass

8      offense subject to the trespassing guidelines, "trespass"

9      falls far short of acknowledging the true gravity of what

10     happened on January 6th at the Capitol.  The events of that

11     day, even for participants like this defendant who did not

12     physically attack the police, were not a garden-variety

13     episode of unlawful entry, or even merely being unlawfully

14     present in a sensitive place like the Capitol when the Vice

15     President was present.

16             The defendant's criminal conduct directly helped

17     facilitate a riot that overwhelmed law enforcement and

18     succeeded in disrupting the proceedings of Congress to

19     ensure the peaceful transition of power from one

20     duly-elected administration to the next one; this was a

21     chilling first in our history.

22             The defendant traveled from Massachusetts.  He

23     first attended the Stop-the-Steal rally, and then followed

24     the crowd from there to the Capitol.  He put himself at the

25     front of this mob that stormed the Capitol, becoming one of

65

1   the first 30 individuals to unlawfully enter the Capitol

2   Building on January 6th through breaching its walls,

3   knocking through a window, breaking down the door, and

4   entering.

5            As we have learned from CCTV footage provided by

6   the government just last week -- or at least it was provided

7   to the Court only last week -- the defendant assisted in the

8   shattering of the window in the Senate wing entrance.  He

9   may not have been effective in breaking the window and

10  others were more effective, but the CCTV footage shows him

11  trying.

12           Before the events on January 6th and traveling to

13  Washington that day, he had expressed his belief that there

14  was widespread voter fraud in the 2020 presidential

15  election.  And then, after arriving on the Capitol grounds

16  from the Stop-the-Steal rally held by the former President,

17  he used a crowd-control fence as a ladder to gain entrance

18  to a courtyard on the Capitol's upper west terrace near the

19  Senate wing entrance.  And as his own recordings from that

20  day make clear, the scene this defendant joined on the upper

21  west terrace was volatile; it was chaotic; it seemed to be

22  degenerating quickly.

23           There he witnessed and filmed his fellow rioters'

24  efforts to breach the Capitol by kicking down the doors and

25  bashing the windows with riot shields, flagpoles, and their

1    fists.  He also observed the person he described to the FBI

2    as the QAnon Shaman directing other individuals in the

3    crowd.  But he wasn't just a mere spectator recording that

4    day; he actively participated and facilitated in it.

5            As the Court ordered the government to submit new

6    videos since the time of the plea hearing to aid in

7    sentencing, and the government then submitted the CCTV

8    footage, which has now been disclosed to the public as

9    well -- in the review of the CCTV footage taken from inside

10   the Capitol, looking out through the windows before they

11   were broken, were -- that CCTV footage is from critical

12   moments, from about 2:13 p.m. to about 2:16 p.m.

13           As Mr. Regan said earlier today, the government

14   has now determined that that was the first breach of the

15   Capitol by the mob outside.  This was occurring before the

16   evacuation order was even given to the members of Congress

17   who were dutifully carrying out their constitutionally

18   mandated task of dealing with objections to the

19   certification of the Electoral College vote.

20           The CCTV footage shows the hallway outside the

21   Senate wing door.  It's calm, it's quiet; a staffer walks

22   by.  And it changed over the next approximately three

23   minutes on the video where people in the mob can be seen

24   rushing towards the doors and the windows and testing them

25   to see if they can get in.  They used fists; they used

1    poles; they used their boots to hit, strike, and kick at the

2    windows, which ultimately cracked and then fell down leaving

3    a gap for people in the mob to break through.

4          This defendant can be seen in a light-colored

5    hoodie participating in the break-in.  At one part in the

6    video, he can be seen next to two people who are using their

7    fists and trying to break down the windows using what

8    appears to be a flagpole to assist them to break through the

9    window in the Capitol Senate wing entrance.  And regardless

10   of whether he was successful in breaking the window and

11   others were more successful because they had bigger poles,

12   or whether this defendant's conduct caused actual damage to

13   the window -- what is significant to me is that he

14   proactively and aggressively contributed to the rioters'

15   efforts to breach the Capitol.

16         It didn't take long for them to break in.  And in

17   between about 2:15 and 2:16 p.m., they begin to stream into

18   the Capitol Senate wing through the broken set of windows

19   and doors; and then that's how he became one of the first 30

20   individuals to breach the Capitol and unlawfully enter it on

21   January 6th.

22         He then remained quite busy.  He was no mere

23   trespasser.  Recall at this point, members of Congress were

24   still sitting in the Senate Chamber; they had not yet been

25   evacuated to a place of safety from the mob.

1          As the videos he filmed that day made clear, he

2     was at the front line of approaching Officer Goodman, with

3     this crowd, with Officer Goodman telling them to disperse.

4     And the defendant's video depicts members of the mob yelling

5     at Officer Goodman, "Where are they counting the fucking

6     votes?"  "Where are they counting?"  "Hey, where are they

7     counting?"

8          After the defendant and his fellow rioters ignored

9     Officer Goodman's commands to disperse, a clearly

10    outnumbered Officer Goodman turned around to lead the crowd

11    up a stairway where a line of police officers was waiting.

12    As Officer Goodman ran up these stairs, the defendant's

13    video depicts another member of the mob yelling at the

14    officer, "Keep running motherfucker."

15         Instead of leaving, instead of helping Officer

16    Goodman to block the crowd from following him and chasing

17    him up the stairs, after witnessing this harassment of

18    Officer Goodman, the defendant carried right on, followed

19    this mob further into the Capitol chasing Officer Goodman up

20    the stairway.

21         At the top of the stairs, the defendant and the

22    mob confronted a line of Capitol police officer

23    reinforcements that prevented them from further breaching

24    the building and accessing the Senate Chamber where members

25    of Congress were at that moment being evacuated.

1            At this point, the defendant witnessed and filmed

2      how members of the mob also harassed and screamed at this

3      line of officers.  He was subsequently confronted by law

4      enforcement and told to leave.  He initially complied with

5      the command to leave, and he exited the Capitol at around

6      2:30 p.m., 15 minutes after first breaching the building at

7      the front lines of the mob and becoming one of the first 30

8      rioters to enter the Capitol that day.

9            Yet, in complete defiance of law enforcement and

10     despite what he had witnessed, he chose to reenter the

11     Capitol moments later, again through a door that had been

12     broken by fellow rioters.  And during his second unlawful

13     entry inside the Capitol, this defendant observed rioters

14     attempting to break the glass around the Speaker's Lobby

15     doors and heard a gunshot fired from that location.  And

16     upon hearing the gunshot he exited the Capitol a second

17     time, at about 2:45 p.m.  So, in total, he spent about 30

18     minutes inside the Capitol between his two unlawful entries.

19            When he returned to Massachusetts, the government

20     reports he told a coworker that he raided the Capitol and

21     sent a coworker multiple videos that he took from inside the

22     building.  He also, when he returned to Massachusetts, did

23     submit to the FBI's tip line a number of the videos that he

24     took that day.

25            So among the factors that I look at in assessing

1    the defendant's overall role in this attack on the Capitol

2    on January 6th, are the following:  He didn't appear to

3    engage in any preplanning for violence prior to traveling to

4    D.C.  Although, according to the FBI and several witnesses,

5    he had expressed his belief that there had been widespread

6    fraud in the 2020 presidential election.

7         He entered the Capitol building knowing this was

8    unlawful.  And how could he not know it was unlawful when he

9    was, quite literally, watching people break the windows, and

10   helping them?  He was one of the first 30 rioters to enter

11   the building.  And he also ignored officers, including

12   Officer Eugene Goodman, who was trying to keep people out of

13   the Capitol, and specifically trying to protect the Senate

14   Chamber while the certification of the Electoral College

15   count was taking place.

16        He entered the Capitol twice, spent about 30

17   minutes total inside the building.  And the second time he

18   entered, it was in direct defiance of a police order that he

19   had received just a few minutes earlier to exit the

20   building.

21        He was busy walking around in those 30 minutes,

22   making his way to the main doorway to the Senate Chamber, to

23   the Speaker's Lobby.  But, to his credit, he didn't enter

24   any private offices or spaces within the Capitol Building,

25   or the Senate or the House Chambers themselves.  He also

1    didn't physically attack any police officer or other person.

2    But he did film videos depicting members of the mob

3    harassing and chasing law enforcement officers inside the

4    Capitol, including Officer Goodman.

5           He didn't publicly post on social media before,

6    during, or after January 6th.  And he did cooperate with law

7    enforcement, first by contacting the FBI in the early

8    morning hours of January 7th and providing information about

9    what he witnessed, along with several of the videos he had

10   filmed inside the Capitol.  And a few weeks later, he also

11   participated in what the government describes as a fulsome,

12   voluntary interview.  And he entered a plea agreement about

13   six months after his arrest, and after about one month after

14   the government had extended the offer.

15          What is striking is that he knew he should not

16   have entered this Capitol Building on January 6th, and he

17   did so anyway.  He didn't help law enforcement when he was

18   there.  He helped facilitate, instead, the overcoming of the

19   law enforcement forces.  He went in not once, but twice, in

20   complete defiance of the repeated police commands to exit

21   the building.

22          So, in sum, the nature and circumstances of this

23   offense, the need for the sentence to reflect the

24   seriousness of what this conduct was on January 6th, promote

25   respect for the law -- frankly, our constitutional processes

1    favors a custodial sentence here.

2            He did far more than some people who participated

3    in the breach of the Capitol on January 6th by following

4    large crowds into the building, and then directly leaving

5    after only a few minutes.

6            He was among the first 30 to get there; he saw

7    them breaking in.  He helped them break in, even if it was

8    ineffective help.  He was part of the crowd chasing Officer

9    Goodman, and he went in twice.

10           Regarding his history and characteristics, he has

11   no prior criminal conviction and he has some college

12   education.  He is married; he has a daughter.  He doesn't

13   have a significant history of substance abuse.  He has been

14   employed consistently, currently maintains employment.  He

15   has been compliant with all of his conditions of pretrial

16   release.

17           But the need for the sentence imposed to deter

18   criminal conduct and protect the public from further crimes

19   of the defendant are critical considerations for every

20   sentencing judge; and particularly here where, for the first

21   time in our history, the peaceful transition of power was

22   jeopardized by a mob attack on the Capitol with the kind of

23   conduct that this defendant engaged in requires, to my mind,

24   a term of incarceration.

25           For the numerous individuals like this defendant

1    who say they got swept up in the chaotic events of

2    January 6th -- which is a quote from the defendant's memo --

3    it's also necessary for this Court to make clear that a lack

4    of forethought and planning doesn't create absolution for

5    criminal activity, especially when participation with a riot

6    amplifies the blamed and egregious criminal conduct of so

7    many others.

8            It is important to deter future malcontents from

9    disrupting the peaceful transition of power after an

10   election, and that weighs very heavily in this Court's

11   consideration.  There are consequences to going along with

12   the crowd, when the crowd is engaging in such clear, obvious

13   criminal activity that disrupted the peaceful transition of

14   power.

15           Specific deterrence is of concern in this case due

16   to the defendant's decision to enter the Capitol at the

17   earliest stages of the breach.  He wasn't following a huge

18   mob in; he was among the first 30 to enter the Capitol

19   through a shattered window.

20           He joined this mob following Officer Goodman up

21   the steps by ignoring Officer Goodman's order to disperse.

22   He entered the Capitol a second time, in complete defiance

23   of police instructions to exit.  He spent a significant 30

24   minutes inside the building unlike -- for example, the

25   defendant I'm sentencing next week, two minutes in the

1    building.  This is 30 minutes, twice.

2         Consideration of these factors favors imposition

3    of a custodial sentence that will promote respect for the

4    law, deter this defendant and others from future criminal

5    activity.

6         Regarding the types of sentences available, he was

7    convicted of a Class A misdemeanor which provides a maximum

8    term of imprisonment of one year, followed by one year of

9    supervised release; or up to five years' probation and,

10   under the guidelines, three years with special conditions

11   that may be supplemented to the probationary term.  He may

12   also be subject to a maximum fine of $100,000.

13        Regarding the need to avoid unwarranted sentencing

14   disparity, he requests -- this defendant, along with the

15   government -- a probationary sentence.  The defendant

16   requests no home detention; the government has requested

17   some home detention.

18        And the Court recognizes that both probationary

19   and custodial sentences have been imposed on January 6th

20   defendants convicted of the same Class A misdemeanor as this

21   defendant.

22        But given the specific offense conduct of this

23   defendant, the Court finds that 3 years of probation, with

24   special conditions of intermittent custodial confinement

25   totaling 42 days, a period of home detention, and a criminal

1    fine of $2500 will help -- to help partially cover the cost

2    of his term of incarceration and probation -- is appropriate

3    to provide both specific deterrence and general deterrence,

4    and just punishment for the seriousness of his offense

5    conduct in this case.

6            So based on my consideration of these and other

7    factors, I will now state the sentence to be imposed.

8            Pursuant to the Sentencing Reform Act of 1984, and

9    in consideration of the provisions of 18 U.S.C. Section

10   3553, it is the judgment of the Court that you, Brian

11   McCreary, are hereby sentenced to a term of 36 months',

12   which is 3 years', probation on Count 2 of the indictment,

13   with special conditions of 42 days of intermittent

14   confinement to be served in three separate periods of 14

15   days each, and 2 months of home detention.

16           In addition, you are ordered to pay a fine of

17   $2500 and a special assessment of $25, in accordance with

18   18 U.S.C. Section 3013.

19           You are ordered to make restitution to the

20   Architect of the Capitol in the amount of $500.  Restitution

21   payments shall be made to the Clerk of the Court for the

22   U.S. District Court, for the District of Columbia, for

23   disbursement to the following victim:

24           Architect of the Capitol, Office of the Chief

25   Financial Officer, Attention: Kathy Sherrill, CPA, Ford

1    House Office Building, Room H2-205B, Washington, D.C. 20515,

2    in the amount of the loss of $500.

3            While on supervision, you shall abide by the

4    following mandatory conditions, as well as the standard

5    conditions of supervision, which are imposed to establish

6    the basic expectations for your conduct while on

7    supervision.

8            The mandatory conditions include:  One, you must

9    not commit another federal, state, or local crime.  Two, you

10   must not unlawfully possess a controlled substance; that

11   includes marijuana.  Three, you must refrain from any

12   unlawful use of a controlled substance.  You must submit to

13   one drug test within 15 days of placement on supervision,

14   and at least two periodic drug tests thereafter, as

15   determined by the Court.  Four, you must make restitution in

16   accordance with your plea agreement and 18 U.S.C. Section

17   3663.

18           You shall also comply with the following special

19   conditions:  For intermittent confinement, pursuant to

20   18 U.S.C. Section 3563(b)(10), you must serve a total of 42

21   days of intermittent confinement.  The intermittent

22   confinement shall be served in three periods of 14 days each

23   within your first year of probation, at a facility

24   designated by the Bureau of Prisons.  You must follow the

25   rules and regulation s of the facility in which you are

1     designated.

2              You must also submit to home detention for a

3     period of 2 months as soon as practicable, and comply with

4     the location monitoring program requirement as directed by

5     the U.S. Probation Office.  You will be restricted to your

6     residence at all times except for employment, education,

7     religious services, medical, substance abuse, mental health

8     treatment, court-ordered obligations, and any other such

9     times specifically authorized by the U.S. Probation Office.

10              The location monitoring technology is at the

11     discretion of the U.S. Probation Office, and you must pay

12     the cost of monitoring.

13              You must provide the probation office access to

14     any requested financial information and authorize the

15     release of any financial information.  The probation office

16     may share financial information with the U.S. Attorney's

17     Office.

18              Having assessed the defendant's ability to pay,

19     payment of the total criminal monetary penalties is due as

20     follows:  Payment in equal monthly installments of $100 to

21     commence 30 days after the date of this judgment.  The Court

22     has determined that you do not have the ability to pay

23     interest, and therefore waives any interest or penalties

24     that may accrue on the balance.

25              The financial obligations are immediately payable

1     to the Clerk of the Court for the U.S. District Court, 333

2     Constitution Avenue, NW, Washington, D.C. 20001.  Within 30

3     days of any change of address, you shall notify the Clerk of

4     the Court of the change until such time as the financial

5     obligation is paid in full.

6              The probation office shall release the presentence

7     investigation report to all appropriate agencies, which

8     includes the U.S. Probation Office in the approved district

9     of residence, in order to execute the sentence of the Court.

10             Pursuant to 18 U.S.C. Section 3742, you have a

11    right to appeal the sentence imposed by the Court if the

12    period of imprisonment is longer than the statutory maximum.

13    If you choose to appeal, you must file any appeal within 14

14    days after the Court enters judgment.

15             As defined in 28 U.S.C. Section 2255, you also

16    have the right to challenge the conviction entered or

17    sentence imposed if new and currently unavailable

18    information becomes available to you or on a claim that you

19    received ineffective assistance of counsel in entering a

20    plea of guilty to the offense of conviction or in connection

21    with sentencing.  If you are unable to afford the cost of an

22    appeal, you may request permission from the Court to file an

23    appeal without cost to you.

24             Are there any objections to the sentence imposed

25    not already noted on the record from the government?

1          MR. REGAN:  No, Your Honor.

2          THE COURT:  From the defense?

3          MR. DENNER:  Absolutely not, Your Honor.

4          THE COURT:  All right.  You may be seated.

5          Mr. Regan, does the government have a motion to

6    dismiss the open Counts 1, 3, 4, and 5 against this

7    defendant?

8          MR. REGAN:  We do, Your Honor.

9          THE COURT:  The motion is granted.

10          Is there anything else to address today from the

11    government?

12          MR. REGAN:  Your Honor, just to clarify the

13    Court's sentence, the special probation conditions were 42

14    days of intermittent confinement in three separate periods

15    of 14 days within the first year of probation.

16          The 2 months of home detention, is that to run

17    consecutive or to begin immediately?

18          THE COURT:  It's to begin immediately because I

19    think it's going to take some time for the Bureau of Prisons

20    to designate a facility for the intermittent confinement.

21          MR. REGAN:  Understood.  Thank you, Your Honor.

22          And then there was also a $2500 fine, correct?

23          THE COURT:  Correct.

24          MR. REGAN:  Thank you.

25          THE COURT:  Anything further, Mr. Denner?

1          You have to step forward.

2          MR. DENNER:  May I understand that he will be

3     released today until he's classified, and then he will

4     report?

5          THE COURT:  Yes.  And he will be allowed to

6     self-surrender.

7          MR. DENNER:  And thank you for hearing us out,

8     Your Honor.

9          THE COURT:  All right.  Thank you.

10          You are all excused.

11          (Whereupon, the proceeding concludes, 11:27 a.m.)

12                    *  *  *  *  *

13                  **CERTIFICATE**

14

15          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

16     certify that the foregoing constitutes a true and accurate

17     transcript of my stenographic notes, and is a full, true,

18     and complete transcript of the proceedings to the best of my

19     ability.

20          This certificate shall be considered null and void

21     if the transcript is disassembled and/or photocopied in any

22     manner by any party without authorization of the signatory

23     below.

24     Dated this 4th day of April, 2022.

25     /s/ Elizabeth Saint-Loth, RPR, FCRR
       Official Court Reporter

## $

**$100** [1] - 77:20
**$100,000** [1] - 74:12
**$25** [2] - 9:16, 75:17
**$2500** [3] - 75:1, 75:17, 79:22
**$500** [7] - 9:15, 10:5, 10:8, 63:9, 63:22, 75:20, 76:2
**$9500** [1] - 9:15

## /

**/s** [1] - 80:25

## 0

**01880** [1] - 1:16

## 1

**1** [4] - 1:4, 8:23, 9:9, 79:6
**100,000** [1] - 56:2
**11:27** [1] - 80:11
**14** [5] - 19:23, 75:14, 76:22, 78:13, 79:15
**15** [3] - 33:20, 69:6, 76:13
**150** [2] - 10:7, 49:6
**1752(a)(1** [3] - 4:2, 8:25, 64:5
**18** [17] - 1:15, 4:2, 8:24, 10:1, 10:7, 10:9, 34:14, 52:7, 62:13, 63:13, 63:19, 64:5, 75:9, 75:18, 76:16, 76:20, 78:10
**1984** [1] - 75:8
**1:30** [1] - 61:11

## 2

**2** [8] - 3:25, 11:25, 19:7, 29:13, 75:12, 75:15, 77:3, 79:16
**20-20** [1] - 4:9
**20001** [1] - 78:2
**20015** [1] - 1:19
**202** [2] - 1:13, 1:20
**2020** [3] - 25:11, 65:14, 70:6
**2021** [4] - 7:6, 20:24, 29:4, 62:12
**2022** [3] - 1:4, 5:3,

80:24
**20515** [1] - 76:1
**20530** [1] - 1:12
**21-125** [1] - 2:3
**21-CR-125** [1] - 1:3
**21-CR-391** [1] - 30:4
**21-CR-435** [1] - 20:1
**21-CR-456** [1] - 19:19
**22** [1] - 7:6
**2255** [1] - 78:15
**227-2800** [1] - 1:16
**24th** [1] - 35:18
**25** [1] - 38:3
**252-7759** [1] - 1:13
**28** [1] - 78:15
**28th** [1] - 5:3
**2:13** [5] - 11:12, 15:20, 15:25, 16:12, 66:12
**2:15** [1] - 67:17
**2:16** [4] - 16:1, 66:12, 67:17
**2:17** [2] - 16:1, 26:21
**2:20** [1] - 16:4
**2:30** [1] - 69:6
**2:45** [1] - 69:17
**2B2.3** [1] - 9:2
**2B2.3(b)(1)(A)(vii)** [1] - 9:5
**2nd** [1] - 1:15

## 3

**3** [4] - 10:4, 74:23, 75:12, 79:6
**30** [21] - 5:9, 17:7, 17:8, 20:3, 20:6, 28:17, 30:8, 51:4, 65:1, 67:19, 69:7, 69:17, 70:10, 70:16, 70:21, 72:6, 73:18, 73:23, 74:1, 77:21, 78:2
**3013** [1] - 75:18
**333** [1] - 78:1
**3553** [1] - 75:10
**3553(a** [3] - 10:1, 50:20, 62:14
**3553(a)(6** [1] - 34:14
**3563(b)(10** [1] - 76:20
**36** [7] - 10:4, 19:23, 20:4, 31:22, 32:1, 32:10, 75:11
**3663** [1] - 76:17
**3663(a)(1)(A)** [1] - 63:13
**3663A** [1] - 63:20
**3663A(c)(3)(B)** [1] - 63:19
**37** [1] - 4:21

**3742** [1] - 78:10
**38** [1] - 4:22
**39** [2] - 4:24, 11:24
**3E1.1(a** [1] - 9:8

## 4

**4** [3] - 9:2, 9:8, 79:6
**40** [1] - 5:11
**41** [1] - 5:9
**42** [5] - 4:25, 74:25, 75:13, 76:20, 79:13
**463-1818** [1] - 1:20
**49** [2] - 44:17, 44:18
**4th** [2] - 1:12, 80:24

## 5

**5** [1] - 79:6
**50,000** [1] - 56:2
**5335** [1] - 1:19
**555** [1] - 1:12

## 6

**6** [6] - 9:10, 20:23, 21:13, 27:14, 27:20, 49:18
**60** [1] - 10:4
**607** [1] - 1:15
**617** [1] - 1:16
**6th** [35] - 11:12, 12:5, 17:5, 17:17, 22:14, 23:1, 28:16, 31:24, 33:17, 33:24, 34:24, 35:1, 35:9, 36:5, 37:3, 37:5, 40:20, 40:25, 41:16, 42:10, 45:25, 46:1, 49:9, 62:12, 64:10, 65:2, 65:12, 67:21, 70:2, 71:6, 71:16, 71:24, 72:3, 73:2, 74:19

## 7

**7** [1] - 29:4
**7th** [4] - 37:5, 37:19, 52:3, 71:8

## 9

**90** [2] - 18:24, 19:8
**9:40** [1] - 1:5

## A

**a.m** [2] - 1:5, 80:11
**abide** [1] - 76:3
**ability** [3] - 77:18, 77:22, 80:19
**able** [2] - 48:1, 59:9
**absolutely** [14] - 15:8, 21:5, 33:5, 39:1, 41:22, 42:24, 45:4, 45:21, 46:22, 47:6, 47:8, 48:15, 54:7, 79:3
**absolution** [1] - 73:4
**abuse** [2] - 72:13, 77:7
**accept** [2] - 56:21, 56:25
**acceptable** [1] - 53:11
**acceptance** [8] - 9:7, 29:15, 29:16, 29:22, 30:11, 30:12, 30:17, 31:10
**accepted** [1] - 8:7
**access** [2] - 4:5, 77:13
**accessing** [1] - 68:24
**accordance** [2] - 75:17, 76:16
**according** [1] - 70:4
**accrue** [1] - 77:24
**accurate** [3] - 40:17, 41:8, 80:16
**acknowledged** [5] - 12:2, 29:10, 29:16, 29:19, 30:13
**acknowledging** [3] - 25:18, 29:22, 64:9
**acknowledgment** [1] - 29:15
**act** [1] - 37:20
**Act** [1] - 75:8
**action** [1] - 31:25
**Action** [1] - 1:2
**actions** [2] - 13:4, 35:4
**active** [2] - 14:10, 14:15
**actively** [3] - 11:16, 17:9, 66:4
**activity** [4] - 28:25, 73:5, 73:13, 74:5
**actual** [2] - 16:12, 67:12
**acuity** [1] - 38:8
**Adams** [1] - 43:10
**add** [1] - 58:5
**added** [1] - 9:3
**addition** [3] - 10:24, 21:8, 75:16
**additional** [3] - 5:1,

10:24, 52:9
**address** [2] - 78:3, 79:10
**addressing** [2] - 5:21, 26:15
**administration** [1] - 64:20
**advantage** [2] - 38:3, 58:21
**adversarial** [1] - 34:10
**advisory** [2] - 6:12, 9:10
**affiliated** [1] - 28:9
**affiliations** [2] - 28:10, 55:16
**afford** [1] - 78:21
**agencies** [1] - 78:7
**aggravating** [4] - 12:13, 13:9, 21:8, 27:12
**aggressive** [1] - 15:6
**aggressively** [1] - 67:14
**ago** [2] - 33:23, 36:16
**agree** [5] - 8:13, 23:19, 27:6, 30:10, 51:13
**agreed** [1] - 63:23
**agreement** [7] - 21:20, 22:10, 29:14, 44:14, 63:8, 71:12, 76:16
**agreements** [2] - 22:2, 22:8
**ahead** [1] - 48:10
**aid** [3] - 5:2, 26:14, 66:6
**aided** [2] - 1:25, 26:15
**allocute** [2] - 48:17, 58:12
**allocution** [2] - 40:14, 58:8
**allowed** [2] - 28:20, 80:5
**almost** [1] - 15:24
**ALSO** [1] - 1:21
**alt** [4] - 28:11, 39:5, 56:16
**alt-left** [1] - 39:5
**alt-right** [2] - 28:11, 39:5
**amazing** [2] - 32:2, 50:3
**AMERICA** [1] - 1:2
**America** [4] - 2:3, 36:12, 36:15, 56:9
**American** [1] - 46:16
**Americans** [3] - 33:13, 33:17, 33:18
**amok** [1] - 49:24
**amount** [7] - 63:7,

63:12, 63:15, 63:22, 75:20, 76:2
**amplifies** [1] - 73:6
**analogous** [1] - 49:21
**answer** [3] - 36:9, 41:23, 42:18
**anticipate** [1] - 33:10
**anticipated** [3] - 47:3, 47:4, 56:7
**Antifa** [11] - 23:1, 23:4, 23:21, 24:3, 24:9, 24:22, 29:2, 37:24, 38:23, 44:5, 44:9
**Antifa-generated** [1] - 37:24
**anyway** [2] - 23:16, 71:17
**apologize** [1] - 61:22
**apologized** [1] - 12:2
**apology** [1] - 12:8
**appalled** [1] - 33:18
**appeal** [6] - 43:8, 78:11, 78:13, 78:22, 78:23
**appear** [3] - 13:6, 35:21, 70:2
**APPEARANCES** [1] - 1:9
**appeared** [1] - 40:23
**applicable** [1] - 6:1
**application** [1] - 9:25
**applies** [3] - 28:18, 32:15, 32:16
**apply** [7] - 6:13, 6:14, 6:15, 8:12, 8:16, 62:25, 63:21
**appreciate** [3] - 12:1, 35:20, 35:21
**appreciating** [1] - 30:12
**appreciation** [1] - 29:17
**appreciative** [1] - 29:9
**approaching** [1] - 68:2
**appropriate** [6] - 6:23, 12:15, 21:6, 61:21, 75:2, 78:7
**approved** [1] - 78:8
**April** [2] - 1:4, 80:24
**aptly** [1] - 33:8
**Architect** [3] - 63:11, 75:20, 75:24
**arduous** [1] - 35:6
**area** [5] - 12:17, 41:1, 41:21, 43:10, 43:19
**arguably** [1] - 36:6
**argument** [2] - 58:5, 62:9
**arrest** [3] - 29:25,

30:5, 71:13
**arriving** [1] - 65:15
**arts** [1] - 43:13
**artsy** [1] - 43:13
**aside** [1] - 27:1
**aspirations** [2] - 40:7, 43:3
**assault** [4] - 36:6, 36:18, 49:24, 52:16
**assaulted** [1] - 13:6
**assessed** [1] - 77:18
**assessing** [1] - 69:25
**assessment** [2] - 9:16, 75:17
**assist** [3] - 11:15, 37:23, 67:8
**assistance** [1] - 78:19
**assisted** [1] - 65:7
**associated** [1] - 5:6
**associates'** [1] - 39:8
**associating** [1] - 27:15
**assume** [1] - 43:24
**attached** [1] - 46:12
**attack** [4] - 64:12, 70:1, 71:1, 72:22
**attacked** [1] - 61:4
**attacking** [3] - 59:13, 60:7, 60:10
**attempted** [1] - 61:15
**attempting** [3] - 11:16, 54:23, 69:14
**attendance** [1] - 58:22
**attended** [1] - 64:23
**attending** [1] - 58:20
**attention** [2] - 12:16, 59:6
**Attention** [1] - 75:25
**Attorney's** [1] - 77:16
**attorneys** [2] - 7:20, 7:24
**authorization** [1] - 80:22
**authorize** [1] - 77:14
**authorized** [1] - 77:9
**available** [8] - 2:8, 4:5, 30:21, 33:7, 63:2, 63:10, 74:6, 78:18
**Avenue** [3] - 1:15, 1:19, 78:2
**average** [2] - 33:13, 33:17
**avoid** [4] - 34:14, 35:7, 63:3, 74:13
**aware** [2] - 16:10, 24:16

**B**

**background** [2] - 36:13, 37:12
**backpack** [1] - 14:8
**bad** [6] - 43:5, 46:22, 48:13, 51:16, 54:7, 57:12
**badge** [1] - 15:22
**bag** [1] - 46:18
**balance** [2] - 43:21, 77:24
**balanced** [1] - 43:20
**bar** [3] - 32:12, 32:15, 33:2
**barely** [1] - 39:8
**barricade** [3] - 59:18, 59:21, 59:24
**base** [1] - 9:2
**based** [9] - 16:2, 17:6, 22:24, 24:5, 30:24, 31:3, 31:7, 43:18, 75:6
**bashing** [1] - 65:25
**basic** [1] - 76:6
**bear** [1] - 46:25
**bearing** [1] - 47:14
**became** [1] - 67:19
**become** [3] - 45:7, 53:2, 53:4
**becomes** [1] - 78:18
**becoming** [2] - 64:25, 69:7
**BEFORE** [1] - 1:7
**began** [1] - 43:1
**begin** [6] - 10:19, 10:20, 63:6, 67:17, 79:17, 79:18
**beginning** [2] - 20:20, 56:19
**begins** [1] - 14:3
**behalf** [3] - 2:14, 2:17, 5:11
**behavior** [2] - 54:12, 57:25
**belief** [2] - 65:13, 70:5
**believer** [1] - 41:4
**belong** [1] - 26:10
**below** [1] - 80:23
**benefit** [2] - 34:18, 49:16
**BERYL** [1] - 1:7
**best** [5] - 46:1, 46:5, 55:1, 63:9, 80:18
**better** [7] - 38:10, 38:15, 40:5, 44:22, 55:20, 59:22, 60:7
**between** [4] - 32:13, 59:1, 67:17, 69:18

**beyond** [1] - 36:17
**bias** [1] - 50:17
**big** [1] - 47:10
**bigger** [1] - 67:11
**bit** [6] - 24:19, 31:13, 33:24, 39:12, 49:14, 61:1
**black** [1] - 37:6
**blame** [1] - 48:5
**blamed** [1] - 73:6
**block** [1] - 68:16
**bluntly** [1] - 17:22
**bona** [1] - 40:25
**boosted** [2] - 2:19, 3:9
**boot** [1] - 14:5
**boots** [1] - 67:1
**bothers** [1] - 46:3
**bottom** [1] - 43:23
**bought** [4] - 46:9, 46:10, 46:16, 46:18
**brag** [1] - 61:17
**Brandon** [2] - 2:14
**BRANDON** [1] - 1:10
**brandon.regan@ usdoj.gov** [1] - 1:13
**breach** [13] - 16:12, 16:13, 17:4, 17:16, 28:18, 33:16, 51:6, 65:24, 66:14, 67:15, 67:20, 72:3, 73:17
**breaching** [3] - 65:2, 68:23, 69:6
**break** [21] - 15:2, 17:10, 25:14, 28:24, 47:10, 47:12, 47:19, 47:25, 48:6, 51:4, 51:9, 54:23, 67:3, 67:5, 67:7, 67:8, 67:16, 69:14, 70:9, 72:7
**break-in** [1] - 67:5
**breaking** [13] - 13:22, 14:11, 15:6, 16:5, 17:17, 46:20, 47:16, 47:21, 65:3, 65:9, 67:10, 72:7
**Brian** [5] - 2:4, 3:7, 3:24, 19:20, 75:10
**BRIAN** [1] - 1:4
**brief** [1] - 36:4
**briefing** [3] - 29:12, 41:24, 42:9
**briefly** [2] - 34:5, 40:14
**bring** [1] - 46:10
**broken** [6] - 11:19, 16:24, 47:18, 66:11, 67:18, 69:12
**build** [1] - 54:25
**building** [28] - 4:1, 9:1,

9:4, 16:13, 16:16, 17:11, 18:11, 18:20, 19:14, 25:6, 27:9, 27:11, 27:25, 47:6, 59:13, 60:18, 64:4, 68:24, 69:6, 69:22, 70:7, 70:11, 70:17, 70:20, 71:21, 72:4, 73:24, 74:1
**Building** [7] - 14:9, 18:14, 51:5, 65:2, 70:24, 71:16, 76:1
**bunch** [1] - 23:7
**burden** [1] - 63:18
**Bureau** [2] - 76:24, 79:19
**business** [1] - 49:2
**busy** [2] - 67:22, 70:21
**buying** [1] - 39:21

**C**

**calculation** [2] - 8:13, 29:20
**calculus** [2] - 21:3, 33:6
**calm** [2] - 15:21, 66:21
**camera** [1] - 49:17
**cannot** [2] - 13:24, 38:14
**capacity** [1] - 25:5
**Capitol** [59] - 11:10, 14:8, 15:15, 17:4, 17:11, 17:16, 18:14, 19:13, 19:16, 19:20, 20:5, 25:14, 25:24, 28:18, 33:16, 36:7, 47:7, 51:5, 51:6, 51:9, 63:11, 63:24, 64:10, 64:14, 64:24, 64:25, 65:1, 65:15, 65:24, 66:10, 66:15, 67:9, 67:15, 67:18, 67:20, 68:19, 68:22, 69:5, 69:8, 69:11, 69:13, 69:16, 69:18, 69:20, 70:1, 70:7, 70:13, 70:16, 70:24, 71:4, 71:10, 71:16, 72:3, 72:22, 73:16, 73:18, 73:22, 75:20, 75:24
**Capitol's** [1] - 65:18
**captured** [1] - 13:20
**captures** [1] - 13:23
**car** [2] - 58:24, 61:2
**career** [3] - 55:20, 55:22, 55:25
**CARMEN** [1] - 1:21

**carried** [1] - 68:18
**carrying** [2] - 28:3, 66:17
**case** [40] - 5:7, 6:13, 6:15, 6:21, 6:23, 7:21, 8:9, 8:12, 10:2, 11:8, 12:15, 12:22, 13:10, 17:3, 19:19, 19:25, 21:7, 21:11, 23:18, 29:7, 29:24, 29:25, 30:1, 30:3, 30:7, 30:23, 31:8, 31:20, 33:12, 35:22, 36:11, 37:6, 49:2, 50:1, 51:1, 51:3, 57:24, 63:12, 73:15, 75:5
**Case** [1] - 2:3
**cases** [8] - 19:9, 19:17, 20:16, 21:22, 22:2, 30:3, 34:12, 49:20
**cash** [1] - 53:19
**catch** [2] - 53:10, 59:9
**category** [3] - 8:19, 8:23, 9:9
**caught** [2] - 38:18, 44:20
**caused** [1] - 67:12
**CCTV** [24] - 5:1, 10:20, 10:25, 11:3, 11:9, 11:10, 11:14, 11:20, 12:21, 13:25, 15:20, 16:17, 25:13, 27:9, 35:17, 35:25, 43:7, 46:8, 65:5, 65:10, 66:7, 66:9, 66:11, 66:20
**certain** [4] - 12:10, 24:14, 31:3
**certainly** [12] - 14:19, 14:23, 21:5, 27:10, 27:16, 27:22, 31:21, 33:25, 34:21, 45:2, 55:24, 60:10
**certainty** [2] - 38:13, 38:15
**CERTIFICATE** [1] - 80:13
**certificate** [1] - 80:20
**certification** [3] - 23:7, 66:19, 70:14
**certify** [1] - 80:16
**challenge** [1] - 78:16
**Chamber** [8] - 16:3, 18:2, 27:2, 51:12, 67:24, 68:24, 70:14, 70:22
**chambers** [1] - 26:21
**Chambers** [1] - 70:25

**change** [3] - 42:23, 78:3, 78:4
**changed** [4] - 36:18, 36:19, 60:25, 66:22
**Chansley** [2] - 25:25, 26:4
**Chansleys** [1] - 26:18
**chaos** [2] - 16:14, 24:11
**chaotic** [2] - 65:21, 73:1
**characteristics** [2] - 63:2, 72:10
**characterization** [1] - 27:7
**characterize** [2] - 14:15, 31:11
**charge** [1] - 14:17
**charged** [3] - 14:18, 31:1, 44:21
**charges** [1] - 31:4
**chasing** [12] - 13:22, 18:1, 18:8, 26:19, 26:23, 26:24, 27:3, 27:16, 68:16, 68:19, 71:3, 72:8
**Chief** [1] - 75:24
**CHIEF** [1] - 1:8
**child** [1] - 39:2
**chilling** [1] - 64:21
**choose** [1] - 78:13
**chose** [2] - 60:6, 69:10
**circle** [1] - 56:14
**circulation** [1] - 49:13
**circumference** [2] - 46:12, 46:13
**circumstance** [3] - 13:9, 15:8, 15:9
**circumstances** [5] - 29:7, 31:8, 63:1, 64:2, 71:22
**circumvented** [2] - 59:7, 59:12
**citizen** [1] - 25:3
**claim** [1] - 78:18
**clarify** [1] - 79:12
**Class** [17] - 4:2, 6:14, 19:10, 19:11, 19:12, 20:2, 20:9, 28:21, 30:7, 31:14, 31:15, 32:7, 32:16, 64:5, 74:7, 74:20
**classes** [2] - 31:3, 49:22
**classified** [1] - 80:3
**clear** [9] - 15:1, 23:22, 34:23, 35:3, 35:8, 65:20, 68:1, 73:3, 73:12
**clearly** [7] - 13:11,

13:16, 14:1, 15:6, 15:11, 46:2, 68:9
**Clerk** [3] - 75:21, 78:1, 78:3
**client** [1] - 62:1
**climb** [2] - 59:21, 60:6
**close** [1] - 21:4
**clue** [1] - 30:14
**CNN** [1] - 44:1
**cocounsel** [1] - 3:14
**coincidence** [1] - 60:19
**colleagues** [1] - 31:21
**collected** [1] - 12:4
**college** [1] - 72:11
**College** [3] - 23:6, 66:19, 70:14
**colleges** [1] - 43:12
**color** [1] - 25:16
**colored** [2] - 23:21, 67:4
**Columbia** [1] - 75:22
**COLUMBIA** [1] - 1:1
**combating** [1] - 22:25
**combination** [1] - 9:9
**coming** [2] - 16:6, 60:9
**command** [1] - 69:5
**commands** [2] - 68:9, 71:20
**commence** [1] - 77:21
**comment** [1] - 35:17
**commit** [1] - 76:9
**committed** [1] - 44:20
**Committee** [1] - 50:2
**committing** [2] - 55:2, 55:3
**communicating** [1] - 49:7
**community** [7] - 10:5, 10:7, 10:9, 49:6, 49:10, 49:16, 52:11
**compare** [1] - 28:4
**compared** [2] - 10:5, 27:25
**compelling** [1] - 29:6
**complete** [5] - 18:16, 69:9, 71:20, 73:22, 80:18
**completely** [3] - 14:3, 23:19, 45:15
**complex** [2] - 38:1, 63:14
**compliance** [1] - 34:13
**compliant** [1] - 72:15
**complicate** [1] - 63:16
**complied** [1] - 69:4
**comply** [4] - 6:1,

62:15, 76:18, 77:3
**component** [2] - 37:8, 45:2
**compound** [2] - 41:23, 42:17
**comprehended** [1] - 61:8
**compromised** [1] - 2:24
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concededly** [2] - 22:18, 24:24
**concern** [1] - 73:15
**concluded** [1] - 16:11
**concludes** [1] - 80:11
**conclusion** [1] - 24:9
**concurrent** [1] - 20:25
**condition** [1] - 19:1
**conditions** [10] - 31:18, 72:15, 74:10, 74:24, 75:13, 76:4, 76:5, 76:8, 76:19, 79:13
**conduct** [33] - 6:3, 11:20, 12:7, 20:8, 20:10, 27:24, 29:18, 29:21, 30:13, 30:16, 31:23, 36:5, 51:1, 51:3, 51:23, 51:24, 52:2, 52:5, 57:22, 62:12, 62:21, 63:4, 64:16, 67:12, 71:24, 72:18, 72:23, 73:6, 74:22, 75:5, 76:6
**confident** [1] - 23:8
**confinement** [7] - 74:24, 75:14, 76:19, 76:21, 76:22, 79:14, 79:20
**confirmed** [1] - 11:8
**confronted** [3] - 17:18, 68:22, 69:3
**confused** [2] - 40:1, 56:19
**confusing** [1] - 44:3
**Congress** [7] - 18:3, 61:14, 62:13, 64:18, 66:16, 67:23, 68:25
**connection** [7] - 4:18, 8:2, 12:4, 54:18, 62:11, 63:25, 78:20
**consecutive** [1] - 79:17
**consent** [2] - 23:15, 23:17
**consequences** [1] - 73:11
**conservatism** [1] -

43:11
**conservative** [10] - 39:13, 41:1, 42:11, 43:8, 43:12, 43:14, 43:15, 43:19, 57:8, 57:9
**consider** [9] - 50:23, 50:25, 51:24, 52:13, 52:14, 52:15, 54:15, 62:12, 62:25
**consideration** [5] - 38:16, 73:11, 74:2, 75:6, 75:9
**considerations** [2] - 50:20, 72:19
**considered** [4] - 15:9, 50:25, 62:24, 80:20
**considering** [4] - 34:17, 40:22, 62:7, 62:23
**considers** [1] - 29:6
**consistently** [1] - 72:14
**conspiracy** [6] - 28:15, 32:23, 41:4, 41:20, 56:17
**conspired** [1] - 45:12
**constitute** [1] - 49:16
**constitutes** [1] - 80:16
**Constitution** [2] - 53:3, 78:2
**constitutional** [1] - 71:25
**constitutionally** [1] - 66:17
**contact** [1] - 15:1
**contacting** [1] - 71:7
**content** [1] - 49:12
**context** [5] - 12:9, 25:8, 54:16, 57:21, 57:22
**continue** [2] - 46:4, 60:12
**continued** [3] - 46:6, 60:16, 60:23
**contradict** [1] - 11:21
**contribute** [1] - 19:15
**contributed** [1] - 67:14
**control** [1] - 65:17
**controlled** [2] - 76:10, 76:12
**conversations** [1] - 37:12
**convicted** [3] - 64:3, 74:7, 74:20
**conviction** [6] - 6:13, 8:24, 9:17, 72:11, 78:16, 78:20
**convictions** [1] - 8:21

84

**cooperate** [1] - 71:6
**cooperation** [16] -
21:16, 21:20, 21:21,
21:22, 21:23, 22:1,
22:3, 22:7, 22:9,
22:12, 29:9, 44:13,
44:14, 44:18, 44:24,
45:1
**copy** [1] - 23:12
**core** [1] - 34:25
**correct** [19] - 7:8, 7:9,
7:16, 7:17, 15:7,
15:17, 17:1, 17:20,
18:6, 18:12, 18:18,
18:21, 19:3, 25:15,
29:7, 32:18, 54:4,
79:22, 79:23
**corrected** [1] - 7:11
**corridor** [2] - 15:21,
15:23
**cost** [4] - 75:1, 77:12,
78:21, 78:23
**counsel** [4] - 2:5, 6:8,
6:19, 78:19
**count** [5] - 9:16, 17:6,
23:6, 34:9, 70:15
**Count** [2] - 3:25, 75:12
**counting** [3] - 68:5,
68:6, 68:7
**country** [2] - 33:22,
50:6
**Counts** [1] - 79:6
**couple** [2] - 12:23,
48:8
**course** [6] - 6:5, 42:7,
48:9, 54:8, 54:11
**COURT** [109] - 1:1,
1:8, 2:9, 2:12, 2:15,
2:18, 2:21, 2:25, 3:4,
3:8, 3:11, 3:18, 3:20,
3:23, 5:14, 5:16,
5:20, 7:4, 7:13, 7:18,
7:23, 8:4, 9:21, 9:23,
10:19, 10:23, 13:25,
15:3, 15:5, 15:13,
15:18, 17:2, 17:8,
17:15, 17:21, 17:25,
18:7, 18:13, 18:16,
18:19, 18:22, 19:1,
19:4, 20:15, 21:19,
22:22, 23:12, 23:25,
24:16, 25:13, 26:1,
26:22, 28:13, 29:8,
31:12, 32:19, 33:15,
34:3, 34:9, 35:12,
35:14, 35:16, 35:24,
37:14, 37:17, 39:24,
40:18, 41:3, 41:14,
41:19, 41:24, 42:3,
42:8, 42:15, 43:16,

46:14, 47:9, 47:14,
47:20, 47:23, 49:4,
50:22, 51:8, 51:11,
51:14, 51:16, 51:19,
52:1, 53:14, 53:24,
55:6, 55:22, 58:4,
58:9, 58:13, 58:17,
59:16, 59:24, 60:3,
61:24, 62:3, 79:2,
79:4, 79:9, 79:18,
79:23, 79:25, 80:5,
80:9
**court** [7] - 4:9, 4:12,
21:24, 32:13, 37:10,
42:5, 77:8
**Court** [40] - 1:23, 1:23,
2:2, 5:2, 6:24, 16:10,
21:2, 21:9, 21:12,
22:15, 22:21, 23:19,
24:13, 33:8, 33:25,
34:6, 36:2, 49:6,
49:11, 63:9, 63:14,
63:21, 65:7, 66:5,
73:3, 74:18, 74:23,
75:10, 75:21, 75:22,
76:15, 77:21, 78:1,
78:4, 78:9, 78:11,
78:14, 78:22, 80:25
**Court's** [5] - 5:2, 27:6,
35:18, 73:10, 79:13
**court-issued** [1] - 4:12
**court-ordered** [1] -
77:8
**courtroom** [2] - 3:15,
3:16
**COURTROOM** [2] -
2:2, 2:10
**courts** [1] - 21:14
**courtyard** [1] - 65:18
**cover** [1] - 75:1
**COVID** [1] - 61:15
**coworker** [2] - 69:20,
69:24
**CPA** [1] - 75:25
**cracked** [1] - 67:2
**craziness** [1] - 47:5
**crazy** [1] - 39:23
**create** [2] - 35:6, 73:4
**credentials** [1] - 4:13
**credit** [2] - 53:17,
70:23
**crew** [1] - 17:16
**crime** [2] - 44:20, 76:9
**Crimes** [1] - 1:11
**crimes** [2] - 62:22,
72:18
**criminal** [21] - 6:2,
8:19, 8:21, 8:22,
8:23, 9:9, 30:16,
37:21, 39:1, 44:17,

53:12, 62:21, 64:16,
72:11, 72:18, 73:5,
73:6, 73:13, 74:4,
74:25, 77:19
**Criminal** [2] - 1:2, 2:3
**critical** [3] - 11:11,
66:11, 72:19
**crowbar** [1] - 48:7
**crowbars** [1] - 46:20
**crowd** [23] - 17:18,
18:1, 18:10, 26:24,
27:1, 27:4, 27:7,
27:10, 27:16, 59:6,
59:7, 59:12, 59:20,
60:16, 64:24, 65:17,
66:3, 68:3, 68:10,
68:16, 72:8, 73:12
**crowd-control** [1] -
65:17
**crowds** [1] - 72:4
**curiosity** [1] - 48:12
**curious** [2] - 22:23,
23:2
**custodial** [4] - 72:1,
74:3, 74:19, 74:24

# D

**D.C** [6] - 1:5, 3:14,
49:9, 70:4, 76:1,
78:2
**damage** [6] - 15:15,
19:15, 55:2, 63:10,
63:24, 67:12
**damaged** [1] - 48:24
**date** [1] - 77:21
**Dated** [1] - 80:24
**daughter** [2] - 26:10,
72:12
**days** [16] - 18:24,
19:8, 19:23, 20:3,
20:6, 74:25, 75:13,
75:15, 76:13, 76:21,
76:22, 77:21, 78:3,
78:14, 79:14, 79:15
**days'** [1] - 30:8
**DC** [2] - 1:12, 1:19
**deal** [3] - 12:18, 12:19,
52:10
**dealing** [1] - 66:18
**debate** [2] - 32:13,
32:14
**December** [1] - 7:6
**decision** [2] - 44:11,
73:16
**decisions** [2] - 20:18
**Declaration** [1] - 53:3
**deemed** [1] - 4:14
**Defendant** [2] - 1:5,

11:15
**defendant** [67] - 2:17,
3:7, 5:11, 11:22,
13:10, 13:15, 14:7,
14:20, 14:24, 15:15,
18:1, 18:7, 18:10,
18:13, 18:19, 19:11,
20:3, 20:8, 21:21,
22:9, 22:15, 22:24,
23:22, 24:24, 25:9,
25:19, 26:24, 27:8,
27:10, 28:9, 28:24,
29:13, 29:17, 29:20,
32:7, 32:21, 33:11,
34:24, 35:9, 36:4,
36:23, 37:24, 49:12,
52:14, 53:15, 58:11,
64:3, 64:11, 64:22,
65:7, 65:20, 67:4,
68:8, 68:18, 68:21,
69:1, 69:13, 72:19,
72:23, 72:25, 73:25,
74:4, 74:14, 74:15,
74:21, 74:23, 79:7
**DEFENDANT** [11] -
1:14, 3:22, 7:3, 7:22,
8:3, 54:5, 58:16,
58:18, 59:18, 60:1,
60:4
**defendant's** [15] - 9:6,
12:7, 13:4, 13:7,
13:20, 15:10, 49:17,
64:16, 67:12, 68:4,
68:12, 70:1, 73:2,
73:16, 77:18
**defendants** [12] -
5:23, 6:3, 14:18,
19:10, 28:19, 31:3,
31:7, 31:9, 31:23,
35:8, 63:3, 74:20
**defense** [7] - 7:14,
10:6, 10:12, 11:5,
36:11, 44:18, 79:2
**defiance** [5] - 18:16,
69:9, 70:18, 71:20,
73:22
**defined** [1] - 78:15
**definitely** [1] - 21:3
**degenerating** [1] -
65:22
**degree** [2] - 39:8,
63:17
**delivering** [1] - 55:20
**delivery** [1] - 49:1
**democracy** [4] -
36:12, 36:18, 49:24,
52:16
**demonstrably** [1] -
31:23
**demonstrating** [3] -

19:13, 19:22, 30:25
**denial** [1] - 4:13
**DENNER** [48] - 1:14,
2:16, 2:20, 2:23, 3:2,
3:6, 5:18, 7:17, 9:22,
35:15, 35:19, 36:8,
37:16, 37:25, 39:25,
41:2, 41:5, 41:18,
41:22, 42:1, 42:7,
42:14, 42:16, 43:20,
46:15, 47:12, 47:15,
47:22, 47:25, 49:19,
51:7, 51:10, 51:13,
51:15, 51:18, 51:24,
52:6, 53:22, 54:2,
54:6, 55:8, 55:24,
58:6, 58:10, 62:2,
79:3, 80:2, 80:7
**Denner** [14] - 2:17,
3:7, 3:14, 5:17, 7:13,
9:21, 30:19, 35:14,
41:14, 43:16, 51:16,
58:4, 62:1, 79:25
**dent** [1] - 56:14
**deny** [1] - 13:24
**department** [1] - 50:18
**depicting** [1] - 71:2
**depicts** [2] - 68:4,
68:13
**DEPUTY** [2] - 2:2, 2:10
**descending** [1] -
16:22
**describe** [2] - 11:8,
42:11
**described** [3] - 11:4,
22:15, 66:1
**describes** [1] - 71:11
**describing** [1] - 25:1
**description** [2] - 8:11,
13:3
**designate** [1] - 79:20
**designated** [2] -
76:24, 77:1
**despite** [1] - 69:10
**destroy** [1] - 17:11
**destroyed** [1] - 13:6
**destruction** [2] -
11:23, 14:17
**detention** [12] - 10:4,
18:24, 19:6, 19:8,
20:11, 31:19, 74:16,
74:17, 74:25, 75:15,
77:2, 79:16
**deter** [4] - 62:21,
72:17, 73:8, 74:4
**determination** [4] -
9:19, 40:15, 46:24,
57:25
**determinations** [1] -
7:8

determine [3] - 6:7, 6:12, 8:15
determined [4] - 21:10, 66:14, 76:15, 77:22
determining [1] - 63:14
deterrence [4] - 34:1, 73:15, 75:3
devices [2] - 23:15, 26:9
died [1] - 33:23
difference [2] - 52:6, 52:17
different [8] - 5:25, 6:2, 12:17, 42:18, 45:15, 47:14, 53:15
difficult [4] - 14:25, 27:19, 34:11, 36:8
difficulty [2] - 47:16, 48:25
digital [3] - 23:15, 26:9, 28:8
direct [3] - 41:14, 51:22, 70:18
directed [2] - 49:7, 77:4
directing [1] - 66:2
directive [1] - 34:13
directly [5] - 6:20, 6:21, 6:22, 64:16, 72:4
disagree [3] - 44:15, 48:4, 54:15
disassembled [1] - 80:21
disbursement [1] - 75:23
disclosed [1] - 66:8
disclosure [1] - 23:20
discourse [1] - 33:22
discovery [2] - 11:5
discretion [1] - 77:11
discuss [1] - 9:25
discussing [1] - 35:2
discussion [3] - 14:19, 32:14, 34:9
dismiss [1] - 79:6
disparities [3] - 34:15, 35:7, 63:3
disparity [1] - 74:14
disperse [7] - 17:22, 17:23, 18:10, 18:11, 68:3, 68:9, 73:21
disrespectful [1] - 39:15
disrupted [1] - 73:13
disrupting [2] - 64:18, 73:9
distinctions [1] - 28:1

district [1] - 78:8
DISTRICT [3] - 1:1, 1:1, 1:8
District [3] - 75:22, 78:1
divergent [1] - 10:1
docketed [8] - 4:21, 4:22, 4:24, 4:25, 5:8, 5:11, 11:24
documents [2] - 4:19, 5:12
DOJ [1] - 1:11
DOJ-USAO [1] - 1:11
dominating [2] - 33:21, 33:24
done [10] - 38:20, 45:25, 46:2, 46:3, 47:18, 49:20, 58:3, 58:10, 61:14, 63:10
door [1] - 11:11, 13:11, 16:5, 16:6, 16:19, 16:25, 17:17, 60:19, 65:3, 66:21, 69:11
doors [6] - 51:4, 60:8, 65:24, 66:24, 67:19, 69:15
doorway [3] - 13:13, 15:24, 70:22
down [27] - 15:22, 21:23, 22:3, 40:5, 40:6, 42:5, 42:22, 44:6, 44:8, 45:14, 45:16, 45:17, 50:6, 51:4, 53:1, 55:17, 55:18, 56:6, 57:13, 58:24, 59:5, 65:3, 65:24, 67:2, 67:7
drafted [2] - 13:2
drag [1] - 51:12
dramatically [1] - 48:24
drive [1] - 61:6
drives [1] - 22:15
driving [5] - 37:4, 38:8, 38:12, 44:10, 52:22
drove [2] - 42:23, 58:24
drug [2] - 76:13, 76:14
drugs [1] - 21:22
due [4] - 37:25, 52:4, 73:15, 77:19
duly [1] - 64:20
duly-elected [1] - 64:20
during [6] - 6:4, 11:23, 15:19, 38:17, 69:12, 71:6
dutifully [1] - 66:17

dying [1] - 46:4

## E

earliest [3] - 29:14, 30:21, 73:17
early [6] - 21:16, 26:11, 29:15, 31:7, 31:10, 71:7
Eastern [1] - 36:15
ECF [7] - 4:21, 4:22, 4:24, 4:25, 5:9, 5:11, 11:24
educated [1] - 39:9
education [2] - 72:12, 77:6
effective [2] - 65:9, 65:10
effort [1] - 11:17
efforts [3] - 21:13, 65:24, 67:15
egregious [4] - 27:14, 54:17, 58:2, 73:6
eight [2] - 5:4, 19:20
either [4] - 8:5, 11:4, 51:25, 55:13
elected [3] - 40:12, 55:22, 64:20
election [18] - 25:12, 31:25, 32:4, 39:6, 39:19, 40:3, 41:21, 42:11, 42:13, 43:8, 44:5, 56:18, 57:12, 65:15, 70:6, 73:10
elections [1] - 32:3
electoral [2] - 40:22, 41:16
Electoral [3] - 23:6, 66:19, 70:14
element [1] - 38:7
ELIZABETH [1] - 80:15
Elizabeth [2] - 1:23, 80:25
eloquently [1] - 21:9
Email [3] - 1:13, 1:17, 1:20
employed [2] - 39:3, 72:14
employment [2] - 72:14, 77:6
empty [1] - 15:21
encourage [1] - 17:13
end [1] - 40:9
endeavor [1] - 63:21
ended [1] - 59:3
enduring [1] - 36:17
enforcement [15] - 21:14, 21:16, 22:4,

24:7, 26:14, 26:15, 26:21, 28:3, 64:17, 69:4, 69:9, 71:3, 71:7, 71:17, 71:19
engage [3] - 11:23, 36:4, 70:3
engaged [2] - 26:20, 72:23
engaging [4] - 29:21, 30:15, 37:20, 73:12
ensure [3] - 32:4, 62:14, 64:19
enter [7] - 65:1, 67:20, 69:8, 70:10, 70:23, 73:16, 73:18
entered [12] - 18:20, 19:13, 29:13, 47:6, 60:18, 70:7, 70:16, 70:18, 71:12, 71:16, 73:22, 78:16
entering [7] - 3:25, 8:25, 25:6, 27:11, 64:3, 65:4, 78:19
enters [1] - 78:14
entertaining [1] - 55:10
entire [2] - 27:19, 59:3
entirely [5] - 12:9, 24:4, 25:10, 30:23, 45:1
entrance [5] - 11:17, 65:8, 65:17, 65:19, 67:9
entries [1] - 69:18
entry [4] - 4:13, 30:5, 64:13, 69:13
episode [1] - 64:13
equal [1] - 77:20
especially [1] - 73:5
esque [1] - 24:20
essentially [2] - 44:23, 49:11
establish [1] - 76:5
estimate [2] - 63:10, 63:24, 63:25
estimated [1] - 63:23
Eugene [1] - 70:12
Europe [1] - 36:15
evacuate [1] - 16:14
evacuated [5] - 16:3, 18:3, 27:2, 67:25, 68:25
evacuation [2] - 16:7, 66:16
evaluate [1] - 29:24
evaluating [1] - 14:19
event [1] - 61:16
events [5] - 20:23, 34:2, 64:10, 65:12, 73:1

everywhere [1] - 41:13
evidence [6] - 5:5, 8:8, 12:17, 24:8, 25:22, 28:8
evident [2] - 53:3, 53:5
evolution [1] - 20:22
evolve [1] - 20:19
evolved [1] - 20:21
exact [1] - 16:21
exactly [3] - 22:19, 45:11, 48:13
example [4] - 13:10, 13:15, 19:19, 73:24
except [1] - 77:6
excusable [4] - 35:10, 57:20, 60:21
excuse [4] - 14:23, 18:24, 45:24
excused [2] - 38:24, 80:10
excusing [1] - 35:4
execute [1] - 78:9
exhausted [1] - 38:12
exhibits [1] - 8:9
existed [1] - 13:1
exit [3] - 70:19, 71:20, 73:23
exited [2] - 69:5, 69:16
expectations [1] - 76:6
expected [2] - 40:19, 57:1
explain [3] - 6:24, 20:7, 62:4
explains [1] - 11:13
explore [2] - 31:12, 49:14
expressed [2] - 65:13, 70:5
extended [2] - 28:20, 71:14
extensively [1] - 37:10
extent [3] - 23:10, 54:15, 56:13

## F

face [1] - 64:7
facilitate [3] - 26:25, 64:17, 71:18
facilitated [2] - 36:6, 66:4
facility [3] - 76:23, 76:25, 79:20
fact [14] - 8:7, 11:14, 13:1, 13:3, 14:24, 25:25, 26:6, 29:9, 30:24, 33:2, 38:18,

44:19, 58:21, 63:15
**factor** [2] - 33:25, 34:20
**factors** [13] - 9:25, 12:14, 21:8, 21:11, 27:12, 28:13, 28:19, 35:3, 50:20, 62:13, 69:25, 74:2, 75:7
**facts** [5] - 12:13, 29:24, 31:7, 50:21, 54:12
**factual** [4] - 6:9, 7:7, 7:15, 8:6
**failing** - 59:3
**fair** [1] - 24:9
**fairly** [4] - 11:2, 21:11, 39:12, 39:13
**fallen** [1] - 14:4
**falls** [3] - 8:20, 13:3, 64:9
**familiar** [2] - 21:12, 30:23
**family** [2] - 36:14, 39:2
**far** [3] - 38:16, 64:9, 72:2
**fashion** [3] - 19:15, 22:18, 35:9
**fashioning** [1] - 12:15
**favor** [2] - 57:23, 57:24
**favors** [2] - 72:1, 74:2
**FBI** [20] - 22:17, 23:3, 23:20, 24:2, 24:12, 24:22, 25:4, 25:17, 26:6, 26:8, 26:10, 37:19, 37:22, 37:23, 43:4, 44:11, 61:11, 66:1, 70:4, 71:7
**FBI's** [1] - 69:23
**FCRR** [3] - 1:23, 80:15, 80:25
**federal** [4] - 6:14, 8:12, 49:2, 76:9
**Federal** [1] - 1:11
**feelings** [1] - 57:10
**fell** [1] - 67:2
**fellow** [5] - 23:4, 29:3, 65:23, 68:8, 69:12
**felonies** [1] - 32:17
**felony** [1] - 31:1
**felt** [1] - 59:3
**fence** [1] - 65:17
**fences** [2] - 47:7, 60:9
**fervor** [1] - 33:11
**few** [6] - 12:5, 12:7, 47:23, 70:19, 71:10, 72:5
**fides** [1] - 40:25
**fifty** [1] - 27:21
**file** [2] - 78:13, 78:22

**filed** [2] - 7:6, 8:1
**film** [3] - 55:11, 55:18, 71:2
**filmed** [4] - 65:23, 68:1, 69:1, 71:10
**filming** [3] - 42:20, 50:12, 52:20
**finalized** [1] - 7:12
**finances** [1] - 53:21
**Financial** [1] - 75:25
**financial** [5] - 77:14, 77:15, 77:16, 77:25, 78:4
**findings** [1] - 8:7
**fine** [5] - 9:15, 74:12, 75:1, 75:16, 79:22
**fired** [2] - 49:1, 69:15
**firm** [1] - 3:16
**first** [39] - 6:7, 6:19, 16:12, 17:4, 17:7, 17:8, 17:16, 24:19, 25:21, 28:17, 31:5, 36:16, 36:24, 36:25, 38:23, 38:24, 40:10, 42:22, 43:6, 44:9, 51:4, 51:6, 53:22, 57:17, 60:8, 64:21, 64:23, 65:1, 66:14, 67:19, 69:6, 69:7, 70:10, 71:7, 72:6, 72:20, 73:18, 76:23, 79:15
**fists** [3] - 66:1, 66:25, 67:7
**fit** [1] - 24:18
**five** [3] - 31:16, 39:2, 74:9
**five-year-old** [1] - 39:2
**fix** [2] - 38:10, 63:21
**flag** [7] - 14:8, 14:21, 46:12, 46:14, 46:15, 46:16
**flagpole** [6] - 14:9, 17:9, 25:14, 47:10, 51:8, 67:8
**flagpoles** [1] - 65:25
**flags** [2] - 14:22, 46:17
**flavor** [1] - 25:1
**Floor** [1] - 1:15
**flow** [1] - 53:19
**focused** [5] - 11:10, 12:11, 12:16, 12:21
**follow** [2] - 17:2, 76:24
**followed** [10] - 9:13, 20:4, 51:11, 51:21, 59:6, 60:16, 60:22, 64:23, 68:18, 74:8
**followers** [1] - 40:9
**following** [12] - 18:1, 18:8, 56:2, 60:20,

68:16, 70:2, 72:3, 73:17, 73:20, 75:23, 76:4, 76:18
**follows** [1] - 77:20
**footage** [29] - 5:1, 10:21, 10:24, 11:1, 11:3, 11:9, 11:10, 11:14, 11:20, 12:21, 14:1, 15:21, 15:24, 16:4, 16:17, 17:15, 17:25, 25:13, 27:9, 35:17, 35:25, 59:9, 61:9, 65:5, 65:10, 66:8, 66:9, 66:11, 66:20
**FOR** [3] - 1:1, 1:10, 1:14
**forces** [1] - 71:19
**Ford** [1] - 75:25
**foregoing** [1] - 80:16
**forethought** [1] - 73:4
**form** [3] - 35:9, 44:23, 53:16
**former** [2] - 36:14, 41:17, 65:16
**forth** [1] - 21:6
**forward** [6] - 2:5, 34:2, 45:18, 57:8, 58:14, 80:1
**four** [2] - 6:6, 76:15
**Fox** [2] - 19:25, 43:25
**fox** [3] - 20:4, 20:5, 20:12
**frankly** [1] - 71:25
**fraud** [3] - 40:3, 65:14, 70:6
**front** [9] - 18:19, 19:9, 21:24, 30:4, 36:20, 60:15, 64:25, 68:2, 69:7
**frown** [1] - 48:4
**fucking** [1] - 68:5
**full** [2] - 78:5, 80:17
**fully** [7] - 2:19, 3:9, 7:20, 29:8, 40:19, 53:20, 58:15
**fulsome** [2] - 21:23, 71:11
**future** [7] - 4:13, 29:21, 32:5, 62:22, 73:8, 74:4

## G

**gain** [1] - 65:17
**gainfully** [1] - 39:3
**gap** [1] - 67:3
**garden** [1] - 64:12
**garden-variety** [1] -

64:12
**gear** [1] - 16:25
**general** [3] - 30:10, 34:1, 75:3
**generally** [1] - 31:22
**generated** [1] - 37:24
**germane** [1] - 14:19
**gesturing** [1] - 54:22
**gigantic** [2] - 57:15, 57:16
**given** [5] - 20:8, 28:24, 36:13, 66:16, 74:22
**glass** [14] - 13:19, 16:23, 46:20, 47:11, 47:12, 47:13, 47:15, 47:21, 47:25, 48:1, 48:6, 69:14
**God** [1] - 46:5
**Goodman** [25] - 17:19, 17:23, 18:1, 18:8, 26:19, 26:23, 26:25, 27:1, 27:4, 27:16, 51:11, 51:21, 52:20, 68:2, 68:3, 68:5, 68:10, 68:12, 68:16, 68:18, 68:19, 70:12, 71:4, 72:9, 73:20
**Goodman's** [2] - 68:9, 73:21
**Government** [1] - 8:1
**government** [81] - 4:24, 5:12, 6:8, 6:18, 7:7, 7:10, 9:19, 10:3, 10:11, 10:14, 10:17, 10:25, 11:3, 11:6, 11:7, 11:13, 12:4, 12:6, 12:19, 12:21, 13:5, 13:19, 13:23, 14:13, 14:17, 16:11, 17:10, 19:5, 19:16, 19:22, 20:3, 20:17, 20:18, 21:5, 21:10, 21:14, 21:16, 22:5, 22:8, 23:8, 25:12, 26:5, 28:1, 28:7, 28:20, 28:21, 28:24, 29:5, 29:10, 29:11, 30:8, 30:10, 30:21, 31:2, 31:11, 31:17, 32:14, 32:20, 32:25, 33:10, 34:2, 34:16, 35:2, 45:2, 46:6, 50:18, 52:1, 61:22, 63:23, 65:6, 66:5, 66:7, 66:13, 69:19, 71:11, 71:14, 74:15, 74:16, 78:25, 79:5, 79:11
**government's** [14] - 5:5, 11:21, 11:24,

64:12
12:1, 15:13, 18:22, 21:3, 23:25, 25:2, 27:18, 34:19, 34:23, 41:11, 41:12
**grand** [1] - 21:24
**granted** [1] - 79:9
**gravamen** [1] - 13:7
**gravity** [1] - 64:9
**grays** [1] - 37:7
**great** [3] - 47:16, 52:4, 57:5
**greater** [1] - 62:15
**gross** [1] - 61:9
**ground** [1] - 21:15
**grounds** [6] - 4:1, 9:1, 9:5, 47:7, 64:4, 65:15
**group** [10] - 27:21, 28:2, 39:5, 43:9, 52:19, 55:14, 57:8, 60:22
**grouping** [1] - 57:9
**groups** [3] - 28:11, 49:22, 55:16
**Gruppo** [1] - 30:4
**Gruppo's** [2] - 30:7, 30:23
**guess** [1] - 14:15
**guided** [1] - 25:11
**guideline** [6] - 8:13, 9:1, 9:5, 9:7, 9:10, 9:19
**guidelines** [12] - 6:13, 6:14, 6:15, 6:17, 8:12, 8:15, 9:12, 31:16, 50:19, 62:24, 64:8, 74:10
**guilty** [8] - 3:24, 19:10, 19:21, 20:1, 20:9, 48:23, 63:4, 78:20
**guns** [1] - 21:22
**gunshot** [2] - 69:15, 69:16
**guy** [5] - 14:5, 26:1, 37:22, 39:9, 39:10

## H

**H2-205B** [1] - 76:1
**habit** [1] - 51:16
**hac** [1] - 35:22
**Hac** [1] - 1:14
**half** [2] - 10:6, 10:13
**hallway** [1] - 66:20
**handed** [1] - 14:22
**hands** [1] - 49:17
**hanging** [1] - 13:13
**hangs** [1] - 14:5
**happily** [1] - 56:12

harassed [1] - 69:2
harassing [1] - 71:3
harassment [1] -
68:17
hard [8] - 20:25, 22:6,
30:16, 38:5, 56:21,
56:23, 56:24, 61:19
hat [1] - 37:22
head [3] - 38:5, 52:23,
56:20
headlines [2] - 33:21,
33:25
health [1] - 77:7
hear [6] - 6:18, 6:19,
17:21, 57:13, 57:14,
59:2
heard [4] - 6:21,
36:16, 53:22, 69:15
hearing [22] - 4:4, 4:7,
5:24, 6:5, 6:6, 8:5,
8:17, 9:25, 32:22,
36:17, 39:6, 39:14,
40:2, 43:25, 49:25,
50:1, 50:4, 62:4,
62:9, 66:6, 69:16,
80:7
HEARING [1] - 1:7
hearings [3] - 4:14,
4:16, 6:3
heart [2] - 38:5, 40:16
heavily [1] - 73:10
Heideman [1] - 3:13
HEIDEMAN [4] - 1:18,
3:10, 3:13, 3:19
held [3] - 4:4, 4:10,
65:16
help [20] - 17:9, 19:4,
23:3, 24:2, 24:22,
25:14, 32:4, 37:22,
41:21, 42:10, 44:19,
44:22, 47:10, 51:4,
51:8, 71:17, 72:8,
75:1
helped [3] - 64:16,
71:18, 72:7
helpful [3] - 34:19,
42:12, 58:3
helping [3] - 26:25,
68:15, 70:10
hereby [2] - 75:11,
80:15
high [1] - 49:22
higher [1] - 26:17
himself [17] - 15:12,
15:16, 22:17, 23:4,
25:17, 25:20, 27:15,
29:2, 31:9, 36:4,
37:21, 42:24, 43:2,
45:24, 46:5, 47:2,
64:24

history [9] - 8:19,
8:22, 8:23, 9:9, 63:1,
64:21, 72:10, 72:13,
72:21
hit [2] - 54:22, 67:1
hitting [3] - 14:2, 14:4,
46:20
Holocaust [1] - 36:15
home [23] - 10:3,
18:24, 19:6, 19:8,
20:11, 22:17, 23:15,
26:9, 31:18, 37:4,
38:12, 42:23, 42:25,
44:10, 60:25, 61:6,
61:10, 74:16, 74:17,
74:25, 75:15, 77:2,
79:16
honest [2] - 21:15,
51:2
Honor [81] - 2:7, 2:13,
2:16, 3:6, 3:19, 5:13,
5:15, 5:18, 7:3, 7:9,
7:17, 7:22, 8:3, 9:20,
9:22, 10:18, 10:22,
12:23, 14:14, 15:7,
15:17, 16:9, 17:1,
17:6, 17:14, 17:20,
17:24, 18:6, 18:12,
18:15, 18:18, 18:21,
19:3, 20:13, 21:1,
22:11, 23:11, 23:14,
24:4, 25:15, 26:2,
27:6, 29:7, 30:19,
32:18, 33:5, 33:19,
34:4, 34:21, 35:11,
35:15, 35:19, 35:23,
36:8, 37:25, 41:2,
41:5, 42:1, 42:7,
42:14, 42:16, 47:13,
48:4, 48:16, 49:3,
50:15, 51:7, 52:7,
53:23, 54:10, 58:6,
58:10, 58:16, 61:18,
62:2, 79:1, 79:3,
79:8, 79:12, 79:21,
80:8
HONORABLE [1] - 1:7
Hood [1] - 24:20
Hood-esque [1] -
24:20
hoodie [1] - 67:5
hoped [1] - 59:9
horns [1] - 26:1
horrendous [1] -
46:23
horrible [2] - 58:25,
59:8
horrid [1] - 61:7
hour [1] - 7:2
hours [7] - 10:4, 10:7,

22:17, 38:11, 44:11,
49:6, 71:8
House [2] - 70:25,
76:1
HOWELL [1] - 1:7
huge [4] - 46:21,
50:13, 56:11, 73:17
hurt [2] - 48:17

I

idea [4] - 59:4, 59:11,
61:4, 61:12
identifiable [2] -
25:24, 63:10
identify [3] - 25:20,
25:21, 26:6
identifying [2] - 25:16,
26:16
ignored [2] - 68:8,
70:11
ignoring [1] - 73:21
immediately [5] -
61:8, 61:11, 77:25,
79:17, 79:18
important [3] - 8:14,
50:9, 73:8
importantly [1] - 52:14
impose [5] - 6:25,
62:5, 62:14
imposed [8] - 62:19,
72:17, 74:19, 75:7,
76:5, 78:11, 78:17,
78:24
imposing [1] - 31:21
imposition [1] - 74:2
imprimatur [1] - 49:11
imprisonment [7] -
9:11, 9:13, 32:8,
32:10, 33:3, 74:8,
78:12
impugn [1] - 34:22
incarceration [6] -
19:17, 19:23, 20:4,
30:9, 72:24, 75:2
include [4] - 26:9,
26:23, 62:18, 76:8
includes [2] - 76:11,
78:8
including [4] - 4:10,
4:12, 70:11, 71:4
incredibly [2] - 45:5,
58:3
Independence [1] -
53:4
indictment [2] - 3:25,
75:12
indictments [1] - 31:4
indirectly [1] - 36:6

indisputably [1] -
32:16
individual [2] - 16:24,
46:2
individuals [7] -
26:19, 44:23, 55:4,
65:1, 66:2, 67:20,
72:25
ineffective [2] - 72:8,
78:19
inexcusable [4] -
34:25, 37:2, 37:4,
45:25
infancy [1] - 26:13
inference [1] - 42:9
inform [1] - 44:23
information [11] -
8:18, 12:4, 12:18,
29:2, 39:14, 58:23,
71:8, 77:14, 77:15,
77:16, 78:18
initial [2] - 43:22,
58:18
inner [1] - 31:2
inoculate [1] - 37:21
inside [18] - 11:10,
13:12, 16:16, 17:1,
19:14, 19:20, 20:5,
27:9, 27:24, 38:5,
66:9, 69:13, 69:18,
69:21, 70:17, 71:3,
71:10, 73:24
installments [1] -
77:20
instead [3] - 68:15,
71:18
instructions [1] -
73:23
insurrection [1] - 56:8
intended [2] - 48:17,
61:13
intent [2] - 47:19,
54:24
intention [1] - 58:19
intentions [1] - 52:18
interest [2] - 77:23
interested [1] - 56:3
interesting [1] - 40:23
intermittent [7] -
74:24, 75:13, 76:19,
76:21, 79:14, 79:20
internet [1] - 57:7
interpret [2] - 41:6,
50:21
interrupt [3] - 42:4,
51:14, 51:20
interview [3] - 22:4,
26:8, 71:12
interviews [1] - 28:8
investigate [3] - 23:3,

24:3, 29:2
investigation [19] -
4:21, 6:10, 7:5, 7:16,
7:25, 8:6, 8:11, 8:20,
16:11, 21:12, 21:15,
25:25, 26:12, 27:19,
53:18, 53:25, 62:8,
78:7
investigative [1] -
25:5
invites [1] - 40:4
involved [1] - 31:9
involvement [1] -
50:24
involving [1] - 19:19
issue [1] - 54:21
issued [1] - 4:12
issues [3] - 34:11,
34:12, 48:16, 63:14
itemizing [1] - 5:5

J

jabbing [1] - 14:9
Jacob [1] - 25:25
jad@dennerlaw.com
[1] - 1:17
jail [1] - 28:22
January [45] - 11:12,
12:5, 17:5, 17:17,
20:23, 21:13, 22:14,
23:1, 27:14, 27:20,
28:16, 29:4, 31:24,
33:17, 33:24, 34:24,
35:1, 35:9, 36:5,
37:3, 37:5, 37:19,
40:20, 40:25, 41:16,
42:10, 45:25, 46:1,
49:9, 49:18, 52:3,
62:12, 64:10, 65:2,
65:12, 67:21, 70:2,
71:6, 71:8, 71:16,
71:24, 72:3, 73:2,
74:19
Jeffrey [2] - 2:17, 3:7
JEFFREY [1] - 1:14
jeopardized [1] -
72:22
jobs [2] - 48:25, 49:1
joined [3] - 3:15,
65:20, 73:20
JOSEPH [1] - 1:18
Joseph [1] - 3:15
journalist [3] - 25:3,
25:5, 55:25
judge [3] - 4:15,
12:12, 72:20
JUDGE [1] - 1:8
judges [3] - 5:25,

29:19, 32:13
**judgment** [5] - 46:22,
46:23, 75:10, 77:21,
78:14
**jumping** [1] - 11:18
**jury** [1] - 21:24

## K

**Kathy** [1] - 75:25
**Keep** [1] - 68:14
**keep** [5] - 2:21, 14:4,
58:17, 70:12
**kept** [1] - 57:3
**kick** [4] - 13:13, 16:25,
40:11, 67:1
**kicked** [2] - 13:12,
60:19
**kicking** [1] - 65:24
**kicks** [1] - 14:6
**kind** [1] - 72:22
**knocking** [1] - 65:3
**knowing** [1] - 70:7
**knowingly** [1] - 44:20
**known** [1] - 26:7
**knows** [3] - 13:16,
25:23, 50:11

## L

**lack** [1] - 73:3
**ladder** [4] - 59:25,
60:3, 60:5, 65:17
**laid** [1] - 21:9
**language** [1] - 24:20
**large** [3] - 45:2, 58:22,
72:4
**largely** [1] - 50:21
**larger** [1] - 28:15
**last** [4] - 6:24, 62:3,
65:6, 65:7
**lastly** [1] - 6:19
**lasts** [1] - 15:24
**lately** [1] - 33:23
**launch** [4] - 55:19,
55:22, 55:24, 61:10
**launching** [1] - 61:13
**law** [18] - 21:13, 21:16,
22:4, 24:7, 26:14,
26:15, 26:20, 28:3,
62:20, 64:17, 69:3,
69:9, 71:3, 71:6,
71:17, 71:19, 71:25,
74:4
**lawyer** [2] - 44:17,
44:18
**lead** [3] - 14:16, 33:19,
68:10

**leadership** [3] - 28:6,
28:14, 28:16
**leading** [3] - 18:2,
18:3, 60:17
**leads** [1] - 42:9
**leaning** [2] - 59:19,
60:5
**learn** [2] - 45:16,
45:17
**learned** [1] - 65:5
**least** [12] - 22:12,
23:23, 24:10, 26:16,
27:14, 32:5, 33:10,
43:25, 57:20, 61:21,
65:6, 76:14
**leave** [6] - 18:11,
18:14, 18:17, 51:22,
69:4, 69:5
**leaving** [1] - 67:2,
68:15, 72:4
**left** [5] - 39:5, 50:7,
51:22, 60:18, 60:24
**legal** [1] - 22:13
**legitimizes** [1] - 44:15
**length** [1] - 33:8
**lengthy** [1] - 31:21
**Leonard** [1] - 30:4
**less** [4] - 19:14, 20:11,
30:5, 50:17
**lesser** [1] - 38:16
**level** [4] - 9:2, 9:8,
37:8, 40:12
**levels** [2] - 9:3, 9:6
**liability** [1] - 37:21
**liberal** [1] - 39:13
**lies** [3] - 31:24, 32:24
**life** [6] - 22:1, 39:4,
42:22, 45:18, 48:23,
53:13
**light** [1] - 67:4
**light-colored** [1] -
67:4
**limited** [2] - 24:14,
63:11
**line** [12] - 4:5, 4:8,
18:4, 18:9, 22:18,
24:12, 24:18, 68:2,
68:11, 68:22, 69:3,
69:23
**lines** [1] - 69:7
**lintel** [1] - 14:5
**listed** [1] - 5:4
**listen** [2] - 4:6, 55:18
**listening** [4] - 4:7,
61:2, 61:3, 61:7
**literally** [1] - 70:9
**lived** [1] - 50:13
**lives** [1] - 22:20
**living** [5] - 38:25,
39:11, 41:21, 43:18,

56:1
**Lobby** [2] - 69:14,
70:23
**local** [2] - 44:1, 76:9
**location** [3] - 69:15,
77:4, 77:10
**lodged** [1] - 7:10
**logic** [3] - 60:20, 60:21
**lone** [2] - 28:9, 28:14
**look** [17] - 16:18, 22:5,
22:22, 23:17, 24:8,
24:13, 25:8, 26:11,
27:7, 27:24, 29:24,
29:25, 30:14, 37:11,
51:2, 61:19, 69:25
**looked** [5] - 11:1,
14:12, 26:24, 28:7,
57:24
**looking** [8] - 7:5, 34:1,
36:25, 48:10, 56:5,
57:23, 58:23, 66:10
**looks** [2] - 25:12,
54:14
**loss** [2] - 63:15, 76:2
**lost** [2] - 42:5, 48:25
**Loth** [2] - 1:23, 80:25
**LOTH** [1] - 80:15
**love** [1] - 36:12
**lower** [1] - 19:10
**lying** [1] - 56:22

## M

**MA** [1] - 1:16
**ma'am** [2] - 3:10, 60:1
**machinations** [1] -
31:2
**machine** [1] - 1:24
**main** [1] - 70:22
**maintain** [1] - 32:21
**maintains** [1] - 72:14
**Major** [1] - 1:11
**malcontents** [1] - 73:8
**man** [3] - 37:12, 38:25,
39:2
**mandated** [1] - 66:18
**mandatory** [3] - 63:20,
76:4, 76:8
**manner** [1] - 80:22
**march** [1] - 57:1
**March** [2] - 5:3, 35:18
**marching** [1] - 59:4
**marijuana** [1] - 76:11
**Marine** [1] - 36:14
**married** [1] - 72:12
**mask** [5] - 2:21, 3:4,
3:8, 3:11, 58:17
**Massachusetts** [17] -
22:16, 39:1, 39:11,

39:13, 40:13, 41:1,
42:12, 43:9, 43:10,
43:14, 43:17, 43:19,
43:24, 55:17, 64:22,
69:19, 69:22
**materials** [1] - 4:17
**matter** [5] - 2:2, 30:11,
47:10, 50:1, 57:5
**maximum** [4] - 9:15,
74:7, 74:12, 78:12
**McCreary** [25] - 1:4,
2:4, 3:7, 3:21, 3:24,
5:20, 7:19, 8:17,
8:20, 8:21, 17:3,
20:8, 27:22, 28:17,
30:22, 31:1, 31:6,
37:18, 49:8, 57:24,
58:13, 61:25, 62:4,
62:22, 75:11
**McCreary's** [5] - 5:7,
16:20, 35:4
**mean** [15] - 20:15,
20:19, 22:6, 22:24,
28:4, 29:8, 30:3,
36:21, 39:7, 39:15,
41:7, 42:17, 51:20,
52:24, 53:24
**meaning** [1] - 34:22
**media** [6] - 4:12, 22:6,
39:18, 49:8, 49:13,
71:5
**media/social** [1] -
49:8
**medical** [1] - 77:7
**medically** [1] - 2:23
**member** [1] - 68:13
**members** [7] - 18:3,
66:16, 67:23, 68:4,
68:24, 69:2, 71:2
**memento** [3] - 46:10,
46:14, 47:9
**memo** [6] - 11:22,
11:24, 12:25, 13:2,
15:14, 73:2
**memoranda** [2] - 5:10,
62:7
**memorandum** [4] -
4:23, 41:12, 45:23,
57:17
**memos** [3] - 20:19,
29:13, 62:10
**mental** [1] - 77:7
**mentality** [1] - 27:21
**mention** [2] - 28:12,
40:18
**mere** [3] - 27:15, 66:3,
67:22
**merely** [1] - 64:13
**message** [1] - 39:18
**messed** [1] - 50:13

**metal** [1] - 46:21
**middle** [3] - 44:1,
57:10, 57:11
**midterm** [1] - 32:3
**might** [4] - 12:6,
40:21, 43:23, 59:10
**million** [1] - 56:2
**mind** [6] - 12:11,
40:16, 42:23, 46:1,
60:12, 72:23
**minimal** [14] - 51:1,
51:23, 51:24, 52:2,
52:5, 52:13, 52:14,
52:16, 54:16, 54:18,
57:25, 58:1
**minimum** [1] - 17:13
**minute** [3] - 5:3,
11:14, 16:23
**minutes** [16] - 15:25,
19:14, 19:20, 20:5,
20:6, 66:23, 69:6,
69:18, 70:17, 70:19,
70:21, 72:5, 73:24,
73:25, 74:1
**misdemeanor** [12] -
4:3, 6:14, 19:11,
19:12, 20:2, 20:10,
30:8, 31:15, 64:6,
74:7, 74:20
**misdemeanors** [3] -
31:14, 32:7, 32:16
**misfortune** [1] - 25:22
**misguided** [1] - 29:1
**misperceptions** [1] -
25:11
**miss** [1] - 12:7
**missed** [2] - 12:10,
54:6
**missing** [1] - 5:14
**mistake** [3] - 48:9,
50:13
**mistakes** [3] - 57:15,
57:16
**mitigated** [1] - 52:2
**mitigating** [5] - 12:14,
21:10, 21:18, 29:6,
35:2
**mixed** [1] - 39:18
**mob** [19] - 27:21,
31:25, 38:19, 52:23,
64:25, 66:15, 66:23,
67:3, 67:25, 68:4,
68:13, 68:19, 68:22,
69:2, 69:7, 71:2,
72:22, 73:18, 73:20
**moment** [5] - 16:21,
24:10, 53:11, 60:12,
68:25
**moments** [2] - 66:12,
69:11

**monetary** [1] - 77:19
**monitoring** [3] - 77:4, 77:10, 77:12
**month** [2] - 33:23, 71:13
**monthly** [2] - 53:19, 77:20
**months** [21] - 9:11, 10:3, 10:4, 10:7, 10:9, 19:7, 19:23, 20:4, 30:2, 30:6, 31:22, 32:1, 32:11, 33:20, 39:7, 52:7, 71:13, 75:15, 77:3, 79:16
**months'** [1] - 75:11
**monumental** [1] - 21:13
**morning** [8] - 2:13, 2:15, 2:16, 3:20, 3:22, 3:23, 38:12, 71:8
**most** [9] - 13:9, 25:24, 27:12, 27:14, 29:6, 33:4, 33:18, 43:24, 60:13
**motherfucker** [1] - 68:14
**motion** [2] - 79:5, 79:9
**motivation** [2] - 22:23, 38:14
**motivations** [4] - 25:6, 25:10, 26:7, 27:11
**moved** [1] - 47:17
**MR** [97] - 2:13, 2:16, 2:20, 2:23, 3:2, 3:6, 3:10, 3:13, 3:19, 5:13, 5:15, 5:18, 7:9, 7:17, 9:20, 9:22, 10:18, 10:22, 12:23, 14:14, 15:4, 15:7, 15:17, 16:8, 17:6, 17:13, 17:20, 17:24, 18:6, 18:12, 18:15, 18:18, 18:21, 18:24, 19:3, 20:13, 21:1, 22:11, 23:10, 23:14, 24:4, 24:17, 25:15, 26:2, 27:6, 29:5, 30:19, 32:18, 33:5, 33:19, 34:4, 34:21, 35:13, 35:15, 35:19, 36:8, 37:16, 37:25, 39:25, 41:2, 41:5, 41:18, 41:22, 42:1, 42:7, 42:14, 42:16, 43:20, 46:15, 47:12, 47:15, 47:22, 47:25, 49:19, 51:7, 51:10, 51:13, 51:15, 51:18,

51:24, 52:6, 53:22, 54:2, 54:6, 55:8, 55:24, 58:6, 58:10, 62:2, 79:1, 79:3, 79:8, 79:12, 79:21, 79:24, 80:2, 80:7
**MSNBC** [1] - 43:25
**multiple** [3] - 24:17, 37:12, 69:21
**municipal** [1] - 40:22
**must** [13] - 62:12, 62:25, 76:8, 76:10, 76:11, 76:12, 76:15, 76:20, 76:24, 77:2, 77:11, 77:13, 78:13

## N

**name** [2] - 3:13, 22:19
**names** [1] - 2:5
**National** [1] - 50:2
**nature** [5] - 23:20, 39:12, 62:25, 64:2, 71:22
**near** [5] - 25:23, 32:5, 46:23, 59:20, 65:18
**necessarily** [2] - 49:20, 55:24
**necessary** [4] - 4:14, 12:9, 62:15, 73:3
**need** [10] - 16:14, 19:4, 62:18, 63:2, 63:5, 63:17, 63:21, 71:23, 72:17, 74:13
**negative** [1] - 3:1
**net** [1] - 53:18
**never** [7] - 43:7, 47:3, 48:16, 48:17, 56:7, 61:13
**new** [3] - 48:25, 66:5, 78:17
**News** [1] - 43:25
**news** [2] - 44:1, 61:3
**NEWTON** [1] - 1:21
**Newton** [1] - 2:8
**next** [11] - 6:4, 7:2, 20:1, 32:3, 33:20, 38:11, 60:20, 64:20, 66:22, 67:6, 73:25
**night** [10] - 22:16, 29:4, 37:5, 37:19, 38:8, 42:23, 42:25, 44:10, 52:22, 58:24
**nobody** [1] - 50:7
**none** [1] - 57:19
**normal** [1] - 22:1
**normally** [1] - 36:13
**north** [1] - 43:10
**North** [1] - 1:15

**northeast** [1] - 43:24
**Nos** [1] - 5:9
**noted** [4] - 21:2, 33:8, 34:1, 78:25
**notes** [2] - 53:18, 80:17
**nothing** [5] - 15:11, 37:6, 55:2, 55:3, 61:17
**notice** [1] - 4:25
**noticed** [4] - 59:18, 59:21, 60:5, 60:7
**notices** [1] - 5:8
**notify** [1] - 78:3
**notion** [1] - 37:7
**nowhere** [1] - 46:23
**null** [1] - 80:20
**number** [3] - 24:14, 69:23
**numerous** [1] - 72:25
**NW** [3] - 1:12, 1:19, 78:2

## O

**object** [1] - 11:15
**objection** [4] - 7:10, 7:15, 8:5, 8:10
**objections** [6] - 6:8, 6:10, 7:7, 9:18, 66:18, 78:24
**obligation** [1] - 78:5
**obligations** [2] - 77:8, 77:25
**obscenities** [1] - 13:22
**observed** [3] - 49:8, 66:1, 69:13
**obtain** [2] - 23:12, 23:13, 53:17
**obtained** [1] - 23:14
**obvious** [1] - 73:12
**obviously** [3] - 25:9, 26:7, 50:16
**occur** [2] - 27:20, 48:14
**occurred** [1] - 9:4
**occurring** [1] - 66:15
**OF** [3] - 1:1, 1:2, 1:7
**offender** [1] - 57:21
**offending** [1] - 30:15
**offense** [28] - 5:6, 6:13, 8:24, 9:2, 9:3, 9:6, 9:8, 19:11, 19:12, 19:21, 20:8, 29:18, 29:21, 30:7, 30:13, 51:3, 57:21, 62:19, 62:21, 63:1, 63:6, 64:3, 64:8,

71:23, 74:22, 75:4, 78:20
**offenses** [3] - 13:7, 28:21, 32:15
**offer** [2] - 31:5, 71:14
**offered** [2] - 31:6
**offering** [1] - 20:20
**offers** [1] - 28:20
**office** [14] - 10:12, 10:16, 32:2, 40:12, 40:22, 41:16, 42:4, 50:23, 52:3, 53:16, 55:23, 77:13, 77:15, 78:6
**Office** [7] - 75:24, 76:1, 77:5, 77:9, 77:11, 77:17, 78:8
**office's** [5] - 4:20, 4:22, 7:24, 10:8, 62:9
**Officer** [29] - 1:21, 17:18, 17:23, 18:1, 18:8, 26:19, 26:23, 26:24, 27:1, 27:4, 27:16, 51:11, 51:21, 52:19, 68:2, 68:3, 68:5, 68:9, 68:10, 68:12, 68:15, 68:18, 68:19, 70:12, 71:4, 72:8, 73:20, 73:21, 75:25
**officer** [5] - 2:7, 37:9, 68:14, 68:22, 71:1
**officers** [11] - 13:22, 18:5, 18:9, 26:20, 60:11, 60:17, 61:5, 68:11, 69:3, 70:11, 71:3
**offices** [1] - 70:24
**official** [1] - 80:25
**Official** [1] - 1:23
**old** [2] - 39:2, 63:24
**omission** [3] - 12:2, 12:25, 13:1
**once** [4] - 19:13, 47:6, 60:18, 71:19
**one** [47] - 9:14, 12:17, 13:21, 14:2, 14:6, 14:21, 15:22, 17:7, 20:6, 21:2, 22:4, 24:19, 25:20, 27:12, 27:17, 27:20, 29:5, 29:6, 29:12, 30:3, 30:14, 31:13, 32:6, 32:9, 32:10, 33:4, 42:18, 43:25, 46:18, 47:3, 49:1, 49:4, 53:12, 53:14, 60:24, 64:19, 64:20, 64:25, 67:5, 67:19, 69:7,

70:10, 71:13, 74:8, 76:8, 76:13
**online** [2] - 32:23, 58:23
**open** [5] - 13:12, 13:14, 16:25, 21:25, 79:6
**operate** [1] - 50:16
**opportunity** [5] - 6:20, 6:22, 35:16, 37:9, 37:11
**opposed** [1] - 29:2
**opposite** [1] - 34:7
**Order** [1] - 4:9
**order** [13] - 5:3, 10:23, 11:14, 26:17, 28:6, 35:18, 37:21, 41:16, 42:12, 66:16, 70:18, 73:21, 78:9
**ordered** [4] - 66:5, 75:16, 75:19, 77:8
**orders** [3] - 18:17, 51:23, 63:12
**original** [1] - 12:25, 23:20, 31:4
**originally** [3] - 7:10, 24:8, 30:25
**otherwise** [1] - 50:4
**outnumbered** [1] - 68:10
**outrageous** [2] - 56:9, 56:10
**outset** [1] - 63:7
**outside** [5] - 16:15, 26:21, 61:4, 66:15, 66:20
**outskirts** [1] - 59:20
**outweighed** [1] - 63:18
**overall** [3] - 21:11, 33:11, 70:1
**overcoming** [1] - 71:18
**overreaching** [1] - 50:8
**overrun** [1] - 16:21
**overwhelmed** [1] - 64:17
**own** [5] - 15:10, 43:3, 48:16, 49:2, 65:19

## P

**p.m** [8] - 11:12, 16:12, 26:21, 66:12, 67:17, 69:6, 69:17
**page** [2] - 11:25, 29:13
**pages** [1] - 57:18
**paid** [1] - 78:5

**papers** [4] - 8:1, 11:4, 22:24, 40:18

**parading** [3] - 19:12, 19:21, 30:24

**paramilitary** [2] - 16:25, 28:11

**park** [1] - 57:2

**part** [33] - 8:14, 17:11, 21:3, 27:10, 27:16, 27:23, 28:1, 28:2, 28:15, 29:19, 32:19, 32:25, 33:6, 34:10, 34:25, 38:13, 38:19, 39:4, 39:11, 40:20, 42:11, 44:14, 45:7, 45:18, 46:9, 46:11, 46:21, 48:11, 51:17, 55:14, 56:16, 67:5, 72:8

**partially** [1] - 75:1

**participant** [1] - 41:3

**participants** [1] - 64:11

**participated** [3] - 66:4, 71:11, 72:2

**participating** [3] - 31:25, 33:16, 67:5

**participation** [4] - 14:11, 14:15, 52:15, 73:5

**particular** [1] - 29:20

**particularly** [4] - 31:22, 39:9, 72:20

**parties** [6] - 4:19, 8:13, 9:24, 10:16, 36:1, 63:23

**parties'** [1] - 11:4

**parts** [4] - 41:23, 42:18, 42:19, 43:24

**party** [1] - 80:22

**path** [1] - 38:18

**pause** [1] - 37:14

**pay** [4] - 75:16, 77:11, 77:18, 77:22

**payable** [1] - 77:25

**paying** [1] - 50:14

**payment** [2] - 63:9, 77:19, 77:20

**payments** [1] - 75:21

**peaceful** [8] - 23:5, 32:1, 32:4, 50:6, 64:19, 72:21, 73:9, 73:13

**pecking** [2] - 26:17, 28:6

**peculiarities** [2] - 31:13, 32:7

**penalties** [2] - 77:19, 77:23

**penalty** [1] - 20:11

**pending** [2] - 34:2, 49:2

**people** [62] - 11:18, 13:8, 13:13, 13:18, 15:3, 15:5, 16:4, 16:16, 16:19, 17:4, 17:16, 17:21, 24:20, 25:23, 26:22, 27:4, 27:13, 27:20, 27:21, 28:17, 33:16, 39:17, 39:18, 45:9, 45:10, 45:11, 45:12, 46:19, 47:4, 47:16, 47:20, 48:21, 49:23, 49:24, 50:2, 50:3, 51:4, 52:4, 53:6, 53:7, 53:9, 55:1, 56:1, 56:2, 56:3, 56:4, 56:24, 57:7, 58:20, 58:22, 59:13, 59:22, 60:7, 61:19, 66:23, 67:3, 67:6, 70:9, 70:12, 72:2

**per** [2] - 24:15, 55:25

**perceived** [1] - 37:24

**percentage** [2] - 39:20, 50:5

**perception** [1] - 60:25

**perfectly** [2] - 49:20, 54:4

**perhaps** [12] - 13:9, 22:11, 25:19, 25:22, 26:13, 27:13, 33:22, 40:5, 49:7, 52:24, 54:16, 59:10

**period** [10] - 9:13, 10:6, 10:13, 11:11, 15:19, 32:9, 33:9, 74:25, 77:3, 78:12

**periodic** [1] - 76:14

**periods** [4] - 31:21, 75:14, 76:22, 79:14

**permission** [1] - 78:22

**permitting** [1] - 35:21

**person** [8] - 4:4, 25:24, 27:20, 31:15, 39:22, 51:3, 66:1, 71:1

**personally** [2] - 49:8, 57:6

**persons** [2] - 4:6, 49:9

**perspective** [2] - 41:8, 61:3

**petty** [6] - 19:10, 19:12, 19:21, 28:21, 30:7, 32:15

**phone** [2] - 22:5, 23:13

**photo** [1] - 26:3

**photocopied** [1] -

80:21

**physically** [2] - 64:12, 71:1

**picketing** [3] - 19:12, 19:22, 30:25

**pictures** [1] - 41:10

**piece** [1] - 5:1

**pieces** [1] - 44:2

**piecing** [1] - 24:6

**pizza** [1] - 49:1

**pizzas** [1] - 55:20

**place** [7] - 35:5, 43:12, 43:13, 43:14, 64:14, 67:25, 70:15

**placement** [1] - 76:13

**places** [1] - 57:21

**plainly** [3] - 32:16, 32:21, 35:8

**planned** [1] - 53:5

**planning** [7] - 40:24, 41:15, 53:6, 55:11, 55:12, 55:14, 73:4

**plastic** [4] - 46:12, 48:7, 54:22, 54:23

**played** [2] - 23:22, 23:23

**plea** [21] - 5:7, 10:25, 20:9, 21:20, 22:2, 22:8, 22:10, 28:20, 29:13, 29:22, 30:1, 30:5, 30:11, 30:21, 31:5, 44:14, 63:8, 66:6, 71:12, 76:16, 78:20

**pleaded** [4] - 3:24, 19:10, 19:21, 20:1

**pleading** [1] - 48:23

**pleas** [2] - 29:15, 31:3

**pled** [1] - 30:24

**pockets** [1] - 43:11

**podcast** [16] - 40:8, 40:11, 40:20, 41:16, 42:3, 43:22, 46:11, 48:3, 55:10, 55:11, 55:19, 57:5, 58:19, 61:10, 61:13

**podcasts** [2] - 56:1, 61:13

**point** [13] - 16:11, 16:13, 16:15, 18:13, 33:20, 40:12, 41:9, 43:1, 46:24, 48:13, 56:24, 67:23, 69:1

**pointed** [1] - 34:6

**points** [1] - 45:2

**pole** [3] - 11:15, 14:7, 54:21

**pole-like** [1] - 11:15

**poles** [3] - 46:21, 67:1, 67:11

**police** [14] - 16:21, 18:4, 18:9, 18:17, 60:10, 60:17, 61:4, 64:12, 68:11, 68:22, 70:18, 71:1, 71:20, 73:23

**policy** [2] - 30:11, 62:24

**political** [3] - 33:21, 39:22, 55:23

**politics** [1] - 43:17

**population** [2] - 39:21, 56:11

**portion** [1] - 56:11

**portions** [3] - 6:9, 8:6, 24:6

**posed** [1] - 27:1

**poses** [1] - 29:21

**position** [4] - 27:18, 34:23, 59:1, 59:8

**possess** [1] - 76:10

**possible** [4] - 23:10, 27:22, 29:14, 40:21

**post** [2] - 59:6, 71:5

**posted** [1] - 24:17

**posts** [1] - 22:17

**power** [8] - 23:6, 32:1, 32:5, 33:13, 64:19, 72:21, 73:9, 73:14

**practicable** [1] - 77:3

**precisely** [3] - 8:15, 59:16, 63:22

**preparing** [1] - 42:10

**preplanned** [1] - 47:4

**preplanning** [1] - 70:3

**presence** [1] - 27:15

**PRESENT** [1] - 1:21

**present** [5] - 2:10, 25:21, 34:12, 64:14, 64:15

**presented** [1] - 63:12

**presentence** [12] - 4:20, 6:9, 7:5, 7:16, 7:25, 8:6, 8:11, 8:20, 53:17, 53:25, 62:8, 78:6

**president** [3] - 14:22, 45:15, 56:20

**President** [10] - 16:3, 39:15, 39:16, 40:3, 41:17, 44:4, 55:17, 57:1, 64:15, 65:16

**presidential** [4] - 25:11, 32:4, 65:14, 70:6

**presiding** [1] - 4:15

**pretrial** [1] - 72:15

**pretty** [2] - 33:12, 49:10

**prevented** [1] - 68:23

**prison** [1] - 10:12

**Prisons** [2] - 76:24, 79:19

**private** [2] - 42:22, 70:24

**privy** [1] - 45:14

**pro** [1] - 35:21

**Pro** [1] - 1:14

**proactively** [1] - 67:14

**Probation** [5] - 1:21, 77:5, 77:9, 77:11, 78:8

**probation** [45] - 2:7, 4:20, 4:21, 7:24, 9:11, 10:4, 10:6, 10:7, 10:8, 10:9, 10:12, 10:13, 10:16, 18:23, 18:25, 19:2, 19:24, 20:4, 20:21, 31:16, 31:18, 31:22, 32:2, 32:21, 33:1, 33:7, 33:9, 50:18, 50:23, 52:3, 52:8, 52:10, 53:16, 54:14, 62:9, 74:9, 74:23, 75:2, 75:12, 76:23, 77:13, 77:15, 78:6, 79:13, 79:15

**probationary** [5] - 19:6, 20:10, 74:11, 74:15, 74:18

**problem** [3] - 34:25, 39:4, 48:22

**proceed** [1] - 5:25

**proceeding** [1] - 80:11

**Proceedings** [1] - 1:24

**proceedings** [4] - 4:6, 4:10, 64:18, 80:18

**process** [5] - 16:7, 34:10, 35:6, 63:16, 63:18

**processes** [1] - 71:25

**prodding** [1] - 14:24

**produce** [1] - 49:12

**produced** [2] - 1:25, 24:1

**production** [1] - 52:2

**profusely** [1] - 61:23

**program** [1] - 77:4

**prohibited** [1] - 4:11

**prohibitions** [1] - 4:11

**prolong** [1] - 63:16

**promote** [6] - 40:25, 49:12, 62:19, 62:22, 71:24, 74:3

**promoting** [1] - 23:5

**prompt** [4] - 29:22, 30:11, 30:17

**proof** [3] - 57:2, 57:3, 57:4

**property** [7] - 11:23,
13:6, 14:17, 15:16,
19:15, 48:18, 55:2
**proposed** [1] - 49:5
**prosecutor** [1] - 38:4
**protect** [3] - 62:21,
70:13, 72:18
**provide** [6] - 23:16,
62:20, 63:5, 63:17,
75:3, 77:13
**provided** [8] - 10:25,
22:21, 23:15, 27:8,
29:3, 63:19, 65:5,
65:6
**provides** [5] - 22:19,
22:20, 26:9, 63:8,
74:7
**providing** [2] - 29:1,
71:8
**provision** [4] - 21:20,
22:1, 22:7, 22:9
**provisions** [2] - 63:20,
75:9
**PSR** [1] - 7:8
**psychic** [1] - 55:13
**public** [7] - 4:5, 4:8,
49:13, 49:15, 62:21,
66:8, 72:18
**publicly** [1] - 71:5
**punching** [2] - 13:19,
14:1
**punishment** [2] -
62:20, 75:4
**purpose** [2] - 42:15,
59:3
**purposes** [4] - 62:16,
62:17, 62:18, 62:23
**pursuant** [4] - 63:12,
75:8, 76:19, 78:10
**pursuing** [1] - 37:23
**pushed** [1] - 26:3
**put** [7] - 17:22, 26:5,
34:7, 46:18, 48:3,
49:16, 64:24
**puts** [1] - 33:9
**putting** [3] - 27:1,
40:20, 41:25
**puzzled** [2] - 19:18,
20:25

## Q

**QAnon** [4] - 26:2,
28:5, 28:12, 66:2
**quantity** [1] - 26:7
**quasi** [1] - 25:5
**quasi-investigative**
[1] - 25:5
**questions** [4] - 34:6,

34:10, 34:22, 36:22
**quickly** [1] - 65:22
**quiet** [2] - 15:22,
66:21
**quite** [4] - 21:14,
60:25, 67:22, 70:9
**quote** [3] - 11:22,
53:3, 73:2

## R

**raided** [1] - 69:20
**raised** [1] - 8:10
**rallies** [1] - 14:23
**rally** [6] - 40:5, 50:6,
53:2, 59:3, 64:23,
65:16
**ran** [2] - 52:22, 68:12
**range** [3] - 6:16, 9:10,
9:15
**rather** [1] - 30:6
**rdheideman@
hnklaw.com** [1] -
1:20
**re** [2] - 30:15, 60:18
**re-entered** [1] - 60:18
**re-offending** [1] -
30:15
**reach** [1] - 15:23
**reached** [1] - 61:11
**read** [4] - 16:2, 22:25,
39:3, 57:18
**ready** [1] - 58:11
**real** [2] - 16:14, 48:14
**realistic** [1] - 43:3
**realize** [4] - 25:19,
26:13, 55:11, 55:12
**realized** [5] - 37:3,
37:6, 38:9, 38:11,
43:1, 48:13, 52:23,
58:2, 61:7
**realizing** [1] - 45:8
**really** [13] - 13:7,
19:18, 22:25, 28:17,
38:6, 46:3, 48:2,
49:23, 54:16, 57:18,
58:2
**reason** [9] - 32:19,
32:25, 39:21, 45:15,
53:20, 54:2, 54:3,
54:7, 60:18
**reasons** [1] - 12:24
**rebroadcasting** [1] -
4:9
**received** [5] - 5:10,
10:2, 10:15, 70:19,
78:19
**recent** [1] - 12:1
**recidivism** [1] - 29:21

**recognized** [1] - 38:18
**recognizes** [1] - 74:18
**recommend** [1] -
10:13
**recommendation** [9] -
4:22, 8:1, 10:9,
12:22, 18:22, 21:6,
49:5, 50:24, 62:9
**recommendations** [4]
- 10:2, 10:15, 34:17,
54:20
**recommended** [5] -
6:16, 10:13, 19:17,
30:8, 52:11
**recommending** [3] -
19:7, 52:7, 52:9
**recommends** [2] -
10:3, 10:11
**record** [17] - 2:6, 9:18,
25:7, 34:23, 39:1,
42:21, 46:25, 53:12,
55:15, 58:25, 59:22,
60:13, 60:16, 60:21,
60:23, 63:11, 78:25
**recorded** [1] - 61:9
**recording** [4] - 4:9,
41:11, 59:13, 66:3
**recordings** [9] - 23:3,
23:8, 23:9, 37:18,
37:19, 42:3, 42:10,
52:3, 65:19
**records** [1] - 63:4
**reenter** [1] - 69:10
**referencing** [1] - 22:14
**reflect** [2] - 62:19,
71:23
**Reform** [1] - 75:8
**refrain** [1] - 76:11
**refusing** [1] - 17:22
**Regan** [16] - 2:14,
2:15, 7:6, 9:19,
10:17, 12:8, 19:18,
28:13, 34:3, 35:12,
37:13, 37:17, 38:2,
57:23, 66:13, 79:5
**report's** [1] - 8:11
**reported** [1] - 1:24
**reporter** [1] - 42:5
**Reporter** [3] - 1:23,
1:23, 80:25
**reporting** [3] - 25:4,
25:5
**reports** [2] - 5:5, 69:20
**reprehensible** [1] -
34:24
**representation** [1] -
36:3
**representations** [1] -
11:21
**representing** [1] -
52:10
**represents** [1] - 15:14

79:8, 79:12, 79:21,
79:24
**regard** [1] - 46:8
**regarding** [5] - 4:25,
64:2, 72:10, 74:6,
74:13
**regardless** [2] - 26:6,
67:9
**regime** [1] - 35:6
**regulation** [1] - 76:25
**rehabilitation** [1] -
62:22
**reinforcements** [1] -
68:23
**related** [1] - 63:15
**release** [6] - 9:14,
53:16, 72:16, 74:9,
77:15, 78:6
**released** [1] - 80:3
**relevant** [6] - 5:6,
33:21, 33:23, 59:9,
60:13, 62:13
**religious** [1] - 77:7
**rely** [1] - 64:1
**remained** [1] - 67:22
**remaining** [3] - 4:1,
8:25, 64:4
**remind** [1] - 62:16
**reminded** [1] - 4:8
**remorse** [1] - 30:15
**remotely** [1] - 4:6
**removal** [1] - 4:12
**remove** [2] - 3:4,
15:12
**repay** [1] - 61:22
**repeat** [1] - 57:19
**repeated** [1] - 71:20
**replay** [1] - 57:6
**report** [13] - 4:21,
6:10, 7:5, 7:12, 7:16,
7:25, 8:6, 53:17,
53:18, 53:25, 62:8,
78:7, 80:4
**representation** (see above)
**respectfully** [4] -
44:15, 44:25, 50:17,
58:11
**response** [4] - 5:2,
10:23, 11:13, 35:18
**responsibility** [6] -
9:7, 29:17, 29:23,
30:12, 30:17, 31:10
**rest** [1] - 53:13
**restitution** [11] - 10:5,
10:8, 63:5, 63:6,
63:8, 63:17, 63:20,
63:22, 75:19, 75:20,
76:15
**restricted** [6] - 4:1,
4:13, 8:25, 9:4, 64:4,
77:5
**result** [2] - 4:12, 36:15
**resulting** [1] - 9:8
**results** [1] - 9:9
**returned** [2] - 69:19,
69:22
**reveal** [1] - 53:20
**review** [5] - 6:15, 8:8,
8:15, 36:2, 66:9
**reviewed** [4] - 4:17,
4:20, 4:23, 5:4
**reviewing** [2] - 4:17,
62:10
**rewarded** [1] - 21:17
**rhetoric** [1] - 23:21
**RICHARD** [1] - 1:18
**Richard** [1] - 3:13
**right-wing** [1] - 28:11
**riot** [4] - 11:23, 64:17,
65:25, 73:5

**republican** [1] - 56:20
**Republican** [1] - 50:1
**request** [2] - 10:6,
78:22
**requested** [5] - 19:22,
20:3, 53:16, 74:16,
77:14
**requesting** [1] - 19:5
**requests** [2] - 74:14,
74:16
**required** [2] - 8:15,
34:18
**requirement** [1] - 77:4
**requires** [2] - 6:24,
72:23
**residence** [2] - 77:6,
78:9
**resolution** [1] - 44:22
**resolve** [1] - 6:11
**respect** [12] - 25:16,
33:6, 36:21, 37:25,
39:22, 41:5, 42:16,
50:15, 52:4, 62:20,
71:25, 74:3

**rioter** [1] - 14:2
**rioters** [12] - 11:16,
14:1, 14:4, 15:23,
23:4, 25:21, 29:3,
68:8, 69:8, 69:12,
69:13, 70:10
**rioters'** [2] - 65:23,
67:14
**riotous** [1] - 38:19
**riots** [1] - 25:25
**risk** [2] - 29:20, 30:15
**Robin** [1] - 24:20
**role** [7] - 23:23, 28:6,
28:14, 28:16, 45:22,
70:1
**roll** [1] - 53:8
**room** [1] - 56:12
**Room** [1] - 76:1
**root** [1] - 43:1
**roughly** [2] - 22:16,
26:21
**RPR** [3] - 1:23, 80:15,
80:25
**rule** [1] - 6:2
**rules** [2] - 6:1, 76:25
**run** [5] - 40:21, 41:16,
42:4, 61:14, 79:16
**running** [2] - 49:24,
68:14
**rural** [1] - 39:12
**rushing** [1] - 66:24

**S**

**safety** [1] - 67:25
**SAINT** [1] - 80:15
**Saint** [2] - 1:23, 80:25
**SAINT-LOTH** [1] -
80:15
**Saint-Loth** [1] - 1:23,
80:25
**Samuel** [1] - 19:25
**sanctions** [2] - 4:12,
4:14
**satisfied** [1] - 7:20
**savagery** [1] - 38:22
**saw** [9] - 5:15, 11:2,
13:25, 25:6, 33:18,
47:16, 47:20, 60:9,
72:6
**scene** [1] - 65:20
**scheme** [1] - 31:14
**school** [1] - 49:22
**score** [1] - 8:22
**screamed** [1] - 69:2
**screaming** [1] - 28:2
**se** [1] - 55:25
**seated** [3] - 7:4, 8:4,
79:4

**second** [7] - 6:12,
37:15, 60:22, 69:12,
69:16, 70:17, 73:22
**seconds** [2] - 12:5,
12:7
**Section** [18] - 4:2,
8:24, 9:1, 9:5, 9:7,
10:1, 34:14, 62:14,
63:13, 63:19, 63:20,
64:5, 75:9, 75:18,
76:16, 76:20, 78:10,
78:15
**see** [15] - 13:18, 14:7,
14:13, 16:19, 16:20,
17:25, 20:9, 21:22,
30:17, 38:6, 41:13,
60:4, 60:9, 60:10,
66:25
**seeing** [3] - 26:16,
32:22, 50:12
**seeking** [1] - 32:20
**seem** [1] - 8:13
**sees** [3] - 13:16,
13:23, 15:10
**segments** [1] - 60:17
**self** [17] - 22:18,
23:19, 24:1, 25:1,
25:16, 25:21, 26:6,
28:25, 37:7, 37:20,
37:23, 38:7, 47:2,
53:3, 53:5, 80:6
**self-evident** [2] - 53:3,
53:5
**self-identify** [2] -
25:21, 26:6
**self-serving** [12] -
22:18, 23:19, 24:1,
25:1, 25:16, 28:25,
37:7, 37:20, 37:23,
38:7, 47:2
**self-surrender** [1] -
80:6
**selling** [2] - 46:17
**semirural** [4] - 38:25,
41:1, 42:11, 43:19
**Senate** [21] - 11:11,
11:17, 16:3, 16:5,
16:18, 17:18, 18:2,
26:21, 27:2, 51:5,
51:12, 65:8, 65:19,
66:21, 67:9, 67:18,
67:24, 68:24, 70:13,
70:22, 70:25
**sending** [1] - 37:18
**sense** [3] - 22:13,
27:17, 35:10
**sensitive** [1] - 64:14
**sent** [1] - 69:21
**sentence** [32] - 6:23,
6:25, 7:12, 12:15,

19:6, 19:23, 20:11,
21:6, 32:12, 32:15,
32:20, 33:2, 34:14,
35:7, 49:6, 62:5,
62:14, 62:18, 63:3,
71:23, 72:1, 72:17,
74:3, 74:15, 75:7,
78:9, 78:11, 78:17,
78:24, 79:13
**sentenced** [4] - 32:8,
32:9, 33:2, 75:11
**sentences** [4] - 20:21,
63:2, 74:6, 74:19
**Sentencing** [1] - 75:8
**SENTENCING** [1] - 1:7
**sentencing** [62] - 3:24,
4:4, 4:7, 4:16, 4:18,
4:22, 4:23, 5:2, 5:8,
5:10, 5:24, 6:3, 6:6,
6:16, 7:25, 8:2, 8:8,
8:12, 8:14, 9:10,
9:24, 10:1, 11:22,
12:12, 12:22, 12:25,
13:2, 19:25, 20:19,
20:22, 29:16, 29:19,
30:14, 31:13, 34:12,
34:17, 35:6, 35:7,
36:4, 41:12, 45:23,
49:5, 50:19, 50:24,
57:17, 62:4, 62:7,
62:10, 62:11, 62:16,
62:17, 62:24, 63:16,
63:18, 64:1, 66:7,
72:20, 73:25, 74:13,
78:21
**sentencings** [2] -
5:25, 20:24
**separate** [2] - 75:14,
79:14
**sequence** [1] - 17:3
**serious** [1] - 58:2
**seriousness** [5] -
29:18, 30:12, 62:19,
71:24, 75:4
**serve** [1] - 76:20
**served** [2] - 75:14,
76:22
**service** [7] - 10:5,
10:7, 10:10, 49:6,
49:11, 49:16, 52:11
**services** [1] - 77:7
**serving** [12] - 22:18,
23:19, 24:1, 25:1,
25:16, 28:25, 37:7,
37:20, 37:23, 38:7,
47:2
**set** [5] - 4:19, 7:8,
12:16, 62:13, 67:18
**sets** [1] - 57:19
**seven** [1] - 22:17

**several** [2] - 70:4, 71:9
**severe** [1] - 20:11
**severity** [1] - 29:18
**shall** [7] - 75:21, 76:3,
76:18, 76:22, 78:3,
78:6, 80:20
**Shaman** [3] - 26:2,
28:5, 66:2
**shame** [1] - 61:18
**shamed** [2] - 45:6,
45:7
**share** [1] - 77:16
**shatter** [1] - 11:16,
14:3
**shattered** [1] - 16:24,
73:19
**shattering** [2] - 14:1,
65:8
**Sherrill** [1] - 75:25
**shields** [1] - 65:25
**shock** [2] - 38:16,
42:25
**shocked** [4] - 33:18,
38:21, 38:22
**shocking** [1] - 45:4
**short** [1] - 64:9
**shorthand** [1] - 1:24
**shots** [1] - 45:13
**show** [2] - 41:17, 48:2
**showed** [1] - 45:10
**showing** [1] - 25:13
**shows** [3] - 11:14,
65:10, 66:20
**sic** [1] - 26:20
**side** [6] - 8:5, 14:6,
26:4, 34:7, 36:11,
50:21
**sides** [2] - 39:14,
57:13
**sign** [1] - 53:16
**signatory** [1] - 80:22
**significant** [6] - 39:20,
50:5, 52:17, 67:13,
72:13, 73:23
**similar** [3] - 30:16,
63:4
**similarly** [1] - 35:8
**simple** [1] - 41:14
**simplifying** [1] - 38:1
**simply** [9] - 39:10,
43:13, 43:15, 44:19,
56:15, 56:22, 58:7,
60:5, 60:12
**single** [1] - 9:16
**sit** [2] - 20:22, 22:3
**sitting** [3] - 51:19,
61:1, 67:24
**situation** [2] - 15:12,
38:1
**situations** [1] - 49:21

**six** [5] - 30:1, 30:6,
42:18, 42:19, 71:13
**skip** [1] - 20:14
**slept** [1] - 58:24
**small** [4] - 14:22,
47:10, 54:21, 56:14
**smallest** [1] - 56:14
**smart** [1] - 39:9
**smashed** [1] - 13:17
**social** [3] - 22:5,
49:13, 71:5
**solitude** [1] - 61:1
**someday** [1] - 48:10
**someone** [3] - 36:11,
44:19, 50:9
**sometimes** [2] - 12:6,
61:19
**somewhat** [4] - 22:18,
23:21, 24:5, 24:25
**soon** [1] - 77:3
**sophisticated** [1] -
57:9
**sorry** [2] - 51:23, 58:9
**sort** [12] - 13:3, 13:20,
13:23, 14:24, 16:18,
16:21, 23:17, 24:15,
24:19, 26:3, 26:17,
28:9
**sorts** [1] - 17:21
**sources** [1] - 61:4
**space** [1] - 60:9
**spaces** [1] - 70:24
**Speaker's** [2] - 69:14,
70:23
**speakers** [1] - 59:1
**speaking** [4] - 3:17,
38:3, 40:16, 59:10
**special** [9] - 9:16,
19:1, 31:18, 74:10,
74:24, 75:13, 75:17,
76:18, 79:13
**specific** [4] - 34:1,
73:15, 74:22, 75:3
**specifically** [4] - 11:9,
26:15, 70:13, 77:9
**spectator** [1] - 66:3
**spectrum** [2] - 23:18,
35:5
**speculative** [1] - 24:5
**speech** [1] - 57:2
**spent** [4] - 19:14,
69:17, 70:16, 73:23
**spill** [1] - 21:25
**split** [4] - 19:23, 32:12,
32:15, 33:2
**sprawling** [1] - 26:14
**springboard** [1] -
58:19
**squarely** [1] - 13:3
**St** [1] - 1:12

**staffer** [2] - 15:22, 66:21
**stages** [1] - 73:17
**stairs** [7] - 18:4, 18:8, 18:9, 51:21, 68:12, 68:17, 68:21
**stairway** [2] - 68:11, 68:20
**stamp** [1] - 15:20
**stand** [4] - 5:20, 7:19, 36:3, 62:1
**standard** [2] - 21:21, 76:4
**Standing** [1] - 4:9
**standing** [6] - 5:23, 12:22, 13:12, 26:4, 50:12
**stands** [1] - 13:5
**start** [6] - 4:16, 10:17, 16:22, 21:4, 35:24, 36:10
**started** [4] - 36:25, 40:8, 59:13, 61:15
**starting** [3] - 8:19, 14:2, 21:13
**starts** [3] - 9:2, 15:20, 16:25
**state** [6] - 2:5, 39:13, 43:15, 49:7, 75:7, 76:9
**statement** [4] - 5:6, 42:8, 53:19
**statements** [2] - 7:15, 62:25
**States** [7] - 2:3, 2:14, 39:16, 40:4, 44:4, 56:8, 56:17
**STATES** [4] - 1:1, 1:2, 1:8, 1:10
**statistics** [1] - 50:5
**statutorily** [4] - 31:14, 31:15, 33:3
**statutory** [3] - 9:15, 34:13, 78:12
**stay** [3] - 5:22, 21:4, 61:24
**Steal** [3] - 41:4, 64:23, 65:16
**stenographic** [1] - 80:17
**Stenz** [2] - 19:20, 20:12
**step** [9] - 6:7, 6:12, 6:18, 6:24, 8:17, 9:24, 58:13, 62:3, 80:1
**steps** [5] - 6:6, 16:19, 16:22, 26:11, 73:21
**stick** [2] - 46:12, 47:18
**still** [10] - 26:5, 28:21,

33:20, 36:3, 39:24, 45:5, 50:5, 56:10, 56:23, 67:24
**stock** [1] - 26:5
**stole** [1] - 44:5
**stolen** [5] - 31:24, 39:19, 40:2, 56:18
**Stop** [5] - 41:4, 64:23, 65:16
**stop** [2] - 15:12, 31:25
**Stop-the-Steal** [3] - 41:4, 64:23, 65:16
**stopping** [1] - 23:5
**stormed** [1] - 64:25
**story** [2] - 55:1, 55:6
**straight** [2] - 20:20, 32:10
**stream** [1] - 67:17
**streaming** [1] - 16:19
**street** [1] - 59:5
**strictly** [1] - 4:11
**strike** [1] - 67:1
**striking** [1] - 71:15
**strong** [1] - 21:11
**stuck** [2] - 14:8, 59:20
**study** [1] - 33:12
**stuff** [4] - 40:2, 45:14, 49:21, 55:21
**stupidly** [2] - 54:25
**subject** [5] - 9:1, 31:16, 57:5, 64:8, 74:12
**submissions** [1] - 11:8
**submit** [4] - 66:5, 69:23, 76:12, 77:2
**submits** [2] - 24:7, 26:8
**submitted** [11] - 4:24, 5:1, 5:11, 11:14, 12:17, 35:17, 36:1, 53:18, 62:8, 62:11, 66:7
**submitting** [1] - 23:2
**subsequently** [1] - 69:3
**substance** [4] - 72:13, 76:10, 76:12, 77:7
**subtracted** [1] - 9:6
**succeeded** [1] - 64:18
**successful** [3] - 11:18, 67:10, 67:11
**sudden** [1] - 15:23
**sufficient** [1] - 62:15
**suggest** [4] - 25:23, 44:25, 49:5, 50:20
**suggestion** [1] - 49:10
**Suite** [1] - 1:15
**sum** [1] - 71:22
**supervised** [3] - 9:14,

33:4, 74:9
**supervision** [7] - 32:2, 32:9, 32:10, 76:3, 76:5, 76:7, 76:13
**supplement** [1] - 12:2
**supplemental** [1] - 4:25
**supplemented** [4] - 5:7, 8:8, 11:7, 74:11
**supplied** [1] - 10:25
**support** [1] - 40:21
**supporter** [1] - 41:17
**supposed** [1] - 53:8
**surprise** [1] - 12:6
**surprised** [3] - 11:2, 36:10, 36:20
**surrender** [1] - 80:6
**surrounded** [2] - 13:8, 27:13
**surrounding** [3] - 27:25, 31:8, 31:9
**susceptibility** [1] - 33:12
**susceptible** [2] - 31:24, 32:22
**swept** [3] - 48:15, 53:10, 73:1

**T**

**table** [1] - 34:7
**tap** [1] - 47:23
**tape** [1] - 46:8
**tapes** [1] - 24:2
**tapped** [4] - 47:15, 47:17, 48:2, 48:8
**tapping** [1] - 47:13
**task** [1] - 66:18
**technology** [1] - 77:10
**teleconference** [1] - 4:8
**ten** [1] - 19:14
**terabytes** [2] - 12:3, 12:18
**term** [8] - 32:8, 33:3, 33:6, 72:24, 74:8, 74:11, 75:2, 75:11
**terms** [7] - 21:17, 26:17, 30:15, 31:2, 31:10, 34:8, 34:13
**terrace** [3] - 59:17, 65:18, 65:21
**test** [4] - 2:24, 3:2, 3:3, 76:13
**tested** [1] - 2:25
**testifying** [2] - 21:23, 21:24
**testing** [1] - 66:24
**tests** [1] - 76:14

**THE** [123] - 1:1, 1:7, 1:10, 1:14, 2:2, 2:9, 2:10, 2:12, 2:15, 2:18, 2:21, 2:25, 3:4, 3:8, 3:11, 3:18, 3:20, 3:22, 3:23, 5:14, 5:16, 5:20, 7:3, 7:4, 7:13, 7:18, 7:22, 7:23, 8:3, 8:4, 9:21, 9:23, 10:19, 10:23, 13:25, 15:3, 15:5, 15:13, 15:18, 17:2, 17:8, 17:15, 17:21, 17:25, 18:7, 18:13, 18:16, 18:19, 18:22, 19:1, 19:4, 20:15, 21:19, 22:22, 23:12, 23:25, 24:16, 25:13, 26:1, 26:22, 28:13, 29:8, 31:12, 32:19, 33:15, 34:3, 34:9, 35:12, 35:14, 35:16, 35:24, 37:14, 37:17, 39:24, 40:18, 41:3, 41:14, 41:19, 41:24, 42:3, 42:8, 42:15, 43:16, 46:14, 47:9, 47:14, 47:20, 47:23, 49:4, 50:22, 51:8, 51:11, 51:14, 51:16, 51:19, 52:1, 53:14, 53:24, 54:5, 55:6, 55:22, 58:4, 58:9, 58:13, 58:16, 58:17, 58:18, 59:16, 59:18, 59:24, 60:1, 60:3, 60:4, 61:24, 62:3, 79:2, 79:4, 79:9, 79:18, 79:23, 79:25, 80:5, 80:9
**themselves** [2] - 44:19, 70:25
**then-president** [1] - 14:22
**theories** [2] - 32:23, 41:20
**thereafter** [1] - 76:14
**therefore** [1] - 77:23
**thinking** [6] - 20:21, 34:11, 34:19, 38:6, 53:1, 61:1
**thinks** [6] - 13:19, 40:9, 50:18, 58:1
**third** [1] - 6:18
**thousands** [1] - 33:16
**threat** [1] - 26:25
**threatening** [1] - 28:3
**three** [16] - 9:11, 9:24, 10:3, 15:25, 30:5, 31:16, 31:18, 32:20,

33:1, 47:17, 66:22, 74:10, 75:14, 76:11, 76:22, 79:14
**throughout** [1] - 27:18
**throwaway** [1] - 44:9
**timeline** [1] - 23:18
**tiny** [1] - 48:7
**tip** [5] - 22:17, 24:12, 24:15, 24:18, 69:23
**Tipograph** [1] - 3:16
**TIPOGRAPH** [1] - 1:18
**tips** [1] - 24:13
**title** [1] - 22:7
**Today** [1] - 26:4
**today** [7] - 3:17, 20:23, 36:20, 45:4, 66:13, 79:10, 80:3
**together** [4] - 24:6, 40:21, 41:25, 48:3
**took** [3] - 30:1, 69:21, 69:24
**top** [2] - 28:5, 68:21
**topic** [1] - 53:15
**total** [5] - 9:8, 69:17, 70:17, 76:20, 77:19
**totaling** [1] - 74:25
**totally** [2] - 12:3, 12:9
**tough** [3] - 34:11, 34:12, 48:2
**toward** [2] - 40:9, 49:7
**towards** [2] - 34:2, 66:24
**transcript** [4] - 1:24, 80:17, 80:18, 80:21
**TRANSCRIPT** [1] - 1:7
**transcription** [1] - 1:25
**transition** [8] - 23:6, 32:1, 33:10, 33:13, 64:19, 72:21, 73:9, 73:13
**transitions** [1] - 32:4
**trapped** [1] - 59:1
**traveled** [1] - 64:22
**traveling** [2] - 65:12, 70:3
**treatment** [1] - 77:8
**trespass** [4] - 9:3, 9:4, 64:7, 64:8
**trespasser** [1] - 67:23
**trespassing** [1] - 64:8
**tried** [1] - 58:25
**triggering** [1] - 24:11
**triple** [1] - 48:6
**trouble** [2] - 38:9, 47:21
**true** [5] - 25:10, 37:8, 64:9, 80:16, 80:17
**truly** [1] - 26:14
**Trump** [9] - 14:22,

41:17, 46:10, 46:14, 46:15, 46:16, 46:17, 47:9, 57:1

**truth** [3] - 44:6, 44:7, 57:12

**truths** [1] - 53:2

**try** [5] - 19:16, 21:15, 44:7, 51:8, 61:9

**trying** [15] - 13:13, 17:9, 24:2, 35:5, 35:6, 41:8, 44:19, 47:12, 51:12, 54:25, 57:11, 65:11, 67:7, 70:12, 70:13

**turn** [3] - 9:23, 55:12, 56:7

**turnaround** [1] - 30:4

**turned** [6] - 23:7, 59:24, 61:3, 61:10, 61:11, 68:10

**twenty** [1] - 27:20

**twice** [5] - 18:20, 70:16, 71:19, 72:9, 74:1

**Twitter** [1] - 24:15

**two** [15] - 8:17, 9:3, 9:6, 13:13, 20:5, 20:6, 47:17, 57:18, 59:1, 67:6, 69:18, 73:25, 76:9, 76:14

**types** [2] - 63:2, 74:6

**typo** [1] - 7:11

## U

**U.S** [9] - 15:15, 34:2, 75:22, 77:5, 77:9, 77:11, 77:16, 78:1, 78:8

**U.S.C** [14] - 4:2, 8:24, 10:1, 34:14, 62:13, 63:13, 63:19, 64:5, 75:9, 75:18, 76:16, 76:20, 78:10, 78:15

**ultimately** [2] - 11:17, 67:2

**unable** [2] - 28:10, 78:21

**unacceptable** [4] - 45:4, 45:22, 53:13

**unacceptably** [1] - 46:22

**unavailable** [1] - 78:17

**under** [9] - 4:8, 6:16, 9:5, 9:7, 9:11, 9:25, 34:13, 49:2, 74:10

**understandable** [1] - 12:10

**understood** [4] -

48:21, 48:22, 52:21, 79:21

**undisputed** [1] - 8:7

**unfortunately** [1] - 55:5

**United** [7] - 2:3, 2:14, 39:16, 40:4, 44:4, 56:8, 56:17

**UNITED** [4] - 1:1, 1:2, 1:8, 1:10

**universe** [1] - 56:22

**unlawful** [6] - 64:13, 69:12, 69:18, 70:8, 76:12

**unlawfully** [4] - 64:13, 65:1, 67:20, 76:10

**unlike** [1] - 73:24

**unorthodox** [1] - 49:10

**unrealistic** [1] - 43:3

**unwarranted** [4] - 34:14, 35:7, 63:3, 74:13

**up** [37] - 7:14, 9:11, 9:13, 13:17, 16:19, 18:4, 18:8, 18:9, 21:25, 26:17, 31:16, 38:18, 43:12, 45:10, 45:19, 47:7, 48:15, 49:21, 50:13, 51:19, 51:21, 53:10, 58:25, 59:3, 59:16, 59:21, 60:2, 60:6, 60:17, 61:12, 68:11, 68:12, 68:17, 68:19, 73:1, 73:20, 74:9

**updated** [1] - 63:25

**upper** [2] - 46:18, 65:20

**uprising** [1] - 56:8

**upstairs** [1] - 60:17

**USA** [1] - 26:3

**USAO** [1] - 1:11

**uses** [1] - 14:9

**utilized** [1] - 40:21

## V

**vaccinated** [3] - 2:19, 3:9, 58:15

**vanguard** [1] - 51:4

**vantage** [1] - 41:9

**variety** [1] - 64:12

**versus** [1] - 2:3

**via** [5] - 1:22, 2:8, 2:9, 2:10, 49:7

**vice** [1] - 35:22

**Vice** [3] - 1:14, 16:3, 64:14

**victim** [2] - 63:17, 75:23

**victim's** [1] - 63:15

**victims** [2] - 63:5, 63:10

**video** [17] - 2:8, 5:5, 8:8, 10:24, 12:5, 12:7, 14:25, 15:20, 17:15, 17:25, 26:16, 48:11, 52:3, 66:23, 67:6, 68:4, 68:13

**videoconference** [4] - 1:22, 2:11, 2:12, 4:10

**videos** [22] - 5:4, 15:10, 16:20, 17:3, 22:20, 24:6, 24:8, 24:14, 24:18, 24:23, 25:8, 27:8, 40:19, 40:24, 41:12, 41:15, 66:6, 68:1, 69:21, 69:23, 71:2, 71:9

**videotapes** [2] - 29:3, 62:10

**view** [7] - 14:10, 15:14, 23:25, 52:4, 52:5, 54:12, 60:7

**views** [2] - 21:16, 52:1

**violation** [4] - 4:1, 4:11, 51:22, 64:4

**violence** [9] - 11:23, 24:11, 37:24, 38:22, 47:4, 48:14, 55:3, 60:8, 70:3

**violent** [1] - 36:5

**void** [1] - 80:20

**volatile** [1] - 65:21

**voluntarily** [2] - 44:12, 45:1

**voluntary** [3] - 23:17, 26:8, 71:12

**vote** [2] - 23:6, 66:19

**voter** [2] - 40:3, 65:14

**votes** [1] - 68:6

**vs** [1] - 1:3

## W

**waiting** [1] - 68:11

**waives** [1] - 77:23

**Wakefield** [1] - 1:16

**walk** [1] - 13:17

**walking** [1] - 70:21

**walks** [3] - 13:11, 15:22, 66:21

**wall** [2] - 59:19, 60:6

**walls** [1] - 65:2

**wants** [2] - 40:4, 40:8

**warrant** [2] - 20:10,

23:16

**Washington** [8] - 1:5, 1:12, 1:19, 3:14, 49:9, 65:13, 76:1, 78:2

**watch** [1] - 16:17

**watched** [1] - 27:8

**watching** [2] - 46:19, 70:9

**ways** [2] - 5:25, 6:2

**weapon** [1] - 28:4

**wearing** [1] - 16:24, 37:22

**wee** [1] - 38:11

**week** [4] - 20:1, 65:6, 65:7, 73:25

**weeks** [2] - 39:7, 71:10

**weighs** [1] - 73:10

**weird** [2] - 21:19, 32:23

**west** [2] - 65:18, 65:21

**western** [1] - 38:25

**Western** [1] - 55:16

**white** [2] - 37:6, 37:22

**whole** [4] - 13:4, 24:8, 36:25, 39:4

**wholesome** [1] - 21:23

**wide** [1] - 26:3

**widespread** [2] - 65:14, 70:5

**wife** [1] - 39:3

**willing** [1] - 54:4

**window** [25] - 11:16, 11:19, 13:17, 13:18, 14:2, 14:3, 14:6, 14:10, 14:11, 15:1, 15:2, 15:6, 17:10, 17:17, 25:14, 48:6, 65:3, 65:8, 65:9, 67:9, 67:10, 67:13, 73:19

**windows** [10] - 13:22, 16:5, 60:8, 65:25, 66:10, 66:24, 67:2, 67:7, 67:18, 70:9

**wing** [12] - 11:11, 11:17, 16:5, 16:18, 17:18, 28:11, 51:5, 65:8, 65:19, 66:21, 67:9, 67:18

**Wisconsin** [1] - 1:19

**wish** [1] - 6:21

**witness** [2] - 46:25, 47:14

**witnessed** [4] - 65:23, 69:1, 69:10, 71:9

**witnesses** [1] - 70:4

**witnessing** [1] - 68:17

**wolf** [2] - 28:9, 28:14

**woman** [1] - 51:19

**wonder** [1] - 44:6

**word** [4] - 22:12, 22:13, 35:10, 45:6

**words** [3] - 10:11, 24:15, 42:4

**world** [4] - 26:18, 44:6, 50:4, 56:23

**worse** [1] - 48:21

**worth** [2] - 25:18, 53:18

**wow** [1] - 45:3

**writing** [1] - 49:21

**written** [1] - 50:19

## Y

**year** [12] - 9:14, 20:23, 32:9, 32:10, 33:4, 39:2, 61:15, 63:24, 74:8, 76:23, 79:15

**year-old** [1] - 63:24

**years** [11] - 9:11, 10:4, 31:16, 31:17, 31:18, 33:1, 36:16, 44:17, 44:18, 74:10, 74:23

**years'** [1] - 32:20, 74:9, 75:12

**yelling** [3] - 13:22, 68:4, 68:13

**yourself** [1] - 44:22

**youth** [1] - 49:22

## Z

**zero** [2] - 8:22, 9:10